IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| SAVANNAH COLLEGE OF ART<br>AND DESIGN, INC.,<br><br>    Plaintiff,<br><br> v.<br><br>PHILIPPE HOUEIX,<br><br>    Defendant. | CIVIL ACTION FILE<br><br>NO. C-1-02 490 |

## DECLARATION OF BRIAN MURPHY

Pursuant to 28 U.S.C. § 1746, I, Brian Murphy, hereby declare as follows:

1. My name is Brian Murphy. I am of legal age and under no legal disability. I have personal knowledge of the facts stated in this Declaration and know them to be true and correct.

2. I am employed as the Executive Vice President of the Savannah College of Art and Design, Inc., also known as "SCAD."

3. SCAD is one of the best-known and most widely respected institutions of higher learning devoted to art and design in the United States.

4. SCAD was founded in 1978 and offers high quality instruction at the college level in the fields of design, the visual and performing arts, the building arts, and the history of art and architecture.

5. In the fall of 1998, SCAD advertised in Europe for an opening for faculty positions at the College. Philippe Houeix responded to the advertisement and applied for a position in interior design.



EXHIBIT
A

6.      SCAD subsequently entered into four written contracts with Houeix: (1) a contract dated February 8, 1999, pursuant to which SCAD retained Houeix as a part-time faculty member to teach during the summer quarter 1999; (2) a one-year contract dated May 15, 1999, pursuant to which SCAD retained Houeix to teach during the 1999-2000 school year; (3) a one-year contract dated August 16, 2000, pursuant to which SCAD retained Houeix to teach during the 2000-2001 school year; and a one-year contract dated April 18, 2001, pursuant to which SCAD retained Houeix to teach during the 2001-2002 school year. Houeix began teaching at SCAD during the summer quarter, June 1999.

7.      The principal accreditation body for the programs SCAD offers is the Southern Association of Colleges and Schools ("SACS"). In keeping with standards of accreditation, SCAD determined that it was prudent to review all faculty credentials as part of the institution's ongoing evaluation and assessment process. As a result of this review, SCAD discovered that Houeix's educational training in France was not the equivalent of a master's degree in the United States, but rather was the equivalent of an undergraduate degree. At the time of hiring Houeix, SCAD had understood that Houeix's educational background was the equivalent of a master's degree in the United States. As a result of this deficiency, SCAD required Houeix to enroll in a master's degree program in Interior Design to supplement his professional experience with additional academic work. SCAD only expected Houeix to enroll in one class per quarter, however, Houeix insisted that he be allowed to enroll in an additional class per quarter so that he could complete the degree on an accelerated basis. SCAD agreed to Houeix's request that he be allowed to take two classes per quarter at no expense to Houeix provided that Houeix execute an Agreement of Repayment.

ATL01/11628849v1

8.    In light of the unique situation of a faculty member taking courses and working on a degree, it was necessary to make individual arrangements for Houeix so that he could both fulfill his teaching requirements and continue to earn his degree. Accordingly, for a variety of reasons, SCAD and Houeix agreed that an individualized program of study should be created for Houeix wherein all of his classes would be in the form of a directed, independent study format.

9.    At the conclusion of the fall semester, SCAD issued grades to Houeix for his classes. At no time, either before or after receiving his grades, did Houeix ever complain in any way to SCAD that he was not receiving any course instruction. In fact, following the fall 2000 quarter, Houeix continued, without complaint, to enroll in classes towards his master's degree in the winter, spring, and summer quarters. In addition, Houeix continued to teach at SCAD through the same time period and continued to accept all of the compensation that was owed to him under the 2000-2001 Employment Agreement. Moreover, Houeix did not complain to SCAD about not receiving course instruction before he entered into the 2001-2002 Employment Agreement.

10.    After teaching classes at SCAD on September 12th and 14th of 2001, Houeix abruptly quit his employment at SCAD, an action that inflicted substantial hardship on the students and faculty of the interior design program and that was in direct violation of his employment contract with SCAD. It was only after Houeix sent his letter of resignation, that the College became aware that Houeix was alleging that SCAD had engaged in purported fraud by purportedly granting him academic credit for classes he did not attend. In fact, at no point in time during the sessions in which he was enrolled in the graduate program or employed by SCAD had Houeix ever complained to the school that he was being given credit for classes that he did not attend or for which he did not receive instruction, despite the fact that SCAD has an extensive faculty and student grievance process to which Houeix could have submitted his

- 3 -

purported "complaint." The proper procedure to resolve such a complaint would have been for Houeix to file a "student complaint," which, under the College's policies, would have been immediately reviewed and addressed by the institution.

11.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this *30th* day of March 2004.

BRIAN MURPHY

1        UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF OHIO

3        WESTERN DIVISION

4

5    _____
                                    )
     SAVANNAH COLLEGE OF ART &      )
6    DESIGN, INC.,                  )
                                    )
7           Plaintiff,              )
                                    )
                                    )    CASE NO.
8              vs.                  )    C-1-02-490
                                    )
9    PHILLIPPE HOUEIX,              )
                                    )
10          Defendant.             )
                                    )
11   _____)

12

13

14   Deposition of:   PHILLIPPE HOUEIX

15   Pursuant to:     Notice

16   Date and Time:   Thursday, January 29, 2004
                      9:30 a.m.
17

18   Place:           Porter, Wright, Morris & Arthur,
                      LLC
                      Suite 2200
19                    250 East 5th Street
                      Cincinnati, Ohio  45202
20

21   Reporter:        Linda Mallory, RMR, CRR
                      Notary Public - State of Ohio

22   Videographer:    Bruce Sandy, CLVS

23

24

25                  **ORIGINAL**

              *Elite Reporting Agency*
                  *513-632-5344*


EXHIBIT
B

1    A.    No.

2    Q.    Did you have any other offers of employment

3    after leaving Savannah?

4    A.    No.    I've been looking for some position as a

5    professor but, it's true, that after September 2001,

6    the situation was very difficult.    Then, also, I didn't

7    carry -- during more than seven months, I never -- I

8    didn't have any work permit because I was not allowed

9    to work.

10    So during that time I just contacted some

11    people that -- some company that could maybe create H-1

12    visa or to offer me an H-1 visa.    But the situation was

13    real difficult, the time was not good for that.    And

14    then after I started really to focus on my consulting

15    and to really work on that rather than to find the

16    work.

17    Q.    What seven-month period were you without

18    permission to work in this country?

19    A.    Because when I give my -- when I leave the

20    Savannah College Of Art and Design and when I give my

21    letter of termination, I was under a G-1 visa.    But

22    when I resign, you know, I lost this.    And so I wasn't

23    on my wife's visa and I became an H-4 order.    And with

24    an H-4 visa, you can't work, you're not allowed to

25    work.

1    Q.    What is H-4, is that tourist?

2    A.    No, you are the spouse of someone carrying an

3    H-1 visa.

4    Q.    Okay.  So your testimony is that, from

5    September 2001, when you resigned from the college --

6    A.    Yes.

7    Q.    -- for a period of seven months --

8    A.    Yes, up -- I don't remember exactly, but we

9    can recall the date, I couldn't work.

10    Q.    What is your visa status now?

11    A.    I've got a green card.  I'm a permanent

12    resident.

13    Q.    And your wife is, as well?

14    A.    Yes.

15    Q.    And you got that through the lottery?

16    A.    Yes, I did.

17    Q.    Okay.  When did you get the green card,

18    permanent resident status?

19    A.    I think it was beginning of 2003.

20    Q.    Sometime first quarter 2003?

21    A.    Yes, something like that.  I can't give you

22    the exact date.

23          MR. CROALL:  Off the record.

24          THE VIDEOGRAPHER:  Off the record.

25          (Off the record.)

1            THE VIDEOGRAPHER:  On the record.

2       Q.   Mr. Houeix, before we took the break we were

3  talking about your employment since leaving SCAD.  And

4  is it all right with you if I refer to the college as

5  SCAD, by its acronym, Savannah College of Art and

6  Design?

7       A.   Savannah College of Art and Design.

8       Q.   It is referred to in that way by others,

9  correct?

10      A.   By other, yes.

11      Q.   It is commonly referred to as SCAD?

12      A.   By mostly as Savannah College of Art and

13  Design.

14      Q.   After your resignation from SCAD, which I

15  think was September 2001 --

16      A.   Yes.

17      Q.   -- did you have any interviews for other

18  teaching positions?

19      A.   Yes, I did.

20      Q.   Where were those?

21      A.   It was in Dayton, in the community --

22  community college of Dayton.

23      Q.   Sinclair State?

24      A.   Sinclair State, yes.  So I went there for an

25  interview.  They were looking for an interior design

1    professor.  But it did not work out.  I think mostly

2    for -- I don't know, the reason what was given to me

3    was they didn't have the budget, really, for the

4    position so they didn't hire anybody.

5        Q.    As far as you know, they didn't hire anyone

6    for that position?

7        A.    From what I know, they didn't.

8        Q.    Did you discuss with them your degree, did

9    they -- were they satisfied with your educational

10   background and experience in terms of the position?

11       A.    Yes.

12       Q.    Did they tell you the position would require

13   a master's degree?

14       A.    But I have a master degree.

15       Q.    Okay.  Let's talk about that for a second.

16   Your educational background is what?  You graduated

17   from a school in France?

18       A.    In France, yes.

19       Q.    Which is called?

20       A.    Boulle.

21       Q.    Boulle, B-o-u-l-l-e?

22       A.    Exactly.

23       Q.    You were there for four years?

24       A.    Yes.

25       Q.    And what kind of degree is it?  I know there

1    was an issue --

2        A.    It's a fine art degree in the field what I

3    was following, which is interior design and product

4    design.

5        Q.    Interior design and product design?

6        A.    Yeah.

7        Q.    And do you have any degree beyond that?

8        A.    No.  I went to -- for my bachelor education,

9    I went -- after I left the school, I work for about a

10   year-and-a-half.  And then I went in the University of

11   Sunderland in England as an oversea student, mostly to

12   perfect my English.

13       Q.    That was a one-year in Great Britian?

14       A.    Yes.

15       Q.    That was primarily to work on your English

16   language skills?

17       A.    Exactly.

18       Q.    And you didn't get any degree from that

19   university, correct?

20       A.    I pass an examination called the Cambridge

21   examination at the end of this one year.  So I pass

22   this examination, called the first certificate in

23   English from the Cambridge University.

24       Q.    A certificate in English?

25       A.    Yes.

1      Q.    But no degree?

2      A.    No.

3      Q.    Wasn't a master's degree from Cambridge?

4      A.    No, it was not.

5      Q.    Okay.  And do you have any formal schooling

6   beyond that?

7      A.    No.

8      Q.    So you don't have a master's degree,

9   correct?

10     A.    I have a master degree from what the

11   accreditation said.

12     Q.    From who?

13     A.    The accreditation, the ECA, I think is the

14   accreditation agency.

15     Q.    One of the equivalency agencies, your

16   understanding was, said that you had a master's?

17     A.    Yes.

18     Q.    Did you see a document that said that?

19     A.    Yes.  It's an official document.

20     Q.    Okay.  Have you produced that to your

21   attorney, if you know?

22     A.    I don't know.  I think it should be in the

23   file.

24     Q.    Okay.  So your understanding is that one of

25   the accreditation or equivalency agencies that

1    evaluated your education said you had the equivalent of

2    a master's degree in fine arts or master's in interior

3    design?

4        A.    Interior design, yes.

5        Q.    And when did that evaluation take place, as

6    far as you know?  Is that while you were still at

7    SCAD?

8        A.    It was when I get to know my evaluation from

9    Paris in May.  So it should be -- I think June or July

10   2001, when I get this accreditation.

11       Q.    Other than the Sinclair State interview, any

12   other interviews for teaching positions after your

13   resignation?

14       A.    No.  I sent to two other institutions my

15   resume and my background, but I didn't get any

16   interview there.  I just receive a letter that I was

17   not for the position.

18       Q.    What institutions is that?

19       A.    The University of Cincinnati, I apply for a

20   position in which -- it was not exactly my main file,

21   which is product design.  So I apply for position in

22   product design, but I receive an answer that was -- I

23   was more an interior designer than product designer so

24   they were not able to hire me.

25            And I sent it also to another, I think,

```
 1   private education in Cincinnati, which is the Art

 2   School of Design in Cincinnati.  But the same thing, I

 3   send the letter, but they just sent me back a letter

 4   saying that they were not looking for my kind of

 5   profile.

 6       Q.   So no interview, no offer?

 7       A.   No.

 8       Q.   Again, after your resignation from SCAD, did

 9   you make application for or have any interviews for any

10   other sorts of jobs, nonteaching jobs?

11       A.   Yes, I tried.  I sent some resume, you know,

12   through different directions, different agency from

13   different states around.  But I think when I try that,

14   it was -- I don't know, I think it was difficult, the

15   situation, the economical situation was not so good.

16   Also, the fact that I was asking for H-1 visa, too,

17   didn't help.

18            I was saying to them that if they want to try

19   me, they had to apply for H-1 visa.  So everything was

20   more complicated.  So most of the time, you know,

21   people say that's fine, but we can't do that.

22       Q.   Okay.  So when you were pursuing those

23   positions, it was during that time when you were on --

24   was it the H-4 status?

25       A.   Yes, H-4 status.
```

1    Q.   And I take it you didn't get any interviews

2    as a result of those inquiries?

3    A.   Yes.   At the same time, the economical

4    situation after September 11 was not -- people were not

5    hiring people.   I think they were mostly trying to get

6    people out.   So I think it was a bad time to find a job

7    as a foreigner, asking for H-1 visa.   It was not a good

8    thing.

9    Q.   At the time you resigned from SCAD, your wife

10   was employed by the University of Cincinnati; is that

11   correct?

12   A.   Yes, she started to be employed by the

13   University of Cincinnati.

14   Q.   In late August, early September of 2001?

15   A.   She started in September 2001.

16   Q.   She continues to be employed there?

17   A.   Yes.

18   Q.   As an assistant professor?

19   A.   Exactly, in fashion design.

20   Q.   In DAAP?

21   A.   Yes.

22   Q.   Let's talk for a minute about the laptop

23   computer that SCAD provided to you during the time you

24   were employed there.

25   A.   Yes.

1      A.    I kept the laptop because the Savannah
2   College of Art and Design didn't pay my last paycheck.
3      Q.    Well, when you resigned, you left Savannah
4   and came to Cincinnati immediately, correct?
5      A.    I was -- I was traveling, you know, because I
6   was living already in Cincinnati when I started my work
7   in September at Savannah.  So I had to travel from
8   Cincinnati to Savannah by car so you can imagine how
9   difficult that could be.
10     Q.    When did you move to Cincinnati?
11     A.    I moved to Cincinnati the first of
12  September.
13     Q.    And classes at SCAD started September 12th?
14     A.    Exactly.
15     Q.    And you taught September 12th and you taught
16  September 13th?
17     A.    Yes.
18     Q.    And you resigned September 14th, correct?
19     A.    Yes.
20     Q.    And when you sent your letter of resignation,
21  were you physically in Savannah or Cincinnati?
22     A.    I was physically in Cincinnati.
23     Q.    You put it in the mail in Cincinnati?
24     A.    I sent by two way:  I sent it by e-mail and I
25  sent it by mail.

1    Q.    I'm sorry?

2    A.    The circumstances?

3    Q.    I'm not understanding.

4    A.    The circumstances that bring me to Savannah

5  College of Art and Design?

6    Q.    How did you learn about SCAD, how did you

7  become employed there, how did you --

8    A.    I learned about Savannah College of Art and

9  Design by a small ad on an English newspaper.  Because

10  I was spending my vacation, my summer vacation, in

11  England.  In the newspaper, I read an ad about a

12  college, a design college that were looking for

13  different position.

14        And so they were looking for a fashion

15  professor, for an interior designer, I think there were

16  six or seven different position.  And so I said to

17  Natalie that maybe that could be an opportunity maybe

18  to see something else, maybe to have another

19  experience.  Because I think we were still young and we

20  were still open to opportunities.

21        So we came back from our vacation in England,

22  so we arrived in France, we started again our business

23  and so we sent by -- I think it was by fax, we sent our

24  resume to the address that was on the ad.

25    Q.    Had you ever heard of SCAD before?

*Elite Reporting Agency*
*513-632-5344*

1        Q.    Okay.   During the conversations in the summer

2    of 2000, SCAD told you that, if you wanted to continue

3    your employment as a professor, they were satisfied

4    that you had the equivalent of at least a bachelor's

5    degree but they needed you to start working towards

6    your master's in the U.S.?

7        A.    Yeah.

8        Q.    And they asked you to do that one course per

9    quarter, correct?

10        A.    Yes.

11        Q.    And as part of your benefits as a professor,

12    you got, at no charge, the ability to enroll in one

13    class per quarter, correct?

14        A.    Yes.

15        Q.    And you responded to SCAD by saying you

16    wanted to do it faster than that?

17        A.    No.   I think you miss a step.

18        Q.    Tell me what step I missed.

19        A.    The fact that the question was raised after

20    the credentials arrive about my -- the fact that I --

21    my diploma was the equivalent of a bachelor degree.   So

22    the question was raised about to get a master degree.

23    And so the question was raised about which type of

24    master degree I should do.

25        Q.    You wanted to do it in architecture?

1   ask me that before, before -- because I think when we

2   discuss our background and our CV, I think it was in

3   October '98, you know.  And so they never raised any

4   question about my education and my background and I

5   never lied about it.

6           So I think it was -- it came late, you know,

7   because even in France I could have started this

8   process.

9       Q.   Because that process takes about a year,

10  right?

11      A.   Yes, it takes a year.  Because you have to

12  re-collect all your work.  You have to rebuild a

13  complete -- it takes an extremely long work.  And you

14  have to go to commission, you have to -- so I think

15  even the commission, I think it's very difficult to

16  bring together, so it's a very long process.

17      Q.   So your point was, if you had been told about

18  it sooner, you could have started the process sooner

19  and maybe could have gotten the master's?

20      A.   And avoid all this mess.

21      Q.   Have you ever done that, gone through that

22  process?

23      A.   Yes, I went because, when I discover that the

24  master degree was necessary and it was possible for me

25  to do it in France this way, I did it.  I think it was

1    wise to do it.  So --

2         Q.    Did you -- were you awarded the master's

3    through that process?

4         A.    Yes.

5         Q.    When was that?

6         A.    It was at the end of 2000.  I started the

7    same -- I started, I think it was in May 2000.  Up to

8    May 2001, during all that year, I work on this

9    project.

10        Q.    When was the equivalency awarded in France?

11        A.    I had my interview in France, I think it was

12   the -- I travel from Savannah to Paris to have this

13   presentation in Paris.

14        Q.    When?

15        A.    I think it was in May because I had to miss

16   classes and SCAD -- Savannah College of Art knew it.

17        Q.    In May of 2001?

18        A.    Yes.

19        Q.    And by that point you had a pretty good idea

20   that you would not be completing the next school year

21   at SCAD, right?

22        A.    I think in May, yes, because --

23        Q.    Your wife was no longer employed at SCAD?

24        A.    She was not employed anymore at SCAD.  And

25   the way she was terminated was reflecting an attitude

1    wanted it to be interior design so you --

2        A.    They didn't give me any choice.

3        Q.    So you did that?

4        A.    I had to go through the whole process and I

5    have to do it completely by myself.

6        Q.    And they -- again, they told you one course

7    per quarter would be okay with them?

8        A.    Yes, because I think they wanted to keep me

9    as long as possible.  I think it was the goal of their

10   investment, in one sense, to try to keep people as long

11   as they can.

12       Q.    What was your understanding about what their

13   requirement was for getting a master's, how many

14   classes would you have to take, how many hours?

15       A.    Yes, I had a very good understanding because

16   I had taught, you know, graduate classes before at SCAD

17   Savannah.  So I knew what was exactly the curriculum

18   for them.

19       Q.    How many classes would that require for the

20   MA -- or is it MFA?

21       A.    MA.  It's an MA.

22       Q.    MA in interior design?

23       A.    Yes.  I think it required twelve, I don't

24   remember.

25       Q.    You think twelve classes?

1   A. Yes.

2   Q. You approached the SCAD administration and

3 said you wanted to take two classes per quarter,

4 right?

5   A. I didn't approach them.  We had a meeting.

6 It was said by the vice-president of academic affair,

7 Francis Wong, with the chair of the interior design

8 department, which was Crystal Weaver.  And then the

9 discussion was very simple, they say that if I wanted

10 to have my contract renewed, I had to register in

11 interior design master.

12   And so I express that I thought it was maybe

13 a little bit ridiculous to go to class with other

14 student or to -- I don't know, I think I didn't feel

15 that I needed that at all.  But they said they have to

16 do it and so I said okay.

17   But I express the wish, rather than to do it

18 in two years, to do it in one year.  Because I think it

19 was not necessary to spend two year to have a master

20 degree in Savannah College of Art and Design.  I think

21 it was a waste of time.

22   Q. So you wanted to do it in one year?

23   A. Yeah.

24   Q. Which would require two courses per quarter

25 and three courses in the summer?

1    me by the vice-president and the chair of the interior

2    design department.

3         Q.    Well, you were permitted to take two courses

4    per quarter, correct?

5         A.    Yes, I was.  But, normally, all this cost

6    should have been paid as a way of the fact that they

7    oblige me to take master degree and so they pay for it

8    as I am a professor.

9         Q.    They did pay for it, correct?

10        A.    No, I had to re-sign an agreement for $5,000.

11        Q.    You didn't pay anything to SCAD for any of

12    the master's courses, correct?

13        A.    No, but I signed a paper for that.

14        Q.    Okay.  You signed a repayment agreement?

15        A.    Yes.

16        Q.    You understood that that repayment agreement

17    said, in essence, if SCAD allowed you to take the

18    master's courses, two per quarter, and you left SCAD in

19    less than one year after the master's degree was

20    awarded to you, then you would owe SCAD the tuition for

21    those courses?

22        A.    Yes.

23        Q.    You understood that?

24        A.    Yes, I understood that.

25        Q.    Tell me about -- was Crystal Weaver the dean

1       Q.    Okay.   Is it fair to say that the longer you

2   were at SCAD, the more distrustful you became about

3   SCAD?

4       A.    No.

5       Q.    No?

6       A.    No, because at one time I was -- I knew that

7   I will have to rebound from this, so I was not angry

8   anymore.   I think I been very angry when I started the

9   master process, when I had this question about my

10  accreditation things because --

11      Q.    The summer of 2000?

12      A.    -- that really affect my credibility, my

13  honesty and everything because suddenly people said to

14  you, well, maybe you lied, maybe it was not really what

15  you said, all this kind of position that can come on

16  this.   That is really -- it's not really good, you

17  know, when you feel that somebody, oh, you don't

18  have -- you are not accredited.

19          All that has really affected me on my time.

20  And at that time, I think during the summer, I spent

21  really an awful summer.   And it was very difficult to

22  share that with my children that were there, et cetera.

23          After it was over, I think I turned the page

24  at that time.   I had to find -- my wife have to find

25  another position, we have to go to move along with all

1       Q.    Did you look at other cities as possible

2    places to move?

3       A.    I think the interest of -- the way -- I think

4    as everything was in jeopardy in Savannah, you know,

5    because I think all our life was completely in jeopardy

6    so we have completely to rethink our future.  And I

7    think what is more important for us is the interest to

8    the work.  So the most interesting place would be where

9    we would be living.  That decision has been made only

10   on the interest of the position.

11      Q.    In the fall of 2000, after SCAD had told you

12   you needed to enroll in the master's program and had

13   said you could enroll in two classes per quarter if you

14   signed the repayment agreement, you enrolled in a

15   couple of classes, right?

16      A.    Yes, I had to enroll in the classes.

17      Q.    And do you recall what those classes were at

18   the start of the fall of 2000?

19      A.    I think it was a lecture, which is kind of

20   history of interior design.  And the other classes is

21   studio, I don't recall the number exactly.

22      Q.    Interior Design Seminar and Interior Design

23   Studio One?

24      A.    Uh-huh.

25      Q.    You signed up for those two classes?

1   correct?

2       A.   Yes.

3       Q.   The quarter ended probably December 10th or

4   something?

5       A.   No, because they fired her the last day of

6   class.  So it's much better for them to fire people

7   because they've got a break to smooth the process.

8            So it's true that I was -- all our life was

9   just completely in jeopardize.  She was not paid her

10   last pay.  Also, I think, two paycheck was not paid.

11   We had only one wages.  She lost, automatically, her

12   visa status.

13            So it's true that, starting at that point,

14   you know, I think we try really hard to imagine what we

15   could do to move on, you know.  And that was my main

16   focus.

17            And it's true that when I receive my grade, I

18   just laugh.  It started to be even more crazy, you

19   know, to receive grades for class that you don't take,

20   that you don't do any work on it and you've got

21   grades.

22       Q.   What grades did you receive on your grade

23   report?

24       A.   Two A, I think.

25       Q.   Did you go to Dean Weaver and question her

1    about that?

2        A.    No.    I went to Dean Weaver to know what was

3    the next step for me, if I would be fired or not.

4        Q.    She told you no, right?

5        A.    Right.

6        Q.    She said what happened to Natalie has nothing

7    to do with you?

8        A.    Exactly.

9        Q.    Did you ask her about the grades?

10        A.    No.

11        Q.    Did you ask her about --

12        A.    I didn't ask any question.

13        Q.    Okay.

14        A.    Because it not worth it.

15        Q.    Did you ask anybody about what classes were

16    next or is the master's program pretty well set out

17    that you do design studio one and then interior design

18    studio two is next?

19        A.    As I told you, as I was obliged to register

20    in the master's degree, I had defined during the

21    meeting that we had with vice-president of academic

22    affair, Crystal Weaver, we have decided all the

23    different class that I should register.

24        Q.    You set out the whole program at that

25    meeting?

1    A.   Yes.

2    Q.   So if I understood your testimony, when SCAD

3  told you they were going to require you to take

4  master's classes, your view was that you already had

5  the equivalent of a master's through your professional

6  work, correct?

7    A.   No.  At that time I was -- I would be able

8  maybe to do it in France.

9    Q.   Right, through France.

10    A.   That require works, to put down all my work

11  for 20 years and to bring that as a thesis in one

12  sense, a body of work that you are to present to a

13  jury, professional jury.  So that was one thing.

14        And then, on the other way, there is --

15  Savannah College of Art was really asking me to do that

16  as part of my employment, of my contract.

17    Q.   Right.  But you didn't feel like you were

18  really going to learn anything through a master's of

19  interior design program, is that a fair statement?

20    A.   Yes, because I taught graduate classes, I

21  know what the other professor were teaching, so I have

22  a clear understanding of what was the classes.

23    Q.   You already knew all of the stuff that would

24  be included in a master's in interior design program?

25    A.   Yes.

1    Q.    So that's why you wanted to do

2    architecture?

3    A.    Because at least I would learn something.

4    Q.    You would have learned something.  And

5    through the master's of interior design, you really

6    wouldn't learn anything new?

7    A.    No.

8    Q.    You testified that you didn't do any work in

9    connection with any of those classes?

10    A.    Yes.

11    Q.    But at least according to the SCAD's student

12    records, you took -- I think it's eight or nine classes

13    and got As in all but one of them and the master's

14    thesis, you got an incomplete, which ultimately, I

15    think the next quarter, when it wasn't completed,

16    converted to an F?

17    A.    Right.

18    Q.    You've seen those records?

19    A.    They were sent to me, to my address.

20    Q.    Right.  How do you think you were harmed by

21    the master's program at SCAD?  I guess I'm struggling

22    with how you think that damaged you in some way.

23    A.    Because I was part of a fraudulent process.

24    They were using me because I was obliged to register to

25    classes, I have to -- I have got some records with my

1    training in law?

2        A.    No.

3        Q.    Your schooling in England didn't include any

4    training in law?

5        A.    No.

6        Q.    And you haven't had any legal training in the

7    United States; is that correct?

8        A.    Yeah.

9        Q.    Okay.  So what you just said is based on just

10   your own understanding as an interior designer?

11       A.    Yes, and U.S. citizen.

12       Q.    You did teach the full 2000-2001 school year

13   at SCAD, correct?

14       A.    Correct.

15       Q.    You were paid the full amount reflected on

16   page two, correct?

17       A.    Uh-huh.

18       Q.    Subject to taxes and all that?

19       A.    Yes.

20            MR. REBEL:    Can we go off the record?

21            MR. CROALL:    I'd rather not.

22            MR. REBEL:    He gave the correct answer.

23            MR. CROALL:    For the 2000-2001 school year?

24            MR. REBEL:    Yes.

25       Q.    You were paid this full amount, weren't

1    you?

2         A.    Except the last paycheck.

3         Q.    Well, that was the 2001-2002 school year,

4    wasn't it?

5         A.    No.

6         Q.    You taught in September 2001 --

7         A.    No, the last paycheck was about this.

8         Q.    You think the last paycheck was under this

9    contract?

10        A.    Yes.  Because the other contract starts from

11   September to September.

12        Q.    This contract, I think, just goes through May

13   31st, 2001, right?  Top of page four, begins September

14   13, 2000 ending May 31, 2001?

15        A.    Uh-huh.

16        Q.    Is that what it says?

17        A.    Yes.

18        Q.    Top of page four.

19        A.    Yes.

20        Q.    Is it your testimony that you were not paid

21   everything that was due to you through May 31st,

22   2001?

23        A.    Up to May 31st, yes.

24        Q.    You were paid everything that was due to you,

25   correct?

1      A.    Yes.

2      Q.    So you were paid everything that was due

3    under this agreement, right?

4      A.    Carry on up to my summer courses.  Because

5    the other --

6      Q.    Was that your understanding, that this

7    agreement carried beyond May 31st?

8      A.    It is -- yes, because there is no document

9    from this part up to the end of September -- to the end

10   of August.

11     Q.    This agreement doesn't cover summer classes,

12   does it?

13     A.    It does, because there is no document for the

14   summer classes.  So it does.

15     Q.    So because there's no other document that

16   covers summer classes, you think this one must?

17     A.    I think so.

18     Q.    Okay.  Can you explain to me how this covers

19   summer classes, where at the top of page four it says

20   the term of employment is for the 2000-2001 academic

21   year with classes beginning September 13, 2000 and

22   ending May 31st, 2001?

23     A.    Because no other contract was signed for the

24   summer classes.

25     Q.    So there was no contract for summer

1    classes?

2        A.    So there's maybe a lack of contract.

3        Q.    Did you understand that some contract covered

4    your summer classes for the summer of 2001?

5        A.    This contract should have, yes.

6        Q.    You understood that this contract did?

7        A.    Yes.  Because I was linked with the

8    university -- to the college with all of the summer

9    classes with this contract because no other contract

10   was there.  And the contract that I had signed started

11   only in September.

12       Q.    Have you ever heard of employment that

13   didn't --

14       A.    I think you're employed or you're not

15   employed.  You're employed under an agreement or you're

16   not employed.  And during the summer, I was working

17   under which agreement?  Under this one because it was

18   the only one that was still on the 2001 year.  So I

19   started the 2001 year in September.

20       Q.    You think it's impossible to be employed

21   without a contract?

22       A.    Yes, for me, it's impossible.

23            MR. CROALL:  Okay.  Why don't we -- we can go

24       off the record.

25            Why don't we take a break here?

1      A.    And so as I help a lot of students, the

2    student used to sign, you know, on this poster, which

3    was quite a big poster.  And for me, kind of memories

4    about that time, but I didn't take that part back.

5      Q.    Did you ever ask the school for any of those

6    items back?

7      A.    No.

8      Q.    When we were talking about the master's

9    program before the lunch break and the grades that were

10   recorded on your record, did you ever go through any

11   kind of complaint process at the school about having

12   received those grades that you didn't think you

13   deserved?

14     A.    No, because my -- once again, I can say to

15   you that we are a couple, I live with my wife, and so

16   that's when I receive my first grades, my wife was just

17   terminated.  And so I just discover, you know, the

18   whole process of how people used to deal with the

19   individuals and the way -- the careless way they did

20   it.  So --

21     Q.    The careless way they did it, is that what

22   you said?

23     A.    Yes.  And also, so there is -- in termination

24   practice, you've got the possibility to do an appeal in

25   the SCAD handbook.  So we did that.

1     Q.    Natalie did appeal?

2     A.    Yes, we did appeal the decision.  So we went

3 back all the process.  We wrote everything to be in

4 track with the application, so we thought that it would

5 be -- normally things should come back to the normal.

6 And then we just discover how everything was fake, you

7 know.  Because the whole process was just to make you

8 lose some more time.

9          But it was already the same person that would

10 review your things.  So, you know, it's only a handful

11 of people that administrate the school and they just do

12 whatever they want, just regardless of even the paper

13 they make you sign.

14     Q.    So Natalie didn't get anywhere with her

15 appeal of her termination?

16     A.    No.  She had exactly the same committee in

17 her appeal that she had -- that the people that were

18 firing -- terminating her with no reason.

19     Q.    Okay.  So because of her experience with

20 that, you didn't ever make any appeal on your grades?

21     A.    No, because I think it was useless to do

22 that.  I think this institution has not the character

23 and integrity and honesty that should be in this kind

24 of schools.

25     Q.    So you never complained to Dean Weaver

1    about --

2        A.    No.

3        Q.    -- the master's program?

4        A.    They did whatever they want.  That is not

5    my --

6              (Plaintiff's Exhibit Number 7 was marked for

7              identification.)

8        Q.    Mr. Houeix, let me hand you what's been

9    marked as Exhibit 7 for your deposition.  That's a

10   letter from Mrs. Clinard to you, correct?

11       A.    Yes.

12       Q.    It appears it was a cover letter to your

13   2000-2001 employment agreement, right?

14       A.    Yes.

15       Q.    And she's confirming that your credential

16   file was complete, right?

17       A.    Yes, this is what she wrote.

18       Q.    And she's confirming what you had already

19   been told in the meeting that you testified about

20   earlier that your contract was contingent on your

21   enrolling and completing one course per quarter in the

22   MA program, correct?

23       A.    Yeah.  But that is not what was said in the

24   meeting that I had with Crystal Weaver.

25       Q.    Because you had already talked about the two

*Elite Reporting Agency*
*513-632-5344*

1    BY MR. CROALL:

2         Q.    Mr. Houeix, I just wanted to confirm that

3    during the break you provided to us, through counsel,

4    the lab-top computer and we now have, at long last,

5    taken custody of it.

6         A.    Uh-huh.

7         Q.    And I wanted you to confirm on the record

8    that, included in the case, is all the extra battery

9    pack, cords, everything that you have --

10        A.    Yes.

11        Q.    -- that you believe goes with the Dell

12   laptop?

13        A.    Yes.

14        Q.    And that, as of last week or earlier this

15   week, as far as you know, it was in good working

16   condition?

17        A.    It is in good working condition.

18        Q.    And that the software that was installed on

19   it when you got it is still on it?

20        A.    Yes.

21        Q.    Okay.  You testified when I was asking you

22   about the work you're doing currently for Zodiac that

23   the work from them has been steadily increasing?

24        A.    Yes.

25        Q.    And I assume that that's reflective of them

1    being satisfied with your work?

2         A.   Yes.

3         Q.   And I assume they've told you that they're

4    happy with your work?

5         A.   Yes.

6         Q.   And that they intend to keep giving you

7    work?

8         A.   Yes.

9         Q.   And as far as you know, your reputation with

10   Zodiac, your reputation as a designer is very good?

11        A.   Is good with the person inside, yes.

12        Q.   Is it pretty much one person you deal with?

13        A.   Mostly, yes.

14        Q.   Who is that?

15        A.   It's the director of the company.

16        Q.   Who is that?

17        A.   Jill Grlnd.

18        Q.   I'm sorry?

19        A.   Jill Grlnd.

20        Q.   Spell the last name.

21        A.   G-r-l-n-d.

22        Q.   He is based in Paris?

23        A.   No, he's based in Meluse, next to Basil in

24   Switzerland.

25        Q.   Okay.  Do you have any reason to believe that

1    your reputation as a designer is anything other than

2    very good in Europe?

3        A.    Yes, I think so.

4        Q.    You think it is very good?

5        A.    I think it's good.  Very good, I don't know

6    what mean very good, but I think it's good.

7        Q.    Based on your career there --

8        A.    Yeah.

9        Q.    -- and your continuing work there --

10       A.    Yeah.

11       Q.    -- do you have any -- as far as you know, do

12   you have a reputation as a designer in the United

13   States?

14       A.    No.

15       Q.    Because you haven't worked as a designer

16   here?

17       A.    Yes.

18       Q.    Okay.  As far as you know, do you have a

19   reputation as a professor in the United States from

20   your three years at SCAD?

21       A.    I can say that it was successful things about

22   education because the students were really happy of

23   what I was teaching to them.  To know if that would be

24   the career that I would carry in the United States, I

25   don't know.  It's just that it was, I think, a good way

1    to approach the design in United States.  That is very

2    important.  That was what was my goal when I came here.

3    And, unfortunately, for the moment, it's on stand-by

4    completely.

5         Q.    And at this point it's just too early to tell

6    whether you will pursue an academic career in the

7    United States or a design career living in the United

8    States and either working primarily in Europe or

9    working both in the U.S. and Europe?

10        A.    Yes.  As long as the story is on, I think

11   it's going to be like that.

12        Q.    In any of the academic jobs that you've

13   approached, applied for, sent a letter about, have any

14   of those institutions ever expressed any concern about

15   what happened at SCAD?

16        A.    I'm extremely -- it's extremely difficult for

17   me to present myself for a position in the United

18   States because, generally, people ask to have some

19   recommendation letter from the college you were before.

20   And I don't see myself asking to Crystal Weaver or to

21   Mr. Brad Murphy or to the human resources to write me

22   letter of recommendation.

23              So, it's true, that I try to be completely --

24   I don't even start to talk about the Savannah College

25   of Art and Design because it's such a -- it's still

1    pending what I would say.  When I present myself, I

2    start -- I talk about my professional experience and

3    what I've been doing.

4            So when you apply for teaching position,

5    people are asking you what have you done before as a

6    teacher or professor.  And so that's much more

7    difficult to present yourself.

8            And also, as far as the fact that my name now

9    is completely with all this story about the

10   accreditation, about what is really the level of my

11   diploma, et cetera.  Everything has been tarnished, you

12   know.

13           So it's very difficult to -- I don't feel

14   comfortable myself about, you know, about all that.  I

15   would like that to be cleared, what's wrong, what's

16   right.  I think that is my main concern.

17      Q.   Have you ever asked anybody at Savannah

18   College of Art and Design for a reference letter?

19      A.   No, except when I talk to you about Crystal

20   Weaver, when I was still employed and I asked her write

21   a letter for the NCIDQ.

22      Q.   But after your resignation, you never asked

23   anybody?

24      A.   I never contacted.

25      Q.   Didn't ask your department chair?

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SAVANNAH COLLEGE OF ART
AND DESIGN, INC.,

        Plaintiff,

    v.

PHILIPPE HOUEIX,

        Defendant.

Case No. C-1-01 490
(Beckwith, J.; Hogan, M.J.)

*Defendant's Answers to*
## PLAINTIFF SCAD'S FIRST SET OF INTERROGATORIES TO DEFENDANT PHILIPPE HOUEIX

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Savannah College of Art and Design, Inc. ("SCAD"), hereby serves these interrogatories upon Defendant Philippe Houeix ("Houeix"), and requests that Houeix serve upon SCAD sworn answers to each Interrogatory in writing within thirty (30) days of service hereod.

Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these interrogatories are continuing in nature so as to require supplemental answers is Houeix obtains information on the basis of which he knows that a prior response was incorrect when made, or if Houeix knows that the response, although correct when made, is no longer true and the circumstances are such that a failure to amend the response is, in substance, a knowing concealment.

### DEFINITIONS AND INSTRUCTIONS

SCAD incorporates herein the Definitions and Instructions set forth in SCAD's First Requests for Production of Documents, served concurrently herewith.



EXHIBIT
C

## INTERROGATORIES

1.    Identify and describe in detail each contractual obligation by SCAD that you allege SCAD has breached, including in your response an identification of each writing in which you allege each obligation is memorialized.

**ANSWER:**

Plaintiff had the obligation to perform its contract in good faith. It is liable for its agents' failure to perform its Employment Agreements dated 8/16/2000 and 4/18/2001 and the Prepayment Agreement dated 9/13/2000 in good faith. Sections No. 1 Appointment, No. 2.A Duties, and No. 4 Service to College (Employment Agreements) grant the discretion to the Plaintiff. Such discretion was not exercised in good faith.

The Employment Agreements incorporate the Handbook that describes the tuition benefit of payment of one course per quarter, at page III.25. the Prepayment Agreement dated 9/13/2000 refers to this benefit. Plaintiff was obligated to provide instruction for courses in which tuition was waived or charged Defendant. Plaintiff failed to perform the contract by failing to provide the instruction for the master program classes.

2.    With respect to each contractual obligation that you identify in response to Interrogatory No. 1 above, identify and describe in detail the manner in which SCAD allegedly breached each obligation.

**ANSWER:**

Plaintiff has the contract discretion to require Defendant to attend its Master Program classes and obtain a Masters degree. Such discretion was not exercised in good faith, since it required Defendant to be a part of an unethical, fraudulent grading scheme to award a Masters degree. It required Defendant to violate OCGA §20-1-7. Plaintiff breached the 8/16/2000 Employment Agreement beginning in the Fall of 2000 through the end of the contract term by awarding Defendant grades and giving course credit for courses that Defendant did not attend and for which he did not complete any course work.

Plaintiff breached its 4/18/2001 Employment Agreement from shortly after 4/18/2001 through the present time, by awarding Defendant grades and giving course credit for courses that Defendant did not attend and for which he did not complete any course work or for courses that did not exist.

Since the fraudulent grades continue as an official record of Plaintiff college the breaches of both employment agreements continue.

Plaintiff was obligated to provide instruction for courses in which tuition was waived or charged Defendant. Plaintiff failed to perform the contract by failing to provide the instruction for the master program classes.

3.    Identify with specificity each item of damage you claim to have suffered as a result of

SCAD's alleged breach of contract, and identify the dollar amount of each item of damage you

claim.

**ANSWER:**

Defendant's damages are the agreed compensation for 2001–2002 school year of about $39,000.00 plus the probable summer quarter salary of $ 4,800. Defendant's damages include a reduced professional reputation by participation in the fraudulent scheme that violates of Georgia law, OCGA § 20-1-7. Defendant's ability to obtain employment as an instructor have been reduced. Damages are in the amount of $100,000.00.

Plaintiff withdrew $1,215.48 from Defendant's bank account on September 17, 2001.

Plaintiff was enriched by its breach since its accreditation status was enhanced by the fraudulent grading scheme. The value of the enrichment is $100,000.00.

Defendant was obligated to sign the September 13, 2000 Agreement of Repayment for courses that were not attended or not taught. Plaintiff promised to waive tuition, page III.25 (Faculty Handbook) for one course per quarter. Plaintiff is obligated to provide instruction for courses for which tuition is waived or charged to Defendant. Plaintiff failed to perform the contract by failing to provide the instruction for the master program classes. These damages amount to $ 16,500.

The fraudulent scheme was to create academic grades and credits for master courses and examinations that were never taken, for classes that were never attended, or never existed. The scheme misrepresents to the college accreditation association, SACS, that Plaintiff's master degree program for its instructors meets accreditation standards. Master degrees that were awarded under such scheme enhanced Plaintiff's accreditation. Plaintiff was enriched by its breach since its accreditation status was enhanced by the fraudulent grading scheme. The value of the enrichment was $100,000.00.

4.    State the factual basis for each item of damage identified in response to Interrogatory No. 3

above, including a full computation of each item of damage.

**ANSWER:**

The agreed compensation for the school year was $39,000.00 plus the compensation for teaching summer classes ($4,800.00). The basis of this are the Employment Agrement (April 18, 2001) term 2.A and prior compensation for summer teaching.

The damages for loss of professional reputation are assessed at $100,000.00, since Defendant will necessarily disclose to an educational institution or other potential employer, that the course transcript from Plaintiff was fraudulent and that he was a participant in the scheme. This affects Defendant's ability to obtain employment as an instructor. The scheme is in violation of a OCGA §20-1-7. The basis is the experience and knowledge of the trier of fact. Perhaps an expert will testify

Plaintiff was enriched by the fraudulent grading scheme since its accreditation was enhanced by its breach.

5.    Identify and describe in detail all work that you performed as part of any masters degree

course that you were enrolled in at SCAD.

**ANSWER:**

No work whatsoever was done by Defendant as part of any master degree course. Discussions were with Crystal Weaver on two occasions during the fall of 2000. Initially, Defendant spent several hours on assembling background information for a design project. Defendant's efforts ended when he was told not to sweat it and to concentrate on teaching, by Crystal Weaver.

6.    Describe in detail and identify all instances in which you met with any instructor or faculty

member of SCAD to discuss any course requirements or work to be performed or that was performed

by you in connection with any masters degree course that you were enrolled in at SCAD.

**ANSWER:**

There were no meetings with instructors, except the meeting with the acting Dean and Chair person of the Interior Design Department, Crystal Weaver (as noted above). Defendant during September 2000, briefly responded to office-mate, Gillian Davies. She expressed surprise that Defendant was on her class roster for INS 702, Interior Design Seminar. Defendant replied that SCAD required him to enroll. Nothing further was said to her concerning the class. There were no subsequent discussion concerning the class. Gillian Davies at first gave an "I" for the course. Defendant did not request a grade change, but the grade was changed to an "A." E-mail to C. Weaver dated 3/2/2001 from Defenddant and copy of Crystal Weaver's e-mail dated 5/22/2001.

7.    Describe in detail and identify all instances where SCAD requested that you reimburse SCAD

for any tuition for any masters degree course that you were enrolled in at SCAD.

**ANSWER:**

Plaintiff's attorney, Kirby Mason, stated that Defendant owed Plaintiff $16,650.00 for master degree
courses in his letter dated October 8, 2001.


8.    Describe in detail and identify all instances, if any, where you paid SCAD tuition for any

masters degree course that you were enrolled in at SCAD, including in your response any amounts

paid and the dates any such amounts were paid to SCAD.

**ANSWER:**

Defendant paid nothing to Plaintiff.  From the Defendant's checking account $1,215.48 was
withdrawn by Plaintiff on September 17, 2001. The tuition waiver of one course per quarter was a
contract promise made by Plaintiff.


9.    Describe in detail all facts and circumstances that support any contention that SCAD required

you to enroll in masters degree courses at SCAD as opposed to some other college or university.

**ANSWER:**

Susie Clinard's letter dated August 16, 2000, second paragraph.  Defendant's July 17, 2000 letter.
Francis Wong's July 20, 2000 e-mail that summarizes a meeting.  Susie Clinard's e-mail of
8/21/2000 and 8/26/2000.Various communications between plaintiff's agents and defendant are
provided in response to the Request for Documents and establish the above, including e-mails &
replies to e-mails dated 7/20/2000, 8/16/2000, 8/21/2000,  8/28/2000, 8/30/2000,  8/31/2000.


10.    Describe in detail all facts and circumstances that you contend support your contention that

the Agreement of Repayment between you and SCAD of September 13, 2000 is a part of the

Employment Agreements between you and SCAD.

**ANSWER:**

August 16, 2000 letter by Susie Clinard, e-mail by S. Clinard 8/21/2000 and the 9/13/2000 Repayment Agreement. S. Clinard e-mail August 30, 2000. Plaintiff required Defendant to enter the Agreement of Repayment as a part of the consideration it received from Defendant. 8/26/2000. Various communications ( e-mails & replies to e-mails dated 7/20/2000, 8/16/2000, 8/21/2000, 8/28/2000, 8/30/2000, 8/31/2000, plus e-mails dated 9/5/2000, 9/7/2000, 9/11/2000) between plaintiff's agents and defendant are provided in response to the Request for Documents which establishes that the executed Agreement of Repayment was a requirement for employment of Defendant. See answer to No. 11.

11.    Describe in detail all facts and circumstances that support any contention that SCAD was

required to provide class instruction to you as part of any employment agreement with SCAD.

**ANSWER:**

The above described manifestations (Clinard's 8/16/2000 letter) that additionally Defendant's contract is "contingent upon enrolling and completing one course per quarter until you complete an M.A. in Interior Design." August 28. 2000 e-mail from S. Clinard describes course instruction as a contract benefit. Implicit that if obligated to pay for course, school is obligated to teach course to Defendant. The tuition refund benefit of the Employment Agreement manifested that the courses would be taught. Also the e-mails identified in Answers to Nos. 9 & 10.

12.    Describe any relationship or affiliation between you or the Defendant's Web Site and

WorldStudent.com or the Web Site located at the URL <www.worldstudent.com>.

**ANSWER:**

Defendant and his Web Site have no relationship or affiliation with Web Site WorldStudent.com, or <www.worldstudent.com>. Defendant's Web Site links to <www.worldstudent.com/uk/na/features> because it is the hub or node linking to 100 sites of various national education ministries that deal with accreditation.

13.    Identify and describe in detail all facts and circumstances that you contend support your

Counterclaim for Breach of Contract.

**ANSWER:**

Facts and documents stated above in responses to Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11.

Communications with Defendant, Francis Wong, Susie Clinard, and Crystal Weaver show that the

Employment Agreements were contingent upon Defendant's obligation to enroll in Master degree courses at Plaintiff's college and to obtain a Master Degree.

Good Faith is violated by requiring Defendant to violate OCGA § 20-1-7 and good faith is violated by Plaintiff's fraudulent grading scheme.

Testimony of the following instructors (identified below) and their records will corroborate that Defendant did not attend the Master Degree courses.

The teaching schedule and graduate student class schedule of Defendant will also demonstrate this. The change of grade forms will verify this.

Testimony of instructors who gave grades to students for classes not attended or who change grades for students so that students might teach at Plaintiff's college.

Testimony of registrar and others as to why Defendant's grades were changed.

14.    Identify each and every person who was consulted or provided information in connection with the preparation of your answers to the foregoing interrogatories, or provided information or documents in connection with your responses to SCAD's First Requests for Production of Documents, and state, for each such person, the interrogatory(ies) or document request(s) in connection with which he or she provided information, documents or was consulted.

**ANSWER:**

15.    Identify all individuals with knowledge of the facts set forth in response to Interrogatory No. 2 above, and, for each individual, identify the subject areas of that person's knowledge.

**ANSWER:**

Philippe Houeix
Martha Furlong          former instructor 31 Henrietta St., Asheville N.C. 28801, 828-225-6530
                        corroborating evidence as to fraudulent grading scheme
Huy Ngo                 Instructor     Winter 2001, INDS 714, grade-A, grade change
Gillian Davies          Instructor     Fall 2000, INDS 702, grade-A, grade change
                        Office mate

| Crystal Weaver | Instructor, | Spring 2001, INDS 717, grade-I |
| | Dean, Chair | Summer 2001, INDS 706, INDS 722, INDS 740 |
| | | Grades- A, A, A |
| Tracey Crow | Instructor, | Fall 2000, INDS 712, grade-A, grade change |
| | Chair | Spring 2001, INDS 725, garde-A |
| Samantha E, Miller | Instructor | Winter 2001, ARC 225, grade-A |
| Margo McLeod | Registrar | Grade change procedure, frequency of grade change |
| | | For master students who are instructors, Names and |
| | | schedules of master students who are instructors |
| Frances Wong | Dean Faculty | Knowledge of Plan to award Defendant master degree |
| Plaintiff's President | Chairperson of | |
| | Board of Trustees | |

16.    Identify all individuals with knowledge of the facts set forth in response to Interrogatory No.

4 above, and, for each individual, identify the subject areas of that person's knowledge.

**ANSWER:**

Philippe Houeix.  Defendant may retain a vocational expert to testify as to the affect of the fraudulent grading scheme  and violation of  OCGA §20-1-7, on Defendant's employability.

_____
Philippe Houeix, Defendant


**STATE OF OHIO**        )  **COUNTY OF HAMILTON**       )SS:

Before me the undersigned Notary, personally appeared Philippe Houeix who first being duly cautioned and sworn signed his name above in witness of the truth of his answers to the foregoing interrogatories on this _____17th_____ day of January, 2004.

_____
Notary

JOHN A. REBEL, Attorney at Law
NOTARY PUBLIC - STATE OF OHIO
My commission has no expiration
date, Section 147.03 O.R.C.