**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| SAVANNAH COLLEGE OF ART AND DESIGN, INC., | : : | |
| Plaintiff, | : : | **CASE No.   C-1-02-490** |
| vs. | : : | Judge Beckwith |
| PHILIPPE HOUEIX, | : : | Magistrate Hogan |
| Defendant. | : : : | **DEFENDANT'S AFFIDAVIT CONTRA TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIM** |

**STATE OF OHIO     ]  COUNTY OF HAMILTON] ss:**

Being duly cautioned that the penalties for perjury could apply and being sworn, the undersigned, Philippe Houeix, states the following to be true to his personal knowledge.

1.     During September 1998, I responded to Plaintiff's employment advertisement while residing in France. I was hired and began teaching during the summer quarter, June 1999, at Plaintiff's college.

2.     In France I worked as an Interior Designer in my own business. I was earning net annual income of $60,000. at the time I left France to teach at Plaintiff College. I relied upon statements that my employment would last at least three years. The College's petition for my J-1 Visa was for a three year period.

3.     During August 2000, Plaintiff required me to enroll in its Master's Degree program in Interior Design. I enrolled in these courses during a one year period. One course, during each of three quarters was scheduled for the same time, that I was scheduled to teach a class. During the

1

summer of 2001, I was enrolled in three classes that did not exist. I did not attend any master degree class during the one year. I was awarded an "A" grade for the eight courses, and with one incomplete grade. Attached hereto are true and accurate copies of my teaching schedules and class schedules as a masters student beginning in September 2000 through the summer of 2001, and tuition invoices. Attached hereto are grade change forms that are apart of my records for my master's enrollment, and copies of e-mails with Tracy Crow with regard to my change of grade. I did not request any grade change. I have no idea why I received "A"'s for the courses, or what prompted Plaintiff to require instructors to change grades to "A"'s.

     4.     The College made no individual arrangement for me so that I could teach and earn a masters degree. There was absolutely no agreement that an individualized program of independent study would be created for me. I never agreed to this. There was no indication that the lecture and studio course attendance and exam requirements would differ from the standards in the Faculty Handbook. I never did any independent study projects. There were discussions and e-mails as to whether the masters degree could be in architecture, and as to whether the interior design masters could be complete in one year in stead of two.

     5.     The College did not require me to produce any art or design projects whatsoever, as a masters degree student. The College course instructors never discussed any projects that should be produced for a given course. There were no student projects by me to be monitored. Not one of Plaintiff's instructors critiqued any design project of mine, especially an instructor for a course in which I was awarded a grade. There were no discussions about independent studies, or work to be done as substitution for class instruction. After October 2000, my only question was which classes do I enroll in. There was absolutely no communications with any instructor as to course content.

6. I could not seek other employment, since my immigration J-1 Visa authorized teaching employment at Plaintiff's school, only. To remain in the United States legally, I had to retain my employment, I had to go along with plaintiff's breaches and fraudulent scheme. Plaintiff's intent was to provide credits for fictitious courses, so that plaintiff would award a master's degree to me. In so doing, Plaintiff would maintain its status as an accredited school, with the Southern Association of Colleges and Schools (SACS), and I could teach masters course.

7. My wife was arbitrarily terminated during November 2000. Two colleagues in my department had been terminated abruptly. I was afraid that I would be terminated and my family deported. I kept a low profile and did not object about the lack of instruction and involvement in the masters courses and the fake grades that I received, in order to keep my family in the U.S.

8. For the first time, during September 2001, it was possible for me to leave my employment with Plaintiff without jeopardizing my family's immigration status, since my wife had obtained an H1B Visa.

9. Plaintiff breached the Employment Agreements executed by me and dated August 16, 2000, and April 18, 2001, by its requiring me to acquiesce to a fraudulent scheme, and by its charging me money for course instruction and education services that were not provided. Damages for failure to provide education services is the tuition for one course for four quarters or $ 7,400.

10. As part of this scheme I was obligated to sign (on September 13, 2000) the Repayment Agreement to pay for courses that were not attended or taught. I was required to reimburse Plaintiff for the tuition for each master's course that exceeded one course per quarter, in the event that my teaching contract was not renewed.

11. If I had known of the fraudulent practices of plaintiff, I would not have entered my initial contract with plaintiff and would have remained in France. My net income as a professional

designer in France amounted to sixty thousand U.S. dollars ($60,000) per year.

12. During the fall 2000 quarter, I requested direction on what student work I needed to do for the masters course. I began a design project, and requested a floor plan of a College building, but the Chair of the Interior Design Department indicated that student work was not necessary. Plaintiff, by the Chair of its Interior Design Department advised me not to be concerned about the conflicts in master's courses with my scheduled teaching assignments, but to concentrate on teaching. The Chair told me to "not sweat the project" and "to concentrate on his teaching". I did not attend any master degree classes but received grades of "A".

13. I had no discussions with any of the instructors concerning the master degree courses, with the exception of Gillian Davies. She was my office-mate. She stated that she noticed I was enrolled in one of her courses. She ask why? My reply was that I was obligated by SCAD to register in the master program. She ask nothing further. I did not request the grade changes. Plaintiff required her to change my grade.

14. Likewise for the winter and spring quarters of 2001, Plaintiff required me to register for two master's program classes. There were again conflicts with my teaching schedule. I did not attend these classes but received an "A", with one incomplete during Spring 2001. Mid term grades were given. I inquired as to the courses to enroll in.

15. For the summer quarter of 2001, three classes were created by the Dean of Building Arts College, so that I could obtain a master degree. These classes did not exist. I received "A"'s for these classes. The original Chair of the Interior Design department became the Dean of the Building Arts College. The new Dean is the listed instructor of the three non-existent summer 2001 classes.

16. During June 2001, I complained to several public agencies including the Southern

Association of Colleges and Schools (SACS), the accreditation organization for Plaintiff's school. I provided specifics with regard to my involvement in the master's program and the fraudulent grading scheme.

17. On August 25, 2001 the domain name of: *phoueix-master-scad.com,* was use by me to publish the true facts concerning the College's false grading scheme.

18. Currently as well as during 2001, I work as a Design Consultant. I had no income for September 2001. My net income for October 2001 was $ 1,750. My net income for November 2001 was $ 580. My net income for December 2001 was $2,080. My net income for January 2002 was $ 850. I had no income for February, March, April and May 2002. My net income for June 2002 was $ 790. For these months my expected income from the College under the Employment Agreement was $ 39,000 or $ 4,333. per month. My total lost wages are $ 32,948.00 from the Colleges's breach of the April 18, 2001 Employment Agreement. My loss in earnings was caused directly by the Plaintiff's breaches of contract.

19. On March 19, 2002, I received a one-year work authorization from the U.S. Immigration agency. On August 26, 2002, I received my permanent resident immigration-status that allowed unlimited work.

20. On September 14, 2001, the College withdrew from my checking account $1215. 49 which was the final pay check for the summer quarter 2001. This is my loss from the Colleges's breach of the August 16, 2000 Employment Agreement.

      Philippe Houeix

The foregoing affidavit was sworn to and signed before me by Philippe Houeix, who is personally known to me, the undersigned notary, on this   19th   day of April 2004.

      Notary