IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SAVANNAH COLLEGE OF ART
AND DESIGN, INC.,

        Plaintiff,

    v.

PHILIPPE HOUEIX,

        Defendant.

CASE NO. C-1-02 490

Magistrate Judge Hogan

## PLAINTIFF SAVANNAH COLLEGE OF ART
## AND DESIGN, INC'S CLOSING ARGUMENT

What Plaintiff Savannah College of Art and Design, Inc. ("SCAD") stated at the opening of this case bears repeating at its close. This case is not about stopping Defendant Philippe Houeix ("Houeix") from saying what he wants about SCAD on the Internet (provided that what he says is not defamatory). This case is about stopping Houeix from luring Internet users to his web site by mistake through his unauthorized registration and use of the SCAD trademark in domain name form.

Despite Houeix's attempts to clothe his actions in First Amendment garb, the law is clear that "[t]he First Amendment is not a license to trammel on legally recognized rights in intellectual property." *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979). Even when the speech at issue is non-commercial in nature (as Houeix claims his speech to be), where the defendant uses the plaintiff's trademark in a source identifying manner, trademark rights "need not 'yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist.'" *Dallas Cowboys Cheerleaders v. PussyCat Cinema, Ltd.,* 604

F.2d 200, 206 (2d Cir. 1979) (quoting *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551 (1972)); *accord San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 541 (1987) (noncommercial use of mark "as opposed to a purely commercial [advertisement], does not give it a First Amendment right to 'appropriate to itself the harvest of those who have sown.'") (citing *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 239-40 (1918)); *United We Stand Am., Inc. v. United We Stand Am., N.Y., Inc.*, 128 F.3d 86, 93 (2d Cir. 1997) ("Even assuming that [defendant] might communicate its political message more effectively by appropriating [plaintiff's] mark, such appropriation would cause significant consumer confusion.  It is not protected by the First Amendment."); *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769 (8th Cir. 1994), *cert. denied*, 115 S.Ct. 903 (1995); *MGM-Pathe Communication Co. v. Pink Panther Patrol*, 774 F. Supp. 869, 876 (S.D.N.Y. 1981) (holding that political speech is no less subject to the trademark laws and rejecting First Amendment defense).[12]

The law is no different in the context of Internet domain names.  Summarizing the law in the area, one of the country's foremost trademark scholars states:

> Most cases have held that regardless of free speech principals, a web site containing criticism of a company or an organization cannot be identified by a domain name confusingly similar to the name or trademark of the target group.  The right to disseminate criticism on the Internet cannot trump the public's right not to be deceived by a confusingly similar domain name.  And the critic has no free speech "right" to

---

[1]    For the reasons addressed below, Houeix's web site is a commercial use in commerce.  Accordingly his speech is properly classified as commercial speech.  Nevertheless, even if his speech is classified as non-commercial, the result is the same.

[2]    In *Taubman Co. v. Webfeats*, 319 F.3d 770, 774-75 (6th Cir. 2003), the Sixth Circuit stated that the Lanham Act applies only to commercial speech.  However, this statement is dicta because the court found that it did not need to reach the constitutional issue to decide the case.  *Taubman*, 319 F.3d at 775.  Additionally, the court did not engage in a fulsome analysis of the issues because it did not need to.  The court therefore did not consider the Supreme Court's decision in *San Francisco Arts & Athletics* or the other case law addressed above in the court's comments regarding the scope of applicability of the Lanham Act.

ATL01/11783763v1

confuse web users into thinking that they are entering a web site of the target.

5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 31:148:1 (4th ed. 2004); *see People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001) (hereinafter referred to as "*PETA*") (rejecting defendant's parody defense related to its registration and use of peta.org); *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176 (W.D.N.Y. 2000) enjoining defendant's use of plaintiff's "The Buffalo News" trademark in domain name "thebuffalonews.com" to host a web site that parodies and provides a public forum for criticism of The Buffalo News web site); *Jews for Jesus v. Brodsky*, 993 F. Supp. 282 (D.N.J. 1998), *aff'd*, 159 F.3d 1351 (3d Cir. 1998); *Planned Parenthood Fed. of Am., Inc. v. Bucci*, 42 U.S.P.Q.2d (BNA) 1430, 1440 (S.D.N.Y. 1997) ("Defendant's use of another entity's mark [as part of a domain name] is entitled to First Amendment protection when his use of that mark is part of the communicative message, not when it is used to identify the source of a product."), *aff'd*, 152 F.3d 920 (2d Cir. 1998).

Numerous adequate alternatives of communcation are available to Houeix because there are innumerable domain names he could use as the address for his web site that would not cause consumer confusion.  Indeed, Houeix's web site was originally located at one such domain name:  phoueix-master-scad.com.  Houeix's domain names are not central to the communication of his message and do not communicate his message.  For example, he has not registered <scadsucks.info>.  An Internet user viewing either of Houeix's domain names could not discern that the sites located at those addresses are critical of SCAD.  To the contrary, Houeix's domain names serve as source identifiers and communicate that the sites are SCAD web sites, or web sites that are associated or affiliated with SCAD.  *See, e.g., Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc.*, 326 F.3d 687, 696 (6th Cir. 2003) ("Domain names can and do communicate information as to the source or sponsor

-3-

of a web site.") (citing *PACCAR Inc. v. Telescan Tech., LLC*, 319 F.3d 243, 253 (6th Cir. 2003)).

Houeix thus has no legitimate reason to be using the scad.info domain name other than to cause

confusion.

　　　　In short, the First Amendment offers Houeix no defense to SCAD's claims of trademark

infringement, unfair competition and trademark dilution.  And for the reasons set forth below, SCAD is

entitled to judgment on each of its claims.

I.　　**Trademark Infringement and Unfair Competition**

　　　　To prevail on its claims of trademark infringement and unfair competition, SCAD must establish

the following five elements:

> (1) that it possesses a mark; (2) that the defendant used the mark; (3) that the
> defendant's use occurred "in commerce"; (4) that the defendant used the mark "in
> connection with the sale, offering for sale, distribution, or advertising" of goods or
> services; and (5) that the defendant used the mark in a manner likely to confuse
> consumers.

*PETA*, 263 F.3d at 364; *see also* 15 U.S.C. § 1125(a)**.**

　　　　The first three elements are not in dispute in this case.  Houeix admits that SCAD owns

trademark and service mark rights in the SCAD mark, and SCAD's ownership of these rights is

confirmed by the substantial evidence of nationwide use of the mark that SCAD introduced at trial.

(*See* R-53, Uncontroverted Fact Nos. 4 and 6).  Additionally, the Certificate of Registration that the

U.S. Patent and Trademark Office issued to SCAD for its mark, Reg. No. 2,686,644, constitutes

"prima facie evidence of the validity of the registration … and of the registrant's exclusive right to use

the registered mark in commerce on or in connection with the goods or services specified in the

certificate…." 15 U.S.C. § 1057(b).

　　　　Houeix concedes that his domain names scad.info and scad-and-us.info include the SCAD

-4-

mark and that he intends Internet users who see his domain names to understand that the "scad" portions of his domain names refer to the Savannah College of Art and Design. (*See* R-64 at p. 159, lns. 9-18). By using these domain names on the Internet, Houeix has used the domain names in commerce. *Planned Parenthood*, 42 U.S.P.Q.2d at 1434 ("[E]stablishing a typical home page on the Internet, for access to all users, [satisfies] the Lanham Act's 'in commerce' requirement."); *see also OBH, Inc.*, 86 F. Supp.2d at 186.

Thus, the only factual issues left to be resolved are whether Houeix has used the SCAD mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services, and whether his use of the SCAD mark is likely to cause consumer confusion. The facts of record clearly establish that the answer to both questions is "yes."

### A.    Houeix has Used the SCAD Mark in Connection with the Sale, Distribution or Advertising of Goods and Services

To have used the SCAD mark in connection with goods or services, Houeix need not have actually advertised or sold goods or services on his web site. Rather, he need only have: "prevented users from obtaining or using [SCAD's] goods or services, *or* need only have connected [his] web site[s] to other's goods or services." *PETA*, 263 F.3d at 365 (emphasis added).

The facts of the *PETA* case are remarkably similar to the facts of this case. In *PETA*, the defendant registered the domain name peta.org then used the domain name as the address for a web site entitled "People Eating Tasty Animals." The defendant alleged that he created his web site to be a parody of the plaintiff. The defendant did not sell or offer for sale any goods or services on his web site. Nevertheless, his web site contained links to third party commercial web sites, including meat, fur, leather, hunting, animal research, and other organizations which hold views antithetical to the plaintiff's.

The Fourth Circuit held that the defendant had used the plaintiff's mark in commerce by preventing others from accessing the plaintiff's site *and* by linking his site to other's goods and services. *Id.* at 365. With regard to the former, the Fourth Circuit explained:

> [Defendant's] use of PETA's Mark in the domain name of his web site is likely to prevent Internet users from reaching [PETA's] own Internet web site. The prospective users of [PETA's] services who mistakenly access Defendant's web site may fail to continue to search for [PETA's] own home page, due to anger, frustration, or the belief that [PETA's] home page does not exist….

*Id.* at 366. Numerous other federal courts have reached this same conclusion.[3]

With regard to the latter, the Fourth Circuit noted that the Lanham Act does not require that the defendant sell goods or services to be liable for infringement. Rather, the Act requires only that the defendant use the plaintiff's mark "*in connection with*" the sale of goods and services. *See PETA*, 263 F.3d at 366 (emphasis added); *see also* 15 U.S.C. § 1125(a)(1)(A). By including links to third party commercial operations on his web site, the Fourth Circuit held that the defendant's "use of PETA's mark is 'in connection with' the sale of goods or services. *PETA*, 263 F.3d at 366; *accord Jews for Jesus*, 993 F. Supp. at 309. The Sixth Circuit has reached this same conclusion. *Taubman Co. v. Webfeats*, 319 F.3d 770, 774-75 (6th Cir. 2003) ("We believe the advertisements [in the form

---

[3]     *See, e.g., Faegre & Benson, LLP v. Purdy*, 70 U.S.P.Q.2d (BNA) 1315, 1317 (D. Minn. 2004)("Defendants' use of domain names incorporating Faegre's mark is in connection with goods or services, because it is designed to, and is likely to, prevent some Internet users from reaching Faegre's official web site."); *PGC Property, LLC v. Wainscott/Sagaponack Property Owners, Inc.*, 250 F. Supp. 2d 136, 141 (E.D.N.Y. 2003)(finding plaintiffs d/b/a Poxabogue Golf Center have standing to bring Section 43(a) claim where "plaintiffs contend that the defendants set up the domain name "poxabogue.org" with the intent of diverting actual and prospective customers of the plaintiff's services and of harming the plaintiff commercially."); *OBH, Inc.*, 86 F. Supp. 2d at 186 ("[D]efendant's use of the mark is 'in connection with' the distribution or advertising of services because it is likely to prevent others or hinder Internet users from accessing plaintiff's services on plaintiff's own web site."); *Jews for Jesus*, 993 F. Supp. at 309 (noting that "in connection with goods and services" requirement was met because "the conduct of the Defendant is not only designed to, but is likely to, prevent some Internet users from reaching the Internet site of the Plaintiff Organization"); *Planned Parenthood*, 42 U.S.P.Q.2d at 1435 ("[D]efendant's use is classically competitive: he has taken plaintiff's mark as his own in order to purvey his Internet services – his web site – to an audience intending to reach plaintiff's services.").

of links to third party sites formerly] on Mishkoff's site, though extremely minimal, constituted his use of Taubman's mark 'in connection with the advertising' of the goods sold by the advertisers. This is precisely what the Lanham Act prohibits.").

In this case, Houeix has used the SCAD mark in connection with the advertising or sale of goods and services in at least three ways: (1) he advertises the goods and services of third parties on his web site in the form of banner ads and links to third party commercial web sites; (2) he has prevented others from reaching SCAD's web site; and (3) he has used his domain names in a way that is designed to interfere with SCAD's ability to engage in commerce.

### 1.    Houeix advertises third party commercial sites on his site

Houeix formerly had advertising in the form of banner advertisements for Register.com on his scad.info web site. Although Houeix no longer has those ads on his site, he still has links on his site to a number of third party commercial web sites, including WorldStudent.com, Yahoo.com and LiveJournal.com. (*See* R-53, Uncontroverted Fact No. 29; Plaintiff's Trial Exhibits P-46, P-79, P-84, P-53, P-54, and Joint Trial Exhibit J-3). The home page of the WorldStudent.com Web site contains rotating advertisements for universities and others who are partners of Worldstudent.com. (*See* R-64 at p. 84, ln. 8 through p. 86, ln. 11; *see also* Plaintiff's Trial Exhibit P-46). LiveJournal.com is a chat room site that charges users to access certain features of the web site, and the page of the Yahoo.com site to which Houeix's web site links contains advertisements for third party products and services. (*See* Joint Trial Exhibit J-3, Plaintiff's Trial Exhibits P-46, P-53, P-54 and P-84). SCAD's links encourage Internet users to go to the sites, thereby enabling those sites to advertise and promote their own and other's goods and services to the users – including the services of other colleges and universities which Houeix ostensibly hopes his visitors will consider instead of SCAD. Houeix has thus

-7-

used his scad.info and scad-and-us.info domain names "in connection with" the advertising and sale of goods and services within the meaning of the Lanham Act. *See, e.g.*, *Taubman*, 319 F.3d at 775; *PETA*, 263 F.3d at 366, *Planned Parenthood*, 42 U.S.P.Q.2d at 1435.

**2.    Houeix has prevented others from reaching the SCAD web site**

Houeix concedes that he registered the domain name scad.info because it includes SCAD's mark and that he switched his site to this domain name from phoueix-master-scad.com because he knew he would capture more traffic at this site. (*See* R-64 at p. 159, lns. 9-18 and p. 161, ln. 19 through p. 164, ln. 2). Why? Because he knew that Internet users would look for SCAD's web site on the Internet under the scad.info domain name. (*See* R-64 at p. 161, ln. 19 through p. 164, ln. 2). Indeed, the record contains evidence of an alumnus of SCAD who did just that. (Plaintiff's Trial Exhibit P-51.) Houeix also concedes that Internet users familiar with SCAD may think the domain name is affiliated with the college. (*See* R-64 at p. 165, lns. 5-13).

Once at Houeix's web site, Internet users may not continue to look further for SCAD's web site "due to anger, frustration, or the belief that [SCAD's] home page does not exist." *PETA*, 263 F.3d at 365; *see also Planned Parenthood,* 42 U.S.P.Q.2d at 1435 (holding that defendant's registration and use of plannedparenthood.com is in connection with the distribution of services "because it is likely to prevent some Internet users from reaching plaintiff's own Internet web site"); *OBH, Inc.*, 86 F. Supp. 2d at 183. Indeed, prospective students and faculty with only a basic knowledge of SCAD who want to find out more information about the college but end up at Houeix's site by mistake are unlikely to continue to look for SCAD's web site after being greeted with Houeix's wildly scandalous – and false – allegations of fraud, rape, and death on the SCAD campus.

Although bad now, this problem is only likely to get worse in the future. SCAD introduced

-8-

substantial evidence at trial that more and more colleges are beginning to register and use domain names in the .info top-level domain as the address for principal or secondary web sites. Brigham Young, Rutgers, Ohio University, Arizona State, Michigan State, the University of Colorado, the University of Wisconsin, are only a few examples of the numerous high profile colleges and universities in the United States are already making prominent use of the .info top-level domain. Houeix has thus used the SCAD mark in connection with the advertising and sale of goods and services by interfering with the ability of Internet users to reach SCAD's web sites.

### 3. Houeix's sites are designed to harm SCAD commercially

Federal courts have held in the context of claims under the federal dilution act that use of a trademark owner's mark to harm the owner commercially is also a commercial use in commerce. *See, e.g., Jews for Jesus*, 993 F. Supp. at 309 (holding that defendant's registration and use of jewsforjesus.org for a web site with views antithetical to plaintiff "constitutes a commercial use of the Mark and the Name of the [plaintiff] because it is designed to harm the [plaintiff] by disparaging it."); *Planned Parenthood*, 42 U.S.P.Q.2d at 1432 ("I hold, however, that defendant's use of plaintiff's mark [in the domain name plannedparenthood.org] is 'commercial' … [because] defendant's actions are designed to, and do, harm plaintiff commercially.") If such use is a commercial use, it naturally follows that the use must also be in connection with the advertising or sale of goods and services.

Houeix plainly intends his use of the scad.info and scad-and-us.info domain names to harm SCAD commercially. Although he contends that his sites are truthful, non-scandalous sources of news and information about SCAD, his sites are in reality hate sites born out of vindictiveness caused by the college's firing of his wife (a firing which he describes as being "without cause"). Houeix's sites contain wild allegations of fraudulent grading, despite the fact that he concedes he never brought these

-9-

allegations to SCAD's attention before abruptly leaving the college without notice two days into a new school year. His sites further contain scandalous allegations of a student having been raped by a staff member, of contamination in Poetter Hall killing three faculty members, and of a faculty member, whom Houeix identifies by name, telling sexist and crude jokes in class. Nevertheless, Houeix admits that he has concrete evidence in the form of a report from the federal Centers for Disease Control that the contamination allegation is false, and he concedes that he has no evidence of any kind to confirm the veracity of the rape or improper faculty conduct allegations and has never inquired into the same. (*See* R-65 at p. 23, ln. 14 through p. 24, ln. 14, p. 24, ln. 16 through p. 28, ln. 11, p. 29, ln. 9 through p. 31, ln. 13).

Houeix picks and chooses which e-mails to post on his web site. Not surprisingly, he rarely posts the e-mails he receives that are favorable to the college. Prospective students and faculty members have written to Houeix and informed him that they have decided not to attend SCAD or accept a faculty position at SCAD on the basis of his web sites. (*See* R-64 at p. 175, ln. 17 through p. 176, ln. 6). This is plainly exactly what Houeix hopes his web sites will accomplish, just as the defendant in the *Planned Parenthood* case hoped that his web site would dissuade Internet users from getting abortions, and just as the defendant in the *Jews for Jesus* case hoped that his web site would dissuade Jews from converting to Christianity. *Planned Parenthood*, 42 U.S.P.Q.2d at 1435; *Jews for Jesus*, 993 F. Supp. at 309.

Aside from the content of his sites, Houeix's mere registration of the domain names is interfering with SCAD's ability to engage in commerce. Brian Murphy testified that SCAD could use the scad.info domain name in a number of different ways to support the school's programs, just as schools like Arizona State, Ohio University, San Diego State and others are using .info domain names to support

-10-

their programs.  However, because there can be only one registrant for any given domain name, Houeix's registration is blocking SCAD from being able to register and use scad.info.  All of the foregoing constitutes use by Houeix of the SCAD mark in connection with the advertising, sale or distribution of goods or services sufficient to trigger the prohibitions of the Lanham Act.

### B.    Houeix's Actions are Likely to Cause Consumer Confusion

The Sixth Circuit has recently adopted the "initial interest confusion" doctrine in a case involving Internet domain names.  *PACCAR*, 319 F.3d at 253.  In *PACCAR*, the defendant registered numerous domain names that included the plaintiff's PETERBILT and KENWORTH marks.  The defendant then used those domain names as addresses for web sites that sold new and used Peterbilt and Kenworth trucks (e.g., peterbiltnewtrucks.com).  The district court preliminarily enjoined the defendant from using the domain names.  On appeal, the defendant argued that disclaimers on its web site prevented any actionable consumer confusion.  The Sixth Circuit disagreed, holding that "[a] disclaimer disavowing affiliation with the trademark owner read by a consumer after reaching the web site comes too late. This 'initial interest confusion' is recognized as an infringement under the Lanham Act."  *Id.; accord Brookfield Comms., Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999); *Victoria's Secret Stores v. Artco Equip. Co.,* 194 F. Supp. 2d 704, 727 (S.D. Ohio 2002).  *See also Jews for Jesus*, 993 F. Supp. at 305 (finding likelihood of confusion even though users would be unlikely to confused after reading defendant's site); *Planned Parenthood*, 42 U.S.P.Q.2d at 1435 (same).

Just as initial interest confusion existed in the *Paccar* case, so too does it exist in this case. Houeix acknowledges that users who see his scad.info domain name and are familiar with SCAD may believe that a site operated at that domain name originates from SCAD.  (*See* R-64 at p. 165, lns. 5-13).  Nevertheless, Houeix contends that once users get to his site they will no longer be confused

-11-

because of the nature of the content on his site. SCAD disagrees. Houeix has designed the home page of his scad.info site in a way that the origin of the site is not readily apparent. Users have to spend time surfing through the site before they will discover (if at all) that the site is not associated or affiliated with SCAD. Nevertheless, even if users do discover that the site is not associated with SCAD, Houeix's argument ignores the fact that the initial interest confusion doctrine is the law of this Circuit. The fact that some users may no longer be confused after they spend time surfing through his site is irrelevant. By that point, the infringement has already occurred. *PACCAR*, 319 F.3d at 253; *see also Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 464 (7th Cir. 2000) ("Such [initial interest] confusion, which is actionable under the Lanham Act, occurs when a consumer is lured to a product by its similarity to a known mark, even though the consumer realizes the true identity and origin of the product before consummating a purchase."). Houeix's principal defense to SCAD's infringement claim is therefore meritless.

To determine whether consumer confusion is likely (whether it be initial interest confusion or otherwise), the court must weigh and balance the following eight factors: "(1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) intent of the defendant in selecting the mark; and (8) likelihood of expansion of the product lines." *PACCAR*, 319 F.3d at 249-50. These factors "imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988).

The balance of these factors in this case overwhelming supports SCAD's claims that Houeix's registration and use of the scad.info and scad-and-us.info domain names is likely to mislead consumers

-12-

into accessing the sites under the mistaken belief that the sites operated at the domain names originate

from, are associated or affiliated with, or are sponsored or endorsed by, SCAD.

### 1.    The SCAD Mark is a Strong, Distinctive Mark

The "strength" element of the likelihood of confusion analysis is a legal shorthand for the scope

of protection to be afforded to the mark from infringement.  "The more distinct a mark, the more likely

is the confusion resulting from its infringement, and therefore, the more protection it is due."  *Daddy's*

*Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

The SCAD mark is a strong mark because it is a coined or "fanciful" word derived from the

initials of SCAD's name.  *See, e.g., Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*,

78 F.3d 1111, 1117 (6th Cir. 1996) (noting that fanciful marks "are the strongest" types of marks);

*Armco Steel Corp. v. Int'l Armament Corp.*, 249 F. Supp. 954, 956 (D.D.C. 1966) (finding

trademark "ARMCO" from the initials of the American Rolling Mill Company is a coined word, and,

thus, distinctive); *accord YKK Corp. v. Jungwoo Zipper Co., Ltd.*, 213 F. Supp. 2d 1195 (C.D.Cal.

2002)(same).  The SCAD mark is also a strong mark because it has been used nationally by SCAD for

years in a variety of advertising, promotional, and marketing materials to identify SCAD and its

educational services, including in advertisements that have appeared regularly for years in such well

known and widely distributed publications as *The New York Times, Business Week, The Chicago*

*Tribune, Los Angeles Weekly, The Atlanta Journal Constitution, The Village Voice,* and *Art in*

*America*.  Indeed, it is the consumer recognition of the SCAD mark that motivated Houeix to use the

mark for his SCAD.INFO domain name in the first place.

Houeix introduced printouts from various third party web sites in an effort to establish that the

SCAD mark is weak.  However, these printouts prove, rather than disprove, that the SCAD mark is

-13-

strong.  To have any probative significance, the printouts must show third party use of the SCAD mark

in the field of educational services in the United States.  *See, e.g., Homeowners Group, Inc. v. Home*

*Mktg Specialists, Inc.*, 931 F.2d 1100, 1108 (6th Cir. 1991) ("In order to be accorded weight a

defendant must show what actually happens in the marketplace."); *R.L. Polk & Co. v. Infousa, Inc.*,

230 F. Supp. 2d 780, 786 (E.D. Mich. 2002) ("In order to prove that third party registrations weaken

the Plaintiff's mark, the Defendant must show that third parties using the []mark are engaged in the same

business in which the Plaintiff is engaged.").  None of the printouts Houeix introduced evidence such

use.  Moreover, with the exception of two sites that Houeix acknowledges are outside the field of

educational services, Houeix admits that he has not visited any of the sites in two years.  Thus, he

concedes that he has no idea whether those sites are even still on the Internet today.  Thus, rather than

showing that the SCAD mark is weak, Houeix's evidence further supports the conclusion that the mark

is strong and, in the field of educational services offered in the United States, entitled to a broad scope

of protection from infringement.

### 2.    The Parties' Services are Related

The Sixth Circuit has identified three categories regarding the "relatedness" of goods and

services:

> First, if the parties compete directly by offering their goods or services, confusion is
> likely if the marks are sufficiently similar; second, if the goods or services are somewhat
> related but not competitive, the likelihood of confusion will turn on other factors; third, if
> the goods or services are totally unrelated, confusion is unlikely.

*PACCAR*, 319 F.3d at 251 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 282).  In determining

relatedness, the question is not whether the parties offer the same goods or services.  Rather, "[t]he

question is, are the [goods or services] related so that they are likely to be connected in the mind of a prospective purchaser?" *Daddy's Junky Music Stores*, 109 F.3d at 283 (citations omitted).

This case falls into the second category of relatedness above. Houeix's site purports to offer news and information regarding SCAD that Houeix hopes prospective students, faculty and staff of SCAD will read. As such, his services are related to, although not competitive with, SCAD's; therefore, the likelihood of confusion analysis in this case will turn on other factors.

### 3.     The Parties' Marks are Similar

Both of Houeix's domain names at issue in this case contain the SCAD mark without other words or phrases that would communicate that the sites located at the domain names are not associated or affiliated with SCAD. The SCAD mark and scad.info domain name are, for all intents and purposes, identical; the only distinctions are the latter's lack of capitalization and the addition of ".info" that is necessary to designate a domain name. "These distinctions are not significant." *OBH, Inc.,* 86 F. Supp. 2d at 188 (finding that "The Buffalo News" and "thebuffalonews.com," are, "for all intents and purposes, identical"); *see also PACCAR*, 319 F.3d at 251-52 (finding, *inter alia*, "peterbiltnewtrucks.com" similar to the "Peterbilt" mark); *Planned Parenthood*, 42 U.S.P.Q.2d at 1437-38 (finding "plannedparenthood.com" nearly identical to "Planned Parenthood" mark). The high degree of similarity between the SCAD mark and Houeix's domain names weighs strongly in favor of a likelihood of confusion among Internet users. *See, e.g.*, *Champions Golf Club*, 78 F.3d at 1119 (holding that "while similarity alone does not compel a determination that marks are likely to be confused, it is a factor entitled to considerable weight) (citations omitted).

### 4.     Actual Confusion has Occurred

A trademark plaintiff need not introduce evidence of actual confusion to prevail on its claim

because the standard is a "likelihood" of confusion. *PACCAR*, 319 F.3d at 252. Because of the

difficulty of obtaining actual confusion evidence, the absence of evidence of such confusion is

"inconsequential." *Id.*; *see also Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988).

Nevertheless, evidence of actual confusion is a powerful indicator that confusion is likely. *Wynn Oil*,

839 F.2d at 1188.

　　　Houeix's use of the scad.info domain name has resulted in actual consumer confusion. An

alumna of SCAD who wanted to give money to the college wrote to SCAD's alumni affairs director

that she "went to the scad home page and … got this totally odd webpage . . ." (*See* R-53,

Uncontroverted Fact No. 28; *see also* Plaintiff's Trial Exhibit P-51; R-64 at p. 102, ln. 16 through p.

103, ln. 10). Brian Murphy testified that the alumna actually went to the scad.info web site. The record

also contains circumstantial evidence of numerous other incidents of confusion. At least two dozen

individuals have telephoned SCAD and expressed that they inadvertently went to Houeix's scad.info

web site, and at least three individuals have written to Houeix and stated that they "stumbled" onto his

site. (*See* R-64 at p. 100, ln. 19 through p. 101, ln. 2; Plaintiff's Trial Exhibit P-43 at p. 12 of 50, e-

mail dated Tu, 11 Mar 2003 ("I just sat down to my computer to write my letter of intent to SCAD for

transferring when I stumbled upon your site"), p. 14 of 50, e-mail  dated Thu, 6 Mar 2003 ("I stumbled

across this web site while researching design schools"); Plaintiff's Trial Exhibit P-43, at p. 38 of 48, e-

mail dated Sun, 2 Mar 2003 ("I bumped into your web site as scad was advertising a new job

position").

　　　In admitting into evidence the e-mail from the alumna referenced above, this court held that the

e-mail is entitled to little weight because it is only one e-mail among the millions of hits that the SCAD

web site has received. Order dated October 14, 2004. SCAD respectfully submits that this is not the

proper measure to use to determine the weight to be afforded the incident of confusion. SCAD submits that the proper measure is the number of hits on *Houeix's* web site because that is the site where the confusion will occur.

There is scant evidence in the record regarding the number of hits that Houeix's web site has received. His site contains approximately 200 emails he has received from third parties, but this is the only evidence of record regarding the volume of hits to his site. Other factors indicate that the traffic to his site is not yet substantial. Houeix registered his domain names shortly after the .info top-level domain became available for registration in late 2001.[4] Because the .info top-level domain is young, it is not a domain that Internet users are as familiar with or as accustomed to using as more well-established and older top-level domains such as .com and .edu which Internet users have used since the mid-1990s. Houeix has not advertised his web site; therefore, one would not expect to find that his site has yet received the kind of traffic SCAD's site receives. This situation is very different than the situations in *Therma-scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 635-36 (6th Cir. 2002), where the plaintiff produced only six incidents of actual confusion despite ten years of substantial competing sales by both parties, and *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1110 (6th Cir. 1991), where the plaintiff produced only one incident of actual confusion despite more than four years of co-existence by the time of trial and extensive advertising by both parties during that time

---

[4]    Every domain name consists of at least two domains: a top-level domain and a second level domain. In the domain name scad.info, the ".info" portion is the top-level domain, and the "scad" portion is the second level domain. *See, e.g.*, *Interactive Prods.*, 326 F.3d at 691. It is the second level domain that consumers recognize as serving the source identifying role of a domain name. *Id.* ("A web site's domain name (e.g., a2zsolutions.com) signifies its source of origin and is, therefore, an important signal to Internet users who are seeking to locate web resources. Because of the importance of a domain name in identifying the source of a web site, many courts have held that the use of another's trademark within the domain name of a web site can constitute a trademark violation.")(citing *PACCAR Inc. v. Telescan Tech. LLC*, 319 F.3d 243, 250 (6th Cir. 2003) (citing cases)).

ATL01/11783763v1

period.[5]

Under these circumstances, SCAD submits that the relatively low volume of actual confusion evidence in this case is to be expected, and the existence of even a single incident of actual confusion therefore serves as powerful evidence of the existence of a likelihood of confusion. Additionally, as more and more colleges and universities move content to web sites posted to the Internet under the .info domain name, it can be expected that more and more Internet users will look for information about colleges and universities under this domain in the future. The alumna's e-mail thus portends even greater confusion in the future.

### 5.     The Parties Use the Same Marketing Channels

Both parties use the Internet. This fact "increases the likelihood of confusion between the two marks" because,

> '[i]n the Internet context, … entering a web site takes little effort – usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership.'

*PACCAR*, 319 F.3d at 252 (quoting *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1057 (9th Cir. 1999)).

### 6.     Prospective Customers are of Average Sophistication

Houeix contends that the target audiences for the parties' services are highly sophisticated and therefore unlikely to be confused. SCAD respectfully disagrees. The target audience for SCAD's

---

[5]     The court in *Homeowners Group* did not give figures or other specific identifications of the scope of the defendant's advertising, but the court stated that defendant engaged in marketing consisting "primarily of advertisements in the real estate section of newspapers and advertisements to property owners," and the court's discussion of the confusion evidence makes it clear that the defendant had "advertised extensively." *Id.* at 1110, 1111.

services consists of 16, 17 and 18 year old high school students. SCAD submits that individuals of this age cannot properly be classified as "highly sophisticated." The relevant consumer of SCAD's services is thus properly classified as a person of average sophistication exercising ordinary caution. *See, e.g., Champions Golf Club*, 78 F.3d at 1120 ("Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution.")

Regardless of what standard is applied, however, confusion is likely. An Internet user looking for information about SCAD in the "information" top-level domain, or .info, would expect to find SCAD's site at the domain name scad.info. However, not even a Nobel Laureate would surmise from the scad.info domain name itself that the site located at the domain name is a hate site designed to denigrate the college, its faculty and administration. Thus, no matter how sophisticated the customer may be, Houeix's registration and use of his domain name is likely to result in actionable initial interest confusion. *See, e.g., PACCAR*, 319 F.3d at 254-55 ("Initial interest confusion 'afflicts sophisticated Internet users no less than it does unsophisticated users.'") (quoting *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 190 (W.D.N.Y. 2000)).[6] The fact that SCAD has for years used the domain e-mail address "info@scad.edu" as the address to which prospective students and their parents should write to obtain information about the College also makes it likely that consumers who encounter the scad.info domain name will assume it to be associated with SCAD.

### 7.    Houeix Intends His Domain Names to Lure Internet Users to His Sites by Mistake

Houeix's choice of scad.info as the address for his web site brings to mind the famous

---

[6]    The Sixth Circuit further noted in *PACCAR* that, even if the average purchaser is sophisticated, the "purchaser care [factor] will decrease the likelihood of confusion only minimally" where, as here, the parties' marks are highly similar. *Id.*

-19-

Humphrey Bogart line from Casablanca:  "Of all the gin joints in all the towns in all the world, she walks into mine."

There are thousands, if not millions, of domain names that Houeix could have registered that do not infringe the SCAD trademark, yet he chose a name that is identical to SCAD's mark.  Houeix admits that he adopted the name because his old name, phoueix-master-scad.com, was not generating much traffic and he knew that scad.info would draw a bigger crowd.  Why?  Because he knew that it was likely that Internet users interested in getting information from SCAD about itself and its services would be likely to look for that information in the ".info" top-level domain, both now and in the future as more and more colleges and universities move to the use of that top-level domain.  He also knew that they would expect to find SCAD's domain name in the .info top-level domain at scad.*info*, just as Internet users looking to purchase products from BestBuy would expect to be able to do so at bestbuy.*com*, a domain name in the "commercial" top-level domain.  Houeix's choice of scad.info was thus a conscious, knowing decision to capture Internet traffic interested in getting information about SCAD so that he could do his best to quash that interest.[7]

Significantly, SCAD need not prove that Houeix intended to cause confusion to prevail on its claims.  Indeed, the "lack of intent by a defendant is largely irrelevant in determining if consumers likely

---

[7]    Houeix contends, without evidence, that confusion is unlikely because Internet users will know to look for SCAD's web site in the ".edu" domain name.  Houeix's contention is belied by his registration of the scad.info domain name, which he plainly registered knowing that Internet users would look for SCAD sites at that domain name, and by the fact that more and more colleges are moving content to sites located on the Internet in the .info top-level domain.  Moreover, Internet users will sometimes use search engines to search for the web sites of a particular entity.  The evidence of record shows that a search on "scad" in the Yahoo! search engine prompts the user to make a more focused search on "scad college."  When that search is run, Houeix's web sites come up third and sixth.  Although the scad.edu site is the first result, Internet users are likely to view some of the other top search results believing that they may contain other information from the college about itself.  The search engine listings for Houeix's domain names do not immediately convey that the sites located at the domain names are not SCAD sites or

[Footnote Continued On Next Page]

will be confused as to source." *Daddy's Junky Music Stores*, 109 F.3d at 287. Nevertheless, Houeix's registration of scad.info with full knowledge of SCAD's ownership and use of the SCAD mark, and with the intention that Internet users understand the "scad" portions of his domain names refer to SCAD evidences that Houeix intended to trade unfairly on SCAD's trademark rights. *See, e.g., Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 603 (6th Cir. 1991) ("[U]se of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement.").

### 8.    Expansion of Product Lines

SCAD concedes that it is unlikely that Houeix will open a competing art and design school. Nevertheless, it is possible that Houeix will pursue a teaching position at a competitive college or university since he came to the United States to teach. If he did so, he could use his domain names to support that position by posting links to, and other advertisements for, his new employer. SCAD thus submits that this factor weighs in favor of a finding of likelihood of confusion.

### 9.    Sum of the Factors

In sum, the clear weight of the eight likelihood of confusion factors falls strongly favors of a finding of a likelihood of confusion. Although confusion is likely now, this confusion is only likely to get more pronounced as the future as use of the .info top-level domain name grows, both in general and by colleges and universities in the United States in specific. SCAD therefore submits that it is entitled to judgment on its trademark infringement and unfair competition claims.

## II.    <u>Trademark Dilution</u>

---

[Footnote Continued From Previous Page]

sites that are associated or affiliated with SCAD, so a user is likely to click on the results believing they he will be taken to a SCAD site.

ATL01/11783763v1

The Federal Trademark Dilution Act ("FTDA") provides, in relevant part, that "[t]he owner of a famous mark shall be entitled … to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1). Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." 15 U.S.C. § 1127. To prevail on its dilution claim, SCAD must therefore establish that the SCAD mark was famous when Houeix registered his scad.info and scad-and-us.info domain names, that Houeix has made a commercial use in commerce of the SCAD mark, and that his use of those domain names dilutes the SCAD mark.

Houeix is making a commercial use in commerce of his domain names for the reasons addressed in Section I.A. above. SCAD thus focuses its discussion in this section on the first and last elements. For the reasons set forth below, SCAD submits that the facts of record clearly demonstrate that SCAD has satisfied both elements.

## A.    The SCAD Mark is Famous

To determine whether a mark is famous, the FTDA instructs courts to consider: (1) the degree of inherent or acquired distinctiveness of the mark; (2) the duration and extent of use; (3) the duration and extent of advertising and publicity; (4) the geographical area in which the mark is used; (5) the channels of trade; (6) the degree of recognition of the mark in the parties' channels of trade; (7) the nature and extent of third party use of the same or similar marks; and (8) whether the mark is federally registered. 15 U.S.C. § 1125(c)(1). Every one of these criteria weighs heavily in favor of a finding that the SCAD mark is famous.

For the reasons set forth above, the SCAD mark is a strong, distinctive mark.  In recognition of this distinctiveness, the U.S. Patent and Trademark Office has granted registration to the mark on the Principal Register (Reg. No. 2,686,644).  SCAD has used the mark extensively since 1979 in nationally distributed advertising and promotional materials.  The undisputed evidence in this case is that that no third parties use the mark to identify competitive services in the United States, and the undisputed testimony of Brian Murphy at trial was that the mark is well known in the field of college level education in the United States, particularly in the sub-field of art and design.  A mark need not be a household name to qualify as "famous" under the FTDA.  The mark need only be famous within its field.  *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 164-65 (3rd Cir. 2000); *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 640-41 (7th Cir. 1999).  The evidence of record in this case establishes the fame of the SCAD mark in the field, and it is this fame that Houeix was banking on to result in increased traffic to his web site through his registration and use of scad.info.

### B.    Houeix Has Diluted the SCAD mark

"Dilution is grounded on the idea that a trademark can lose its 'ability ... to clearly and unmistakably distinguish one source' through unauthorized use."  *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir. 1996) (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §24.13[l][a] at 24-106 (4th ed. 2004).  "Once a trademark has become diluted, it has lost the strength it once possessed.  No matter how small the dilution, the harm has been done ... [the slightest dilution] destroys the possibility that [the mark] can ever be made whole."  *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Inc.*, No. 96 Civ. 4758 (SAS), 1996 WL 391886, at *4 (S.D.N.Y.  July 11, 1996).

A trademark can be diluted in two ways:  by blurring and by tarnishment.  Blurring occurs when a defendant uses a plaintiff's trademark to identify the defendant's goods or services, thereby creating the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product (e.g., the mark now identifies two different products and sources and not just one).  *See, e.g., Ringling Bros.-Barnum & Bailey, Combined Shows, Inc. v. B.E. Windows, Corp.*, 937 F. Supp. 204, 209 (S.D.N.Y. 1996) (citing *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994)). Tarnishment occurs when a famous mark is improperly associated with an inferior or offensive product or service.  4 *McCarthy*, § 24:104 at 24-172 to 173; *Ringling Bros.*, 937 F. Supp. at 209 (*citing Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir. 1996)).

The Sixth Circuit has adopted the following ten factor test to be used in determining whether dilution has occurred:  (1) distinctiveness; (2) similarity of the marks; (3) proximity of the services and the likelihood of bridging the gap; (4) the interrelationship among the distinctiveness of the senior mark, the similarity of the junior mark, an the proximity of the products; (5) shared consumers and geographic limitations; (6) sophistication of consumers; (7) actual confusion; (8) adjectival or referential quality of the junior use; (9) harm to the junior user and delay by the senior user; and (10) the effect of the senior user's prior laxity in protecting its mark.  *V Secret Catalogue, Inc. v. Moseley*, 259 F.3d 464, 476 (6th Cir. 2001), *rev'd on other grounds,* 537 U.S. 418 (2003).  Nevertheless, the court recognized in *Moseley* that where it is clear that the public will associate the defendant's mark with the plaintiff's, an exhaustive evaluation of these factors is unnecessary.  *Moseley*, 259 F.3d at 477 ("Given this conclusion, it follow that Victoria's Secret would prevail in a dilution analysis, even without an exhaustive consideration of all of ten of the Nabisco factors.").

In this case, Houeix concedes that he *intends* the "scad" portions of his domain names to refer

to SCAD and its mark.  (*See* R-64 at p. 159, lns. 9-18).  He further concedes that persons who see his

domain names will associate them with SCAD.  (*See* R-64 at p. 165, lns. 5-13).  A detailed evaluation

of the ten dilution factors is therefore unnecessary in this case.

In light of the distinctiveness of the SCAD mark in the field of higher education in the United

States, this is a textbook case of dilution by blurring.  *See, e.g.*, *NBBJ E. Ltd. Partnership v. NBBJ*,

201 F. Supp. 2d 800, 808 (S.D. Ohio, 2001).  In light of the false and scandalous nature of the content

on Houeix's site regarding SCAD, this is also a textbook case of dilution by tarnishment.  *See, e.g.,*

*Kraft Foods Holdings, Inc. v. Helm,* 205 F. Supp. 2d 942, 948 (N.D. Ill. 2002) ("Tarnishment is

often found when the senior mark is placed in the context of sexual activity, obscenity or illegal

activity."); *Eastman Kodak Co. v. Rakow*, 739 F. Supp. 116, 118 (W.D.N.Y. 1990).

The Supreme Court in *Moseley* held that the plaintiff must demonstrate actual dilution of its

mark to prevail under the FTDA.  *Moseley*, 537 U.S. at 432-33.  Nevertheless, the Court also made it

clear that its holding does not mean that the plaintiff must introduce evidence of "the consequences of

dilution, such as an actual loss of sales or profits…."  *Id.* at 433.  The Court held that "[i]t may well be

… that direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can

reliably be proved through circumstantial evidence – the obvious case is one where the junior and senior

marks are identical.  *Id.* at 434.[8]  Federal courts that have addressed dilution issues since *Moseley* have

found that actual dilution is established where the marks at issue are identical.  *See, e.g.*, *Gen. Motors*

*Corp. v. Autovation Techs., Inc.*, 317 F. Supp. 2d 756, 764 (E.D. Mich. 2004); *Nike Inc. v.*

---

[8]    *See also Id.* at 433 ("We do agree, however, with [the Fourth Circuit's] conclusion that, *at least where the*
*marks at issue are not identical*, the mere fact that consumers mentally associate the junior user's mark with a
famous mark is not sufficient to establish actionable dilution.") (emphasis added)

*Variety Wholesalers, Inc.*, 274 F. Supp. 2d 1352, 1372 (S.D. Ga. 2003); *Pinehurst, Inc. v. Wick*, 256 F. Supp. 2d 424, 431 (M.D.N.C. 2003) (finding actual dilution where defendant used plaintiff's marks in its domain name because a customer using the Internet "will be unable to discern any appreciable difference" between the defendant's domain name and the plaintiff's mark).

In this case, the second level domain of Houeix's scad.info domain name (and the source identifying portion of the name) is identical to the SCAD mark, and the second level domain of Houeix's scad-and-us.info domain name contains the SCAD mark in its entirety.  *See, e.g.*, *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1327 n.8 (9th Cir. 1998) (noting that a domain name may "indicate to users some information as to the content of the site, and, in instances of well-known trade names or trademarks, may provide information as to the origin of the contents of the site.")  Houeix's wholesale incorporation of the SCAD mark in his domain names evidences the actual dilution of SCAD's mark by tarnishment and blurring.  SCAD therefore submits that it is entitled to judgment on its federal dilution claim.

## III.    The Relief SCAD Requests On Its Claims

Once infringement or dilution is established, irreparable harm is presumed.  *See, e.g., Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999).  The relief that SCAD requests to remedy this harm is narrowly tailored to address this harm.  SCAD requests that the Court order Houeix to transfer the domain names scad.info and scad-and-us.info to SCAD within ten (10) days of the court's entry of judgment.  SCAD further requests that the court enter a permanent injunction enjoining Houeix, his agents, employees, representatives, and all those in active concern or participation with them, from:

(1)    registering, seeking to register or using any domain name that incorporates the term "SCAD," any of SCAD's marks, or any term, mark, or name confusingly similar thereto;

(2)    adopting, using, or registering as a trade name, corporate name, service mark, e-mail address, meta-tag, or keyword any name or mark that incorporates the SCAD mark or any term, name, or mark confusingly similar thereto;

(3)    passing off or inducing or enabling others to sell or pass off any goods, services, Internet web sites, or e-mail addresses that are not authorized by SCAD as and for goods, services, web sites, or e-mail addresses that are sponsored or endorsed by, associated with, or affiliated with SCAD; and

(4)    otherwise diluting the distinctive quality of or infringing the SCAD mark.

SCAD further requests that court award it recovery of its costs and, in light of Houeix's knowing and willful registration of the SCAD mark in domain name form to lure Internet traffic to his web sites by mistake, SCAD requests that the court find this case to be exceptional under 15 U.S.C. § 1117(a) and award SCAD recovery of the reasonable attorneys' fees it has incurred in connection with this action.  *See, e.g., Johnson v. Jones*, 149 F.3d 494, 503-04 (6th Cir. 1998).

Respectfully submitted, this 5th day of November 2004.

  /s/ Stephen J. Butler_____
Stephen J. Butler, Esq.
Bar. No. 0010401
Theodore D. Lienesch, Esq.
Bar. No. 0016542
Thompson Hine LLP
312 Walnut Street
Cincinnati, Ohio 45202-4089
Telephone:  (513) 352-6700
Facsimile:  (513) 241-4771

ATL01/11783763v1

David J. Stewart, Esq.
J. Patrick Elsevier, Esq.
Alston & Bird, LLP
1201 West Peachtree St.
Atlanta, Georgia 30309-3424
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

Counsel for Plaintiff Savannah College of Art
and Design, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SAVANNAH COLLEGE OF ART
AND DESIGN, INC.,

        Plaintiff,

v.

PHILIPPE HOUEIX,

        Defendant.

CASE NO. C-1-02 490

Magistrate Judge Hogan

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing PLAINTIFF'S CLOSING ARGUMENT was electronically

served upon John A. Rebel, counsel for Defendant Philippe Houeix, on this 5th day of November 2004.

        _/s/ Stephen J. Butler _____

        Stephen J. Butler (Bar. No. 0010401)
        Attorney for Plaintiff Savannah College of Art and
        Design, Inc.