IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SAVANNAH COLLEGE OF ART
AND DESIGN, INC.,

    Plaintiff,

  v.

PHILIPPE HOUEIX,

    Defendant.

CASE NO. C-1-02 490

Magistrate Judge Hogan

**PLAINTIFF SAVANNAH COLLEGE OF ART AND DESIGN, INC.'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Savannah College of Art & Design, Inc. ("SCAD") filed suit against Defendant Philippe Houeix ("Houeix") alleging trademark infringement, unfair competition and dilution arising from Houeix's registration and use of the domain names scad.info and scad-and-us.info to host web sites with content that is critical of the College, its faculty and administration. SCAD alleges that Houeix's use of these domain names is likely to cause confusion among those persons seeking information about SCAD on the Internet as to whether SCAD is the source of, is associated or affiliated with, or sponsors or endorses the web sites hosted at those domains. SCAD further alleges that Houeix dilutes its "SCAD" trademark and constitutes unfair competition. SCAD requests, *inter alia*, a permanent injunction enjoining Houeix from using the domain names and requiring him to transfer the domain names to SCAD.

On October 6 and 7, 2004, the court conducted a bench trial and heard testimony from

witnesses for each party and received numerous exhibits into evidence.  The parties also stipulated to a

number of relevant facts in the Joint Pretrial Order.  Upon review of the testimony, exhibits, and

arguments, the court issues the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.    SCAD and Its "SCAD" Service Mark and Trademark

1.    SCAD is located in Savannah, Georgia.  Since its founding in 1978, SCAD has offered

instruction at the college level in the fields of design, the visual and performing arts, the building arts, and

the history of art and architecture.  (*See* R-53, Final Pretrial Order. Signed by Judge Timothy S Hogan

on 10/4/2004, Uncontroverted Fact No. 1; s*ee also* R-64, Transcript of Proceedings held on

10/6/2004 before Judge Magistrate Judge Timothy S Hogan, at p. 29, lns. 10-25).

2.    SCAD draws students from all over the United States and from over sixty countries

worldwide, many of whom seek information about SCAD via the Internet.  (*See* R-53, Uncontroverted

Fact No. 2; s*ee also* R-64 at p. 30, lns. 3-6).

3.    SCAD's current enrollment is approximately 6,700 students.  (S*ee* R-64 at p. 30, lns.

1-2)

4.    Since its inception, SCAD has continuously used the acronym "SCAD" in interstate

commerce as a service mark to identify its college-level education services.  (*See* R-53, Uncontroverted

Fact No. 4; s*ee also* R-64 at p. 31, ln. 12 through p. 59, ln. 2).

5.    SCAD also uses "SCAD" as a trademark to identify a wide variety of goods that

SCAD sells through its bookstore, including clothing, notebooks, journals, deskpads, mugs, pens, office

paraphernalia and other imprinted materials, photographs of which were introduced into evidence at

trial. (*See* R-53, Uncontroverted Fact No. 6; *see also* R-64 at p. 59, ln. 13 through p.62, ln. 23; *see*

*also* Plaintiff's Trial Exhibits P-2, P-21 through P28) (SCAD's service mark and trademark rights are referred to collectively hereinafter as the "SCAD Mark").

6. For years, SCAD has engaged in substantial national advertising and promotional efforts, many of which prominently feature the SCAD Mark and/or scad.edu domain name. (*See* R-53, Uncontroverted Fact No. 11; R-64 at p. 30, lns. 7 through p. 31, ln. 6).

7. Advertisements for Savannah College of Art and Design and its services have appeared regularly for years in such well known and widely distributed publications as *The New York Times, Business Week, Chicago Tribune, Los Angeles Weekly, The Atlanta Journal Constitution, The Village Voice, Art in America* and many others. (*See* R-53, Uncontroverted Fact No. 13; R-64 at p. 31, lns. 1-11 and p. 50, ln. 13 through p. 52, ln. 21; Plaintiff's Trial Exhibits P-29 and P-30).

8. Since its inception, SCAD has also printed and distributed numerous publications that make prominent use of the SCAD Mark. (*See generally* R-64 at pp. 30-49, 57; Plaintiff's Trial Exhibits P-3, P-5 through P-20, P-80, P-81). Many of these publications are distributed nationwide to prospective and current students, alumni, parents, and high schools. (*See generally* R-64 at pp. 30-49). For example, SCAD prints approximately a quarter of a million full color school catalogs each year that are sent to virtually every high school in the United States. (*See* R-64 at p. 30, lns. 16-19 and p. 47, ln. 15 through p. 48, ln. 2). The SCAD mark is referenced throughout these catalogs to identify the College. (*See* R-64 at pp. 44-48). Other examples of such publications that make use of the SCAD Mark include newsletters, admissions posters, post card mailers, brochures and schedules for SCAD's athletic programs. (*See generally* R-64 at pp. 30-49, 57; Plaintiff's Trial Exhibits P-3, P-5 through P-20, P-80, P-81).

ATL01/11779791v3

9.    SCAD's Admissions Department supplements these promotional materials by hosting

numerous "SCAD Information Sessions" across the United States where prospective students and their

parents can come and speak with SCAD admissions representatives about the College and its

programs.  (*See* R-65, Transcript of Proceedings held on 10/7/2004 before Magistrate Judge Timothy

S Hogan, at p. 78, ln. 22 through p. 79, ln. 20, p. 98, ln. 17 through p. 99, ln. 21).  If there is an

information session being held in a large metropolitan area, SCAD typically will place an advertisement

in the metropolitan area's local paper regarding the event.  (*See* R-64 at p. 31, lns. 3-7; R-65 at p. 79,

lns. 11-25).

10.    At trial, SCAD introduced a number of other ways in which it has used the SCAD

Mark since well prior to the actions of Houeix complained of in this lawsuit, including the following:

- On the uniforms for its men's and women's athletic programs (*See* R-64 at p. 32, lns. 9-10, p. 36, lns. 14-25; Plaintiff's Trial Exhibits P-7, P-16, and P-17);

- On a college identification card that also functions as a debit card, known as the "SCAD card". (*See* R-64 at p. 45, ln. 14 through p. 46, ln. 7);

- On the marquee of a theatre SCAD owns in Savannah, Georgia named the "SCAD Trustees Theater" (*See* R-64 at p. 37, lns. 12-25 through p. 38, lns. 1-15, p. 58, lns. 5-21);

- On brochures for events to be held at the SCAD Trustees Theater (*See* R-64 at p. 38, lns. 4-22); and

- In the name of its parents association, the "SCAD Parents Association. (*See* R-64 at p. 31, lns. 3-7; *see also* Plaintiff's Trial Exhibit P-5).

11.    SCAD's annual advertising expenditures are nearly half-a-million dollars.  (*See* R-53,

Uncontroverted Fact No. 12).  Including the cost of printing and mailing SCAD's catalogs, SCAD

spends between one and two million dollars a year on promotional materials.  (*See* R-64 at p. 59, lns. 6-12).

      12.      Articles about SCAD have appeared in numerous newspapers and magazines, and SCAD has been featured in various radio and television news broadcasts.  (*See generally* R-64 at p. 52, ln. 22 through p.56, ln. 9, p. 125, lns. 3-14; Plaintiff's Trial Exhibits P-32 and P-33).

      13.      On February 11, 2002, the United States Patent and Trademark Office (the "USPTO") issued SCAD Certificate of Registration No. 2,686,644 for the mark SCAD for use in connection with "education services, namely providing instruction and training at the undergraduate, graduate and post-graduate levels."  (*See* R-53, Uncontroverted Fact No. 16; *see also* R-64 at p. 63, ln. 23 through p.64, ln. 13; Plaintiff's Trial Exhibits P-1).

      14.      No one has challenged SCAD's right to register or use the SCAD Mark to identify its goods and services.  (*See* R-64 at p. 64, lns. 14-22).

      15.      By virtue of SCAD's longstanding promotion and use of its goods and services under the SCAD Mark, the mark is well known in the field of higher education and among current and prospective students, faculty members, parents, and alumni as identifying the Savannah College of Art and Design.  (*See* R-64 at p. 31, lns. 12-21, p. 63, lns. 3-16; p. 155, lns. 15-25).

      16.      The undisputed evidence of record is that SCAD is the only entity in the field of educational services in the United States that uses the term "SCAD" as a service mark or trademark to identify educational services or related goods or services.  As such, the SCAD Mark is a strong, distinctive mark in its field.

      17.      Houeix attempted to attack this point at trial by introducing screen prints of alleged third party web sites that use the SCAD mark; however, none of Houeix's evidence is competent evidence

on this point. (*See generally* Defendant's Trial Exhibit D-22[1]). Houeix admitted that, with the exception of the sites at scad.org and scad.com, he had not visited any of the sites in two years and could not verify that the sites are still active today. (*See* R-65 at p. 4, ln. 20 through p. 5, ln. 10). SCAD demonstrated that one of the web sites, scad.ac.jp (the alleged site for a Japanese arts school) does not exist today. (*See* R-65 at p. 6, ln. 20 through p. 7, ln. 7). Neither of the web sites located at scad.org and scad.com – nor any of the other web sites Houeix introduced – relate to educational services promoted to the public in the United States. (*See* R-65 at p. 5, lns. 15-21). Scad.org is the address for the Smith County Appraisal District, and scad.com is the address for a real estate organization. (*See* Defendant's Trial Exhibit D-22, p. 3-4; R-64 at p. 199, lns. 5-18; R-65 p. 5, lns 12-21).

## II.    SCAD'S Web Sites and Domain Names

18.    Since 1995, SCAD has operated a heavily trafficked Internet web site under the domain name scad.edu that provides detailed information about the College and its goods and services. (*See* R-53, Uncontroverted Fact No. 8; s*ee also* R-64 at p. 66, lns. 1-11 and p.67, ln. 10 through p. 69, ln. 4; Plaintiff's Trial Exhibits P-35, P-4).

19.    SCAD's web site is now its principal marketing tool. (S*ee* R-64 at p. 30, lns. 21-22).

20.    In 2003, SCAD received over 260 million hits on its scad.edu web site. (*See* R-64 at p. 68, ln. 18 through p. 69, ln. 4).

---

[1]    The print outs of these third party Web sites are contained in pages 2-11, 14 and 16 of Defendant's Trial Exhibit D-22. The remaining pages of Defendant's Trial Exhibit D-22, pages 1, 12-13, and 15, were not admitted into evidence. (See R-64 at p. 208, ln. 24 through p. 209, ln. 17).

21.     The content on the scad.edu web site had grown so voluminous, having more than 50,000 pages, that SCAD had to remove a large portion of the content (approximately 38,000 pages) to make the site easier for Internet users to navigate.  (*See* R-65 at p. 77, lns. 4-23).

22.     SCAD has registered and uses other domain names, including scadradio.org, scad.biz and scad.net to host additional content about the College and to capture additional Internet traffic looking for information about the College.  (*See* R-65 at p. 76, ln. 15 through p. 81, ln. 9; *see also* Plaintiff's Trial Exhibits P-87, 88 and 89).

23.     Since at least as early as 1998, SCAD has used the e-mail address info@scad.edu as its general e-mail address for persons seeking information about the College.  (*See* R-53, Uncontroverted Fact No. 7; s*ee also* R-64 at p. 66, ln. 23 through p. 67 ln. 7).

## III.     Houeix and His Retention by SCAD

24.     SCAD sometimes interviews in Europe for faculty positions at the school.  (*See* R-64 at p. 72, lns. 2-6).  In or before 1999, SCAD advertised in a London newspaper for an opening in its interior design department.  (*See* R-64 at p. 72, lns. 2-6).

25.     Houeix is a French citizen who read SCAD's advertisement and interviewed for the position.  (*See* R-64 at p. 72, lns. 2-6).

26.     SCAD requires that each of its faculty members have a graduate degree in their field.  (*See* R-65 at p. 81, ln. 20 through p. 82, ln. 16).  When Houeix interviewed with SCAD, he represented that his educational background was the equivalent of a graduate degree in the United States.  (*See* R-65 at p. 81, lns. 15-23).

27.     Based on Houeix's representations, SCAD offered him employment as a professor in the Interior Design Department, which Houeix accepted.  (*See* R-65 at p. 81, lns. 15-23; R-64 at p.

72, lns. 2-6). SCAD also offered a teaching position to Houeix's wife, Natalie Doucetle, in the College's school of fashion design. (*See* R-65 at p. 90, lns. 7-16).

28.    To permit Houeix to teach at the College, SCAD secured an H-1 visa for Houeix that would allow Houeix to teach in the United States for three years. (*See* R-65 at p. 15, lns. 19-21, p. 40, ln. 22 through p. 41, ln. 2).

29.    During Houeix's first year of employment, as part of a routine audit of academic credentials, an outside accreditation agency informed SCAD that Houeix's educational background was only the equivalent of an undergraduate degree in the United States. (*See* R-65 at p. 81, lns. 23- through p. 82, ln. 8).

30.    Although SCAD could have chosen not to renew Houeix's contract as a result of this information, SCAD gave Houeix the option of continuing to teach at the College provided that he enroll and make satisfactory progress in a graduate program in interior design. (*See* R-65 at p. 82, ln. 17 through p. 83, ln. 6).

31.    SCAD's requirement that Houeix enroll in post graduate classes marked a turning point in Houeix's relationship with the College. He was angry at SCAD for requiring him to enroll in the graduate program. He had practiced in the field for many years and believed he knew everything there was to know in the field. (*See* R-65 at p. 11, ln. 21 through p. 12, ln. 4, p. 83, lns 7-16). He, therefore, plainly considered SCAD's requirement to be an affront to his reputation and credentials. Nevertheless, Houeix needed to stay at SCAD because of his visa status, so he enrolled in SCAD's graduate program in interior design and continued to teach at the College. (*See* R-65 at p. 43, ln. 23 through p. 44, ln. 3).

32.    Houeix insisted that he be allowed to enroll in an extra class per quarter than was required by the College so that he could complete the degree on an accelerated basis.  (*See* R-65 at p. 84, lns. 8-13).  To accommodate this demand and his teaching schedule, Brian Murphy, SCAD's Executive Vice President of Business Affairs, testified at trial that Dr. Crystal Weaver, then head of SCAD's Department of Interior Design, permitted Houeix to take his classes in an individual, independent study format and allowed him to turn in work after a quarter was done.  (R-65 at p. 84, ln 9 through p. 86, ln. 7, p.  88, ln. 5 through p. 89, lns 19).

33.    Sometime after Houeix enrolled in SCAD's graduate program, SCAD fired Houeix's wife.  (*See* R-65 at p. 12, lns. 15-17, p. 90, ln. 11 through p. 92, ln 1).  Mr. Murphy, testified that the College did everything it could to keep Houeix's wife on the staff, but that, after moving her to several different positions within the College, it became clear that she could not work effectively with others and that the College had no choice but to fire her. (*See* R-65 at p. 90, ln. 11 through p. 91, ln 15).

34.    Houeix was upset by his wife's firing and believed it to be without cause.  (*See* R-65 at p. 13, ln. 17-18).  Houeix therefore set out on a course to leave the College as soon as his visa status would permit him to do so.  (*See* R-65 at p. 59, ln. 15-22).

35.    In September 2001, Houeix's wife obtained a job at the University of Cincinnati and secured an H1 Visa.  (*See* R-65 at p. 41, lns. 12-16).

36.    With his wife's hiring, Houeix no longer needed to rely on the G1 Visa that he obtained through SCAD to keep his family in the Unites States.  (*See* R-65 at p. 41, lns. 12-24).  Houeix resigned from SCAD's faculty on September 14, 2001, two days after the beginning of the first quarter of SCAD's 2001-02 school year, without advance notice to the College. (*See* R-64 at p. 72, lns. 10-15; R-65 at p. 14, ln. 20 through p. 15, ln. 7).

-9-

37.     Mr. Murphy testified that Houeix's departure was a complete surprise and caused considerable harm to SCAD, its faculty members, and students.  (R-65 at p. 89, ln. 20 through p. 90, ln. 6; *see also* R-53, Uncontroverted Fact No. 25).

## IV.     Houeix's Domain Names and Web Site Content

38.     After he resigned from SCAD, Houeix registered the domain name scad.info. Thereafter, he began using the domain name to host a web site about SCAD, its faculty, and administration.  (*See* R-53, Uncontroverted Fact No. 27; *see also* R-64 at p. 156, lns. 16-19, p. 72, ln. 16 through p. 73, ln. 4; Plaintiff's Trial Exhibit P-38).

39.     When Houeix first posted his scad.info web site to the Internet, his site contained a prominent advertisement for Register.com.  (Plaintiffs Trial Exhibit P-40).  Houeix testified that he agreed to place this advertisement on his web site in exchange for free web hosting services from Register.com.  (*See* R-64 at p. 171, lns. 4-19).

40.     At the top left of the home page of Houeix's scad.info web site is a link entitled "Savannah College of Art and Design Fake Master Fraudulent Process."  (Plaintiff's Trial Exhibit P-43).  When a user clicks on this link, he is taken to a web page on which Houeix alleges that he was given fraudulent grades by SCAD for classes he never attended and work he never performed.  (*See* R-64 at p. 129, ln. 20 through p. 130, ln. 13).

41.     Mr. Murphy testified that the College did not know anything about these allegations until they read them on Houeix's web site.  (*See* R-65 at p. 83, ln. 20 through p. 84, ln. 1).

42.     Houeix admits that he did not bring his allegations to the attention of anyone at SCAD before he resigned, despite that the fact that he was aware that the College had a formal student grievance process through which he could have addressed the claims and despite the fact that he

-10-

accepted new contracts and raises in salary from SCAD while the alleged fraud was occurring. (*See* R-64 at p. 60, lns. 6-9; R-65 at p.10, ln 19 through p. 11, ln. 5, p. 83, lns. 10-20).

43.    After reading Houeix's allegations on the Internet, the College promptly conducted a thorough evaluation of Houeix's claims and concluded that they were without merit. (*See* R-65 at p.84, ln 2 through p. 86, ln. 7). SCAD also provided information about Houeix's allegations to the accreditation agency responsible for the accreditation of colleges in the southern United States, the Southern Association of Schools and Colleges ("SACS"), which likewise determined that no action was necessary on Houeix's claims. (*See* R-64 at p.132, lns. 20-25).

44.    Despite the presence of these "fraudulent grading" allegations on the scad.info site, Houeix testified that the real purpose of his web site is to provide news and information to prospective students, parents and faculty members about SCAD that they will not get from SCAD. (*See* R-64 at p.161, lns. 10-25).

45.    Houeix attempts to accomplish this goal in several ways. The home page of his site includes prominent links to third party web sites that contain SCAD related message boards or other content Houeix believes prospective students to SCAD should consider. (*See* R-64 at p.187, lns. 2-13; Plaintiff's Trial Exhibit P-43). These sites include WorldStudent.com, Yahoo.com and LiveJournal.com. (*See* R-53, Uncontroverted Fact No. 29; *see generally* R-64 at p. 84, ln. 2 through p. 97, ln. 21, p. 172, lns. 7-20; Plaintiff's Trial Exhibits P-46, P-79, P-84, P-53, P-54, and Joint Trial Exhibit J-3).

46.    Each of these third party sites are commercial in nature. The WorldStudent.com web site contains rotating advertisements for various universities and others who are partners of Worldstudent.com. (*See* R-64 at p. 84, ln. 8 through p. 86, ln. 11; Plaintiff's Trial Exhibit P-46).

-11-

LiveJournal.com is a chat room site that charges users to access certain features of the web site. (*See* R-64 at p. 91, ln. 12 through p. 94, ln. 22; Joint Trial Exhibit J-3, Plaintiff's Trial Exhibit P-46). The page of the Yahoo.com site to which Houeix's web site links contains advertisements for third party products and services. (*See* R-64 at p. 95, ln. 3 through p. 97, ln. 21, p. 112, ln. 21 through p. 115, ln. 6, p. 115, ln. 18 through p. 116, ln. 12; Plaintiff's Trial Exhibits P-53, P-54 and P-84).

47. Another link on the home page of Houeix's web site is entitled "Savannah College of Art and Design's Testimonies." (Plaintiff's Trial Exhibit P-43). When clicked, this link redirects users to a web site located at the domain name scad-and-us.info. (*See* R-64 at p.81, lns. 6-22; Plaintiff's Trial Exhibit P-43).

48. Scad-and-us.info is another domain name that Houeix registered after he resigned from SCAD. (*See* R-64 at p.157, ln. 20 through p. 158, ln. 18; Plaintiff's Trial Exhibit P-38). The site Houeix operates at the domain name consists of e-mails Houeix has received from third parties about the College and its faculty, staff, and administration from prospective students, parents, faculty members and staff. (*See* R-64 at p. 81, ln. 17 through p. 83, ln. 17; Plaintiff's Trial Exhibit P-43).

49. Houeix's scad.info web site also contains a prominent link at the top of the site entitled "Emails of the Week." (*See* R-64 at p. 78, lns. 6-20; Plaintiff's Trial Exhibit P-44). When a user selects this link, the user is directed to a web page within the scad.info web site that contains a selection of the various e-mails that Houeix has received from third parties about the College and its faculty, staff, and administration. (*See* R-64 at p. 79, lns. 2-15; Plaintiff's Trial Exhibit P-44).

50. The scad.info and scad-and-us.info web sites are not bulletin boards. Rather, Houeix picks and chooses from among the e-mails he receives as to which e-mails he wishes to post to these sites. (*See* R-65 at p. 19, lns. 6-23).

51.    The majority of the e-mails that Houeix has posted on his sites are critical of SCAD. (*See* R-65 at p. 19, ln. 24 through p. 20, ln. 4). Of the approximately 200 e-mails posted on his web sites, Houeix testified that he would only characterize five of the e-mails as being favorable to SCAD. (*See* R-65 at p. 50, ln. 1-5). Houeix admits that he does not post e-mails to his site that disagree with his point of view and that he has failed to post e-mails to his site for this reason. (*See* R-65 at p. 39, lns. 14-19).

52.    Houeix testified that the e-mails he posts to his sites are truthful and non-scandalous. (*See* R-65 at p. 28, ln. 24 through p. 29, ln. 2, p. 54, ln. 20 through p. 55, ln. 1). Nevertheless, the postings on his site belie this testimony.

53.    For example, Houeix's sites contain allegations of rape including one allegedly occurring in a SCAD dormitory room and another allegedly perpetrated by a staff member of SCAD, allegations of the death of three faculty members caused by contamination in Poetter Hall, a building on SCAD's campus, and allegations of a SCAD professor, whom Houeix identified by name, telling sexist and crude jokes in class. (*See* R-65 at p. 24, ln. 16 through p. 27, ln. 15, p. 29, ln. 9 through p. 31, ln. 13, p. 22, ln. 7 through p. 23, ln. 13; Plaintiff's Trial Exhibits P-43, P-85). Houeix posted these allegations to his web site even though Houeix testified that he has no factual basis for knowing whether the rape allegations are true or not, Houeix has a report from the lauded Centers for Disease Control that the contamination claim is false and Houeix admits that he never contacted the named faculty member regarding classroom conduct allegation. (*See* R-65 at p. 23, ln. 14 through p. 24, ln. 14, p. 24, ln. 16 through p. 28, ln. 23, p. 29, ln. 9 through p. 31, ln. 13). Nevertheless, Houeix has refused to remove the e-mails from his sites or post exculpatory information on his site.

54.     Prospective students and faculty members have written to Houeix and informed him that they have decided not to attend SCAD or accept a faculty position at SCAD on the basis of the materials contained on his web sites.  (*See* R-64 at p. 175, ln. 17 through p. 176, ln. 6)

55.     Houeix concedes that he intends the "SCAD" portion of his scad.info and scad-and-us.info domain names to refer to the College.  (*See* R-64 at p. 159, lns. 9-18).  Houeix further admits that the web sites he operates under these domain names are designed to targets persons who are affiliated with the College or who may one day be affiliated with the College.  (*See* R-64 at p. 165, lns. 14-18).

56.     Internet users interested in reaching the web site of a particular entity will often do so by typing in the name of the entity following by a top-level domain name, such as .com or .info.  (*See* R-64, p. 77, lns. 2-8).  Because .info is the new top-level domain name intended to be used as the location for information about particular companies or institutions, and because the domain name is widely understood by Internet users as such, it is substantially likely that a consumer trying to find a SCAD web site providing information about the College would do so under the domain name scad.info.  (*See* R-53, Uncontroverted Fact No. 21).

57.     Prior to registering the scad.info domain name, Houeix had his web site content posted to the Internet at the domain name phoueix-master-scad.com.  (*See* R-64 at p. 160, lns. 12-19).  Houeix moved his site to scad.info because he knew that it was more likely that Internet users who were looking for information about the College would come to the scad.info web site because of the domain name's wholesale adoption of the SCAD Mark.  (*See* R-64 at p. 161, ln. 19 through p. 164, ln. 2).  Houeix also concedes that persons who are familiar with SCAD may think the domain name scad.info has some affiliation with the College.  (*See* R-64 at p. 165, lns. 5-13).

-14-

58.     Houeix's use of scad.info has led to actual consumer confusion.  An alumnus of SCAD who wanted to give money to the College wrote to SCAD's alumni affairs director that she "went to the scad home page and … got this totally odd webpage . . .."  (*See* R-53, Uncontroverted Fact No. 28; *see also* Plaintiff's Trial Exhibit P-51; R-64 at p. 102, ln. 16 through p. 103, ln. 10).  Brian Murphy testified that the alumnus actually went to the scad.info web site.  (*See* R-64 at p. 102, ln. 16 through p. 103, ln. 10).

59.     At least two dozen other individuals have telephoned SCAD and expressed that they inadvertently went to Houeix's scad.info web site, and at least three individuals have written to Houeix and stated that they "stumbled" onto his site.  (*See* R-64 at p. 100, ln. 19 through p. 101, ln. 2; Plaintiff's Trial Exhibit P-43 at p. 12 of 50, e-mail dated Tu, 11 Mar 2003 ("I just sat down to my computer to write my letter of intent to SCAD for transferring when I stumbled upon your site"), p. 14 of 50, e-mail  dated Thu, 6 Mar 2003 ("I stumbled across this website while researching design schools"); Plaintiff's Trial Exhibit P-43, at p. 38 of 48, e-mail dated Sun, 2 Mar 2003 ("I bumped into your website as scad was advertising a new job position").

60.     Once a user gets to Houeix's site and spends some time examining it, he or she may discover that the site is not in fact a SCAD site; nevertheless, by then the user has already been lured to the site by mistake.

61.     Internet users interested in reaching SCAD's web site may also use a search engine such as Yahoo! to locate the site.  (*See* R-53, Uncontroverted Fact No. 30).

62.     When a user conducts a search in Yahoo! on the term "scad," a prompt appears to suggest that a search on "SCAD College" may lead to more focused results.  (*See* Plaintiff's Trial Exhibits P-74; *see also* R-64 at p. 69, ln. 5 through p. 70, ln. 19 and p. 98, lns. 5-11).  A search of

"SCAD College" on September 22, 2004 returned Houeix's scad.info and scad-and-us.info sites as the third and sixth search results, respectively. (*See* Plaintiff's Trial Exhibit P-75; *see also* R-64 at p. 98, lns. 17-21).

63.    The search listing results for Houeix's sites in Yahoo! do not clearly identify that the sites are unaffiliated with SCAD. (*See* R-64 at p. 98, ln. 22 through p. 99, ln. 24; *see also* Plaintiff's Trial Exhibit P-75). Indeed, from all appearances, the search engine listing for the scad-and-us.info site is for a SCAD site. (*See* Plaintiff's Trial Exhibit P-75) Accordingly, Internet users are likely to click on the results thinking that by doing so they will be taken to a SCAD operated or approved web site.

64.    Houeix registered his .info domain names just after the .info top-level domain became available for registration. (*See* R-64 at p. 101, ln. 23 through p. 101, ln. 15). Because there can be only one registrant for any given domain name, Houeix's registration prevents SCAD from being able to register or use scad.info to host its own web site.

65.    Mr. Murphy testified that SCAD would like to own the scad.info domain name to capture the Internet traffic that is looking for information about SCAD at a web site located in the .info domain. (*See* R-64 at p. 101, ln. 23 through p. 102, ln. 15). Mr. Murphy further testified that the College could use the scad.info domain name to host some of the content that SCAD has removed from the scad.edu web site due to size considerations. (S*ee* R-65 at p. 77, lns. 4-23).

66.    Mr. Murphy further testified that, although the .info domain name is a relatively new top-level domain, it is being used with increasing frequency by colleges and universities in the United States to serve as the address for primary or secondary web sites. (*See generally* R-64 at p. 104, ln. 20 through p. 109, ln. 19; *see also* Plaintiff's Trial Exhibits P-56 through P-69, P-73). In support of this testimony, SCAD introduced at trial print-outs of web sites of more than fourteen colleges and

-16-

universities in the United States that operate web sites at domain names in the .info top-level domain, including Brigham Young, Ohio University, Rutgers, San Diego State, the University of Colorado, Arizona State, Michigan State, and numerous others. (*See generally* R-64 at p. 104, ln. 20 through p. 109, ln. 19; *see also* Plaintiff's Trial Exhibits P-56-58, 60-69, 73).

## CONCLUSIONS OF LAW

64.      "[D]omain names can and do communicate information as to the source or sponsor of a web site." *Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc.,* 326 F.3d 687, 696 (6th Cir. 2003) (quoting *PACCAR, Inc. v. TeleScan Techs, LLC*, 319 F.3d 243, 250 (6th Cir. 2003)). Accordingly, it is well settled that the use of another's trademark as a domain name for a web site may constitute both trademark infringement and trademark dilution. *See, e.g.*, *Interactive Prods.*, 319 F.3d at 250; *PACCAR, Inc.,* 319 F.3d at 243 (holding that defendant's use of domain names such as "peterbilttrucks.com" and "kentworthnewtrucks.com" violated plaintiff's trademark rights in the marks "Peterbilt" and "Kentworth"); *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001) (hereinafter referred to as *"PETA"*) (holding use of animal rights organization's trademark "PETA" in the domain name "peta.org" for a web site which featured materials on eating meat and hunting that were antithetical to message of organization constituted trademark infringement).[2]

---

[2]      *See also OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp.2d 176 (W.D.N.Y. 2000) (enjoining use of plaintiff's trademark "T*he Buffalo News*" by defendant in a domain name "thebuffalonews.com" to host a web site to parody and provide a public forum for criticism of *The Buffalo News* web site); *Jews for Jesus v. Brodsky*, 993 F. Supp. 282 (D.N.J.) (enjoining use of plaintiff's trademark "Jews for Jesus" by defendant in the domain name "jewsforjesus.org" to host a web site providing a counterpoint to plaintiff's views), *aff'd*, 159 F.3d 1351 (3d Cir. 1998); *Planned Parenthood Fed'n of Am. Inc. v. Bucci*, 42 U.S.P.Q.2d (BNA) 1430 (S.D.N.Y. 1997), *aff'd,* 152 F.3d 920 (2d Cir. 1998), *cert. denied,* 525 U.S. 834, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998) (affirming district court's order enjoining use of plaintiff's trademark "Planned Parenthood" by defendant in the domain name "plannedparenthood.com" to host a web site that was adverse to plaintiff's views).

65.    SCAD has asserted claims for trademark infringement and dilution in violation of the federal Lanham Act, 15 U.S.C. §§ 1125(a)(1)(a) and 1125(c), and unfair competition under the common law of Ohio.

## I.    SCAD's Claims for Trademark Infringement and Unfair Competition

66.    SCAD's claims of trademark infringement under Section 43(a) of the Lanham Act and unfair competition under the common law of Ohio are governed by the same standard. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 626 n.2 (6th Cir. 2002). Accordingly, resolution of SCAD's infringement claim will also resolve SCAD's unfair competition claim.

67.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides a cause of action for infringement of common law trademark rights. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). To prevail on a claim under the Act, the plaintiff must prove:

> (1) that it possesses a mark; (2) that the defendant used the mark; (3) that the defendant's use occurred "in commerce"; (4) that the defendant used the mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (5) that the defendant used the mark in a manner likely to confuse consumers.

*PETA,* 263 F.3d at 364; *see also* 15 U.S.C. § 1125(a).

### A.    Ownership of Trademark Rights

68.    The undisputed evidence of record is that SCAD has the term "SCAD" nationwide to identify educational services in the field of art and design and to identify a wide variety of merchandise since 1979. SCAD therefore owns valid and enforceable service mark and trademark rights in the term. *See, e.g., Two Pesos*, 505 U.S. at 768; *Callaway Golf Co. v. Golf Clean, Inc.*, 915 F. Supp. 1206, 1213 (M.D. Fla. 1995).

69.    The Certificate of Registration the USPTO has issued to SCAD for its Mark (Reg. No. 2,686,644), which Houiex does not contest, serves as prima facie evidence of SCAD's exclusive right to use the SCAD Mark in commerce in the United States in connection with education services.  15 U.S.C. § 1057(b).

### B.    Use by Houeix of the SCAD Mark in Commerce

70.    It is well settled that "[t]he term 'use in commerce' as used in the Lanham Act 'denotes Congress's authority under the Commerce Clause rather than an intent to limit the [Lanham] Act's application to profit making activity." *Planetary Motion, Inc. v. Technosplosion, Inc.*, 261 F.3d 1188, 1194 (11th Cir. 2001); *see also United We Stand America, Inc. v. United We Stand America, N.Y., Inc.*, 128 F.3d 86, 92 (2d Cir. 1997) ("The history and text of the Lanham Act show that 'use in commerce' reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause, rather than to limit the Lanham Act to profit seeking uses of a trademark"); *Planned Parenthood Fed'n of Am. Inc. v. Bucci*, 42 U.S.P.Q.2d (BNA) 1430, 1434 (S.D.N.Y. 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998), *cert. denied*, 525 U.S. 834, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998), ("The 'use in commerce' requirement of the Lanham Act is a jurisdictional predicate to any law passed by Congress" and that "the scope of the 'in commerce' as a jurisdictional predicate of the Lanham Act is broad and has a sweeping reach.").

71.    Accordingly, it has been generally recognized that because of the nature of the Internet, "establishing a typical home page on the Internet, for access to all users, [satisfies] the Lanham Act's 'in commerce' requirement." *Planned Parenthood*, 42 U.S.P.Q.2d at 1434; *see also OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 186 (W.D.N.Y. 2000) ("[T]he national, and even

international, nature of the Internet itself makes defendants' use of plaintiffs' trademark as a domain name a "use in commerce" for purposes of the Lanham Act."); .

72.     In this case, Houeix has used the SCAD Mark in commerce by registering and using two domain names that include the SCAD Mark in whole (scad.info and scad-and-us.info) and using those domain names to serve as the addresses for Internet web sites.

73.     Federal courts have further recognized that the use of the plaintiff's mark to disparage or otherwise interfere with the plaintiff's ability to engage in commerce constitutes use of a mark in commerce. *See, e.g., Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998) (noting that because defendants action had an adverse effect on plaintiff's ability to conduct its business, the "in commerce" requirement under the Lanham Act was satisfied); *OBH*, 86 F. Supp. 2d at 186 ("[D]efendants' use of plaintiffs' trademark constitutes a 'use in commerce' as it affects plaintiffs' ability to offer their services in commerce."); *Planned Parenthood*, 42 U.S.P.Q.2d at 1434 ("[T]he effect of [defendant's] activities on plaintiff's interstate commerce activities would place defendant within the reach of the Lanham act.").

74.     Houeix has therefore used the SCAD Mark in commerce by using the domain names for web sites that disparage SCAD, its faculty, and administration.

### C.     In Connection with Goods and Services

75.     Houeix contends that his actions are not "in connection with goods and services" because he does not offer or sell any goods or services on his site.

76.     To have used the SCAD mark in connection with goods or services, Houeix need not have actually sold or advertised goods or services on his website.  Rather, he need only have "prevented users from obtaining or using [SCAD's] goods or services, *or* need only have connected

-20-

[his] web site[s] to other's goods or services." *PETA*, 263 F.3d at 365 (emphasis added); *accord*

*OBH*, 86 F. Supp. 2d at 186 ("[T]he 'in connection with' requirement is not only met by use of the

mark in connection with the goods or services distributed or advertised by the alleged infringer; it may

also be met by use in connection with the goods or services distributed by the trademark holder. Here,

defendants' sue of the mark is 'in connection with' the distribution or advertising of services, because it

is likely to prevent or hinder Internet users from accessing plaintiffs' services on plaintiffs' own web

site." (citations omitted)); *Faegre & Benson, LLP v. Purdy*, 70 U.S.P.Q.2d (BNA) 1315, 1317 (D.

Minn. 2004)("Defendants' use of domain names incorporating Faegre's mark is in connection with

goods or services, because it is designed to, and is likely to, prevent some Internet users from reaching

Faegre's official website."); *Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 309 (D.N.J. 1998), *aff'd*,

159 F.3d 1351 (3d Cir. 1998) (noting that "in connection with goods and services" requirement was

met because "the conduct of the Defendant is not only designed to, but is likely to, prevent some

Internet users from reaching the Internet site of the Plaintiff Organization"); *Planned Parenthood*, 42

U.S.P.Q.2d at 1435 ("[D]efendant's use is classically competitive: he has taken plaintiff's mark as his

own in order to purvey his Internet services – his web site – to an audience intending to reach plaintiff's

services.").

77.    The facts of the *PETA* case are remarkably similar to the facts of this case. In *PETA*,

the defendant registered the domain name peta.org then used the domain name as the address for a web

site entitled "People Eating Tasty Animals." The defendant alleged that he created his website to be a

parody of the plaintiff. The defendant did not sell or offer for sale any goods or services on his website.

Nevertheless, his website contained links to third party commercial websites, including to the sites of

meat, fur, leather, hunting, animal research, and other organizations which hold views antithetical to the

plaintiff's. The Fourth Circuit held that the defendant had used the plaintiff's mark in commerce by

preventing others from accessing the plaintiff's site *and* by linking his site to other's goods and services.

*Id.* at 365. With regard to the former, the Fourth Circuit explained:

> [Defendant's] use of PETA's Mark in the domain name of his web site is likely to
> prevent Internet users from reaching [PETA's] own Internet web site. The prospective
> users of [PETA's] services who mistakenly access Defendant's web site may fail to
> continue to search for [PETA's] own home page, due to anger, frustration, or the belief
> that [PETA's] home page does not exist….

*Id.* at 366.

78.    With regard to the latter, the Fourth Circuit noted that the Lanham Act does not require

that the defendant sell goods or services to be liable for infringement. Rather, the Act requires only that

the defendant use the plaintiff's mark "*in connection with*" the sale of goods and services. *PETA*, 263

F.3d at 366 (emphasis added); *see also* 15 U.S.C. § 1125(a)(1)(A); *Jews for Jesus*, 993 F. Supp. at

309 ("The requirement that the activities of an infringer be done 'in connection with any goods or

services,' does not require the infringer to actually cause goods or services to be placed into the stream

of commerce."). By including links to third party commercial operations on his website, the Fourth

Circuit held that the defendant's "use of PETA's mark is 'in connection with' the sale of goods or

services. *Id.*

79.    This same conclusion has been widely reached by other federal courts considering the

same issues, including the Sixth Circuit. *See, e.g., Taubman Co. v. Webfeats*, 319 F.3d 770, 75 (6th

Cir. 2003)("We believe the advertisements on Mishkoff's site [in the form of links to other web sites],

though extremely minimal, constituted his use of Taubman's mark 'in connection with the advertising' of

the goods sold by the advertisers. This is precisely what the Lanham Act prohibits."); *OBH*, 86 F.

Supp. 2d at 186; *Jews for Jesus*, 993 F. Supp. at 309 (finding use in commerce in connection with

goods and services because defendant's site provided a hyperlink to another organization's site that was commercial in nature).

80.    In this case, Houeix has used the SCAD mark in connection with the advertising or sale of goods and services in at least three ways.

81.    First, Houeix's scad.info web site promotes the goods and services of others by providing prominent links from the home page of his site to a number of third party commercial web sites, including Register.com, WorldStudent.com, LiveJournal.com, and Yahoo.com. *See, e.g., Taubman*, 319 F.3d at 775; *PETA*, 263 F.3d at 366; *Jews for Jesus*, 993 F. Supp. at 309; *Planned Parenthood,* 42 U.S.P.Q.2d at 1435. Houeix's web site also formerly had prominent banner advertisements for Register.com at the top of his site.

82.    Second, Houeix has prevented others from reaching SCAD's web site. Houeix concedes that he registered the domain name scad.info because it includes SCAD's mark and that he switched his site to this domain name from phoueix-master-scad.com because he knew the scad.info domain name would capture more prospective SCAD students and faculty who were looking for information about SCAD on the Internet to this site. (*See* R-64 at p. 159, lns. 9-18 and p. 161, ln. 19 through p. 164, ln. 2). Internet users looking for information about SCAD on the Internet may look for this information at a domain name that consists of the SCAD Mark in the "information" domain, or ".info." Indeed, the record contains evidence of an alumna of SCAD who did just that. (Plaintiff's Trial Exhibit P-51.) Houeix concedes that Internet users familiar with SCAD may think his scad.info domain name is affiliated with the college. (*See* R-64 at p. 165, lns. 5-13).

83.    Once at Houeix's website, Internet users may not continue to look further for SCAD's website "due to anger, frustration, or the belief that [SCAD's] home page does not exist." *PETA*, 263

F.3d at 365-66; *accord Planned Parenthood,* 42 U.S.P.Q.2d at 1435 (holding that defendant's registration and use of plannedparenthood.com is in connection with the distribution of services "because it is likely to prevent some Internet users from reaching plaintiff's own Internet web site"); *OBH*, 86 F. Supp. 2d at 183. Indeed, prospective students and faculty with only a basic knowledge of SCAD who want to find out more information about the college but end up at Houeix's site by mistake are unlikely to continue to look for SCAD's website after being greeted with Houeix's allegations of fraud, rape, and death on the SCAD campus.

84.    Houeix contends that Internet users will know to look for SCAD's web site in the ".edu" domain name. The court disagrees. SCAD has introduced substantial evidence that more and more colleges are registering and using domain names in the ".info" domain name as addresses for primary or secondary web sites, including such well known universities as Brigham Young, Rutgers, Ohio University, Arizona State, and the University of Colorado. Based on this evidence, the court is persuaded that it is likely that Internet users will look for information regarding SCAD on the Internet at "scad.info" and that this likelihood will become even more pronounced in the future as the use of the ".info." domain name continues to grow. Additionally, courts have recognized that Internet users who are interested in finding a company's web sites, in addition to typing in the company's name followed by a top-level domain such as .info, may also search for such company web sites using search engines. The evidence in this case shows that Houeix's web sites turn up third and sixth in the search results of a search run in Yahoo!, one of the leading Internet search engines. Although SCAD's scad.edu web site appears before Houeix's web sites in the search results, Internet users may click on the results for Houeix's web sites believing they contain additional information from SCAD about itself or its programs/activities. The search listing for Houeix's sites do not clearly communicate that the sites are

unaffiliated with SCAD; therefore, Internet users are likely to go to his sites believing that they are additional SCAD sites or that they are affiliated with SCAD in some way.

85.     The third way in which Houeix's web site is in connection with goods and services is because the content of his web sites is designed to harm, and has harmed, SCAD commercially. Federal courts have held in the context of claims under the federal dilution act that use of a trademark owner's mark to harm the owner commercially is also a commercial use in commerce. *See, e.g., Jews for Jesus*, 993 F. Supp. at 309 (holding that defendant's registration and use of jewsforjesus.org for a web site with views antithetical to plaintiff "constitutes a commercial use of the Mark and the Name of the [plaintiff] because it is designed to harm the [plaintiff] by disparaging it."); *Planned Parenthood*, 42 U.S.P.Q.2d at 1432 ("I hold, however, that defendant's use of plaintiff's mark [in the domain name plannedparenthood.org] is 'commercial' … [because] defendant's actions are designed to, and do, harm plaintiff commercially.")  If such use is a commercial use, it naturally follows that the use must also be in connection with the advertising or sale of goods or services.

86.     Here, Houeix plainly intends his use of the scad.info and scad-and-us.info domain names to harm SCAD commercially.  As such, his sites contain a variety of content that is critical of SCAD including allegations of fraud, rape, death and illness.  Moreover, even though Houeix has reason to believe that at least some of the content on his web sites is false, Houeix has refused to remove the e-mails from his sites or to even post the exculpatory information on his sites.  Houeix has succeeded in his goal.  Prospective students and faculty members have written to Houeix and informed him that they have decided not to attend SCAD or accept a faculty position at SCAD on the basis of the statements on his web sites.  (*See* R-64 at p. 175, ln. 17 through p. 176, ln. 6).  Houeix has therefore also used his

domain names "in connection with" the advertising or sale of goods and services by interfering with

SCAD's ability to engage in commerce.  *See, e.g.*, *Jews for Jesus*, 993 F. Supp. at 309.[3]

**D.    Likelihood of Confusion**

87.    To establish trademark infringement under the Lanham Act, it is not necessary for

SCAD to prove Houeix's use of the SCAD Mark as the address for his scad.info web site has caused

actual confusion.  Rather, the Lanham Act only requires that Houeix use the SCAD Mark in a manner

that is *likely to cause* confusion.  15 U.S.C. § 1125(a).

88.    The Sixth Circuit has recently adopted the initial interest confusion doctrine in cases

involving a defendant's use of a plaintiff's mark in a domain name.  *Paccar*, 319 F.3d at 253.  Under

this doctrine, Houeix's use of SCAD's Mark as his domain name can give rise to actionable confusion

even if persons realize after reading the content of his sites that the sites do not originate from SCAD.

*Paccar*, 319 F.3d at 253 ("A disclaimer disavowing affiliation with the trademark owner read by a

consumer after reaching a web site comes too late.

89.    Such initial interest confusion is actionable "[e]ven though when the user accesses the

defendant's site, she finds that it is not the plaintiff's site that she was seeking, [because] the defendant

has succeeded in luring users to his site, which often is the defendant's main purpose."  4 J. Thomas

McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 25:76 (4th ed. 2002).

90.    In *OBH*, 86 F. Supp. 2d at 191, the court explained the initial interest confusion

doctrine in the context of an Internet domain name case as follows:

---

[3]    Houeix has further interfered with SCAD's ability to engage in commerce through his mere registration of
the scad.info domain name.  Brian Murphy testified at trial that SCAD could, and would like to, use the scad.info
domain name in a number of different ways to support the school's programs.  However, because there can be only
[Footnote Continued On Next Page]

[E]ven if defendants' web site, itself, is assumed to be a parody, defendants' use of plaintiffs' mark as the domain name for the site still creates a likelihood of confusion. An Internet user looking for plaintiffs' web site may initially encounter defendants' web site by mistake either by running "The Buffalo News" mark through a search engine or by entering "thebuffalonews.com" as the domain name. The user will not realize that he or she is at the wrong site until he or she reads through defendants' site and discovers that the site is a parody of plaintiffs' site and not the real thing. Thus, even if users will easily recognize, upon reaching defendants' web site, that it is only a parody, the use of plaintiffs' mark as the site's domain name (the external address that users must enter in order to get to the site) creates initial interest confusion, which, … is actionable under the Lanham Act.

*Id.*

91.     To determine whether initial interest confusion (or any other form of actionable consumer confusion) exists, the court must weigh and balance the following eight factors: "(1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) intent of the defendant in selecting the mark; and (8) likelihood of expansion of the product lines." *PACCAR*, 319 F.3d at 249-50. These factors "imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988).

92.     Houeix's admission that he copied the SCAD Mark for his domain names alone justifies an inference of a likelihood of confusion. *Sally Beauty Co., v. Beautyco, Inc.,* 304 F.3d 964, 973 (10th Cir. 2002) ("Proof that a defendant chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion."); *Paccar*, 319 F.3d at 254 (finding use of mark in domain name indicates an intent to create the impression that the web site is sponsored

---

[Footnote Continued From Previous Page]

one registrant for any given domain name, Houeix's registration is blocking SCAD from being able to register and use

[Footnote Continued On Next Page]

by or affiliated with plaintiff); *see also, Artco*, 194 F. Supp. 2d at 727; *Ford Motor Co. v. Lloyd Design Corp.*, No. 00-2046, 2001 WL 1356137, at *4 (6th Cir. Oct. 25, 2001) ("[A] likelihood of confusion is presumed when a defendant intentionally copies a trademark design 'with the intent to derive a benefit from the reputation of another."). An analysis of each of the likelihood of confusion factors buttresses this conclusion.

### 1.    Strength of the SCAD Mark

93.    The "strength" element of the likelihood of confusion analysis is a legal shorthand for the scope of protection to be afforded a mark from infringement. "The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997)

94.    The SCAD mark is a strong mark because it is a coined or "fanciful" word derived from the initials of SCAD's name. *See, e.g., Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996) (noting that fanciful marks "are the strongest" types of marks); *Armco Steel Corp. v. Int'l Armament Corp.*, 249 F. Supp. 954, 956 (D.D.C. 1966) (finding trademark "ARMCO" from the initials of the American Rolling Mill Company is a coined word, and, thus, distinctive); *accord YKK Corp. v. Jungwoo Zipper Co.*, 213 F. Supp. 2d 1195, 1200 (C.D. Cal 2002)(same).

95.    The SCAD mark is also strong because it has been used by SCAD for years in a variety of nationally distributed advertising, promotional, and marketing materials to identify SCAD and

---

[Footnote Continued From Previous Page]

it. (*See* R-64 at p. 101, ln. 23 through p. 101, ln. 15).

ATL01/11779791v3

its educational services.  Indeed, it is the consumer recognition of the SCAD mark that motivated

Houeix to use the mark for his scad.info domain name in the first place.

96.    Houeix introduced printouts from various third party websites in an effort to establish

that the SCAD mark is weak.  However, these printouts prove, rather than disprove, that the SCAD

mark is strong.  To have any probative significance, the printouts must show third party use of the

SCAD mark in the field of educational services in the United States.  *See, e.g., Homeowners Group,*

*Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1108 (6th Cir. 1991) ("In order to be accorded

weight a defendant must show what actually happens in the marketplace."); *R.L. Polk & Co. v.*

*Infousa, Inc.*, 230 F. Supp. 2d 780, 786 (E.D. Mich. 2002) ("[I]n order to prove that third party

registrations weaken the Plaintiff's mark, the Defendant must show that third parties using the []mark are

engaged in the same business in which the Plaintiff is engaged."), *aff'd,* No. 02-2452, 2004 WL

771749 (6th Cir. Apr. 8, 2004).  None of the printouts Houeix introduced evidence such use.

Moreover, with the exception of two sites that Houeix acknowledges are outside the field of educational

services, Houeix admits that he has not visited any of the sites in two years.  Thus, he concedes that he

does not know whether these sites are still operational, and, at trial, SCAD demonstrated that one of

the sites, www.scad.at.jp," is no longer in operation.  Thus, rather than showing that the SCAD mark is

weak, Houeix's evidence further supports the conclusion that the mark is strong and, in the field of

educational services offered in the United States, entitled to a broad scope of protection from

infringement.

## 2.    Relatedness of the Parties' Services

97.    The Sixth Circuit has identified three categories regarding the "relatedness" of goods

and services:

> First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely.

*PACCAR*, 319 F.3d at 251 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 282). In determining relatedness, the question is not whether the parties offer the same goods or services. Rather, "[t]he question is, are the [goods or services] related so that they are likely to be connected in the mind of a prospective purchaser?" *Daddy's Junky Music Stores*, 109 F.3d at 283 (citations omitted).

98.     This case falls into the second category of relatedness above. Houeix's site purports to offer news and information regarding SCAD that Houeix hopes prospective students, faculty and staff of SCAD will read. As such, his services are related to, although not competitive with, SCAD's. The likelihood of confusion analysis in this case will thus turn on other factors.

### 3.    Similarity of the Parties' Marks

99.     Both of Houeix's domain names at issue in this case contain the SCAD mark without other words or phrases that would communicate that the sites located at the domain names are not associated or affiliated with SCAD. Indeed, the second level domain of Houeix's scad.info domain name is identical to the SCAD mark, and Houeix concedes that he intends the "scad" portion of his domain names to identify the Savannah College of Art and Design. *See, e.g., PACCAR*, 319 F.3d at 251-52 (finding, *inter alia*, "peterbiltnewtrucks.com" similar to the "Peterbilt" mark); *Planned Parenthood*, 42 U.S.P.Q.2d at 1437-1438 (finding "plannedparenthood.com" nearly identical to "Planned Parenthood" mark). The high degree of similarity between the SCAD Mark and Houeix's domain names thus weighs strongly in favor of a likelihood of confusion among Internet users. *See, e.g., Champions Golf Club*, 78 F.3d at 1119 (holding that "while similarity alone does not compel a

determination that marks are likely to be confused, it is a factor entitled to considerable weight) (citations omitted).

### 4. Actual Confusion

100.    A trademark plaintiff need not introduce evidence of actual confusion to prevail on its claim because the standard is a "likelihood" of confusion. *PACCAR*, 319 F.3d at 252; *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988). Because of the difficulty of obtaining such evidence, the absence of proof of such confusion is "inconsequential." *PACCAR*, 319 F.3d at 252; *accord Wynn Oil Co.,* 839 F.2d at 1188. Nevertheless, evidence of actual confusion is a powerful indicator that confusion is likely. *Wynn Oil*, 839 F.2d at 1188.

101.    In this case, Houeix's use of the scad.info domain name has resulted in at least one instance of actual consumer confusion. An alumnus of SCAD who wanted to give money to the college wrote to SCAD's alumni affairs director that she "went to the scad home page and … got this totally odd webpage . . .." (*See* R-53, Uncontroverted Fact No. 28; *see also* Plaintiff's Trial Exhibit P-51; R-64 at p. 102, ln. 16 through p. 103, ln. 10). Brian Murphy testified that the alumnus actually went to the scad.info website.

102.    The record contains circumstantial evidence of numerous other incidents of confusion. At least two dozen individuals have telephoned SCAD and expressed that they inadvertently went to Houeix's scad.info website, and at least three individuals have written to Houeix and stated that they "stumbled" onto his site. (*See* R-64 at p. 100, ln. 19 through p. 101, ln. 2; Plaintiff's Trial Exhibit P-43 at p. 12 of 50, e-mail dated Tu, 11 Mar 2003 ("I just sat down to my computer to write my letter of intent to SCAD for transferring when I stumbled upon your site"), p. 14 of 50, e-mail dated Thu, 6 Mar 2003 ("I stumbled across this website while researching design schools"); Plaintiff's Trial Exhibit P-

-31-

43, at p. 38 of 48, e-mail dated Sun, 2 Mar 2003 ("I bumped into your website as scad was advertising a new job position")..

103.    In admitting into evidence the e-mail from the alumna referenced above, this court held that the e-mail is entitled to little weight because it is only one e-mail among the millions of hits that the SCAD website has received.  Order dated October 14, 2004.  However, SCAD correctly points out that the proper measure to use in determining the weight of this evidence is not the number of hits to SCAD's web site but the number of hits to Houeix's web site because that is where the confusion will occur.

104.    There is little evidence in the record regarding the number of hits that Houeix's website has received.  His site contains approximately 200 e-mails he has received from third parties, but this is the only evidence of record regarding the volume of hits to his site.  Other factors indicate that the traffic to his site is not nearly as substantial as the traffic to SCAD's site.  Houeix registered his domain names shortly after the .info top-level domain became available for registration in late 2001.  Because the domain is young, it is not a domain that Internet users are as familiar with or as accustomed to using as more well-established and older domains such as .com and .edu, which Internet users have used for a decade.  Moreover, Houeix has not advertised his website; therefore, one would not expect to find that his site has yet received the kind of traffic SCAD's site receives.

105.    Under these circumstances, the relatively low volume of actual confusion evidence is to be expected.  Thus, the confusion of the alumna is entitled to significant weight and is strong evidence of the existence of a likelihood of confusion in this case.

ATL01/11779791v3

### 5.    Similarity of the Parties' Marketing Channels

106.    Both parties use the SCAD mark to host web sites that are available on the Internet.

That the marks are used as domain names for web sites "increases the likelihood of confusion between

the two marks" because,

> '[i]n the Internet context, … entering a web site takes little effort – usually one click
> from a linked site or a search engine's list; thus, Web surfers are more likely to be
> confused as to the ownership of a web site than traditional patrons of a brick-and-
> mortar store would be of a store's ownership.'

*PACCAR*, 319 F.3d at 252 (quoting *Brookfield Communications,* 174 F.3d at 1057).

### 6.    Sophistication of Target Consumers

107.    Houeix contends that the target audiences for the parties' web sites are highly

sophisticated and therefore unlikely to be confused.  SCAD respectfully disagrees.  The target audience

for SCAD consists of 16, 17 and 18 year old high school students.  SCAD submits that individuals this

young cannot properly be classified as "highly sophisticated."  The court agrees.  The relevant target of

SCAD's web site and educational services are thus consumers of average sophistication exercising

ordinary caution.  *See, e.g., Champions Golf Club*, 78 F.3d at 1120 ("Generally, in assessing the

likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising

ordinary caution.").

108.    Regardless of what standard is applied, however, confusion is likely in this case.  An

Internet user looking for information about SCAD in the "information" top-level domain, or .info, would

expect to find SCAD's site at the domain name scad.info.  Not even a Nobel Laureate would surmise

from the scad.info domain name itself that the site located at the domain name is the address for a site

that is critical of SCAD, as opposed to a site operated by SCAD.

109.    Without delving into the content of Houeix's web site, it would be almost impossible for an Internet user accessing Houeix's web site for the first time to determine that the site does not originate from, and is not sponsored by or affiliated with, SCAD. *See Planned Parenthood*, 42 U.S.P.Q.2d at 1438 ("[A]n Internet user cannot immediately determine the content of a home page maintained by the owner of a particular domain name or located at a specific address. Only after a user has seen or entered [the domain name] can she access the web site; such access occurs after at least a temporary delay. In addition, there is a delay while the home page loads into the computer.").

110.    Thus, no matter how sophisticated the customer may be, Houeix's registration and use of his domain names is likely to result in actionable initial interest confusion. *See, e.g., PACCAR*, 319 F.3d at 254 ("Initial interest confusion 'afflicts sophisticated Internet users no less than it does unsophisticated users.'"); *OBH*, 86 F. Supp. 2d 176, 190 ("the particular type of confusion caused by defendants' use of the 'thebuffalonews.com' domain name[, initial interest confusion,] afflicts sophisticated Internet users no less than it does unsophisticated users.).[4]

### 7.    Houeix's Intent

111.    Significantly, SCAD need not prove that Houeix intended to cause confusion to prevail on its claims. Indeed, the "lack of intent by a defendant is 'largely irrelevant in determining if consumers likely will be confused as to source.'" *Daddy's Junky Music Stores*, 109 F.3d at 287. Nevertheless, Houeix's registration of scad.info with full knowledge of SCAD's ownership and use of the SCAD mark, and with the intention that Internet users understand the "scad" portions of his domain names refer

---

[4]    The Sixth Circuit further noted in *PACCAR* that, even if the average purchaser is sophisticated, the "purchaser care [factor] will decrease the likelihood of confusion only minimally" where, as here, the parties' marks are highly similar. *Id.*

ATL01/11779791v3

to SCAD evidences that Houeix intended to trade unfairly on SCAD's trademark rights. *See, e.g.,* *Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 603 (6th Cir. 1991) ("[U]se of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement."). This factor therefore strongly favors a finding of likelihood of confusion.

### 8.    Expansion of Product Lines

112.    SCAD concedes that it is unlikely that Houeix will open a competing art and design school.  Nevertheless, it is entirely possible that Houeix will pursue a teaching position at a competitive college or university.  Indeed, he came to the United States to teach.  If he does, he could use his domain names to support that position through links to his new employer's web site or otherwise that encourage prospective students to come to his new school and not the SCAD.  SCAD thus submits that this factor weighs in favor of a finding of likelihood of confusion.

### 9.    Conclusion

113.    The clear weight of the likelihood of confusion factors strongly favors a finding of a likelihood of confusion.  Houeix's registration and use of scad.info and scad-and-us.info therefore infringe SCAD's trademark rights.

## II.    SCAD's Trademark Dilution Claim

114.    To prevail on its claim of trademark dilution under the Federal Trademark Dilution Act ("FTDA"), SCAD must show that:  (1) the SCAD Mark is famous; (2) the SCAD Mark is distinctive; (3) Houeix's use is in commerce; (4) Houeix began use of the scad.info domain name after the SCAD Marks became famous; and (5) Houeix's actions cause dilution of the distinctive quality of the SCAD Mark.  *See* 15 U.S.C. § 1125(c); *V Secret Catalogue, Inc. v. Moseley*, 259 F.3d 464, 469 (6th Cir.

2001), *rev'd on other grounds,* 537 U.S. 418 (2003); *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 577 (6th Cir. 2000).

### A.    Fame and Distinctiveness

115.    To qualify for protection under the FTDA, a mark need not be known to all consumers across all fields.  Rather, a mark may be protected from dilution within its field if the mark is famous within that field.  *See, e.g., Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 164-65 (3rd Cir. 2000); *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 640-41 (7th Cir. 1999); *see also Playboy Enters., Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1032 (9th Cir. 2004) (evidence of third party uses that were "in different fields or in localized areas should not be counted, at least not when considering whether [plaintiff's] marks are famous within their market.").

116.    To determine whether a mark is famous in its field, the FTDA instructs courts to consider:  (a) the degree of inherent or acquired distinctiveness of the mark; (b) the duration and extent of use; (c) the duration and extent of advertising and publicity; (d) the geographical area in which the mark is used; (e) the channels of trade; (f) the degree of recognition of the mark in the parties' channels of trade; (g) the nature and extent of third party use of the same or similar marks; and (h) whether the mark is federally registered.  15 U.S.C. § 1125(c)(1).  The SCAD Mark qualifies as a famous mark within its field under these factors.

117.    The SCAD Mark is inherently distinctive and arbitrary in as much as it is an acronym for the college's full name, "Savannah College of Art and Design."  (*See* R-53, Uncontroverted Fact No. 5; s*ee also* R-64 at p. 31, lns. 12-16).

ATL01/11779791v3

118.    The SCAD Mark has further acquired significant consumer recognition and distinctiveness in the field, and did so well prior to Houeix's registration of his domain names, as a result of SCAD's continuous use of the mark nationwide for more than a quarter of a century in broadly disseminated marketing and advertising materials to identify its educational services in the fields of art and design. SCAD is the largest art and design school in the United States.

119.    The undisputed evidence at trial was that no third parties use the mark to identify competitive services in the United States, and Mr. Murphy testified without challenge that the SCAD mark is well known to others in the United States within the field of college level instruction, and in particular in the field of art and design instruction. (*See* R-64 at p. 63, lns. 3-16).

120.    The certificate of registration the USPTO has issued to SCAD for its Mark (Reg. No. 2,686,644) further evidences the distinctiveness of the mark. See, e.g., 15 U.S.C. § 1057(b).

121.    Finally, the fact that Houeix registered the scad.info domain name to increase traffic to his web site confirms the fact that the SCAD Mark is famous within the field.

122.    Based on the foregoing, the court finds that the SCAD Mark is famous, distinctive, and acquired fame prior to Houeix's registration of the domain names at issue in this case. SCAD's claims therefore satisfy the first, second and fourth factors of the FTDA.

### B.    Commercial Use in Commerce

123.    For the reasons noted above with respect to SCAD's trademark infringement claim, Houeix's use of the SCAD Mark in the domain names for his web pages is a commercial use in commerce. Specifically, Houeix's use is a commercial use because his sites interfere with and disrupt Internet users seeking to reach SCAD's web sites; his scad.info site contain advertisements in the form of links to several third party commercial web sites, and he thereby advertises and promotes those sites;

-37-

and his sites interfere with SCAD's ability to engage in commerce by denigrating SCAD, its faculty and administration, and by blocking SCAD from registering and using a domain name it could use to post information about SCAD to the Internet.

### C.    Dilution of the SCAD Mark

124.    Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception."  15 U.S.C. §1127.  "Dilution is grounded on the idea that a trademark can lose its ability ... to clearly and unmistakably distinguish one source through unauthorized use." *Hormel Foods Corp. v. Jim Henson Prods, Inc.*, 73 F.3d 497, 506 (2d Cir. 1996) (quoting 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, §24.13[l][a] at 24-106.  "Once a trademark has become diluted, it has lost the strength it once possessed.  No matter how small the dilution, the harm has been done ... [the slightest dilution] destroys the possibility that [the mark] can ever be made whole." *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Inc.*, 937 F. Supp. 204, 209 (S.D.N.Y. 1996).

125.    A trademark can be diluted in two ways: by a blurring of the distinctiveness of the mark through use by a third party and by tarnishment through the association of the plaintiff's mark by the defendant with goods or services of an unsavory nature or lower quality level. *See, e.g., Moseley,* 259 F.3d at 471; *Ringling Bros.-Barnum & Bailey*, 937 F. Supp. at 209 (citing *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994)).

126.    The Sixth Circuit has adopted the following ten factor test to be used in determining whether dilution has occurred:  (1) distinctiveness; (2) similarity of the marks; (3) proximity of the

services and the likelihood of bridging the gap; (4) the interrelationship among the distinctiveness of the

senior mark, the similarity of the junior mark, an the proximity of the products; (5) shared consumers

and geographic limitations; (6) sophistication of consumers; (7) actual confusion; (8) adjectival or

referential quality of the junior use; (9) harm to the junior user and delay by the senior user; and (10) the

effect of the senior user's prior laxity in protecting its mark. *Moseley*, 259 F.3d at 476. Nevertheless,

the court recognized in *Moseley* that where it is clear that the public will associate the defendant's mark

with the plaintiff's, an exhaustive evaluation of these factors is unnecessary. *Moseley*, 259 F.3d at 477

("Given this conclusion, it follows that Victoria's Secret would prevail in a dilution analysis, even without

an exhaustive consideration of all of ten of the *Nabisco* factors.").

127.    In this case, Houeix concedes that he *intends* the "scad" portions of his domain names

to refer to SCAD and its mark. (*See* R-64 at p. 159, lns. 9-18). He further concedes that persons

who see his domain names will associate them with SCAD. (*See* R-64 at p. 165, lns. 5-13). A

detailed evaluation of the ten dilution factors is therefore unnecessary to reach the conclusion that

consumers will associate Houeix's domain names with SCAD and its SCAD mark.

128.    In light of the distinctiveness of the SCAD mark in the field of higher education in the

United States, this is a textbook case of dilution by blurring. *See, e.g., NBBJ E. Ltd. Partnership v.

NBBJ*, 201 F. Supp. 2d 800, 808 (S.D. Ohio, 2001).

129.    In light of the false and scandalous nature of the content on Houeix's site regarding

SCAD, this is also a textbook case of dilution by tarnishment. *See, e.g., Kraft Foods Holdings, Inc.

v. Helm,* 205 F. Supp. 2d 942, 948 (N.D. Ill. 2002) ("Tarnishment is often found when the senior

mark is placed in the context of sexual activity, obscenity or illegal activity."); *Eastman Kodak Co. v.

Rakow*, 739 F. Supp. 116, 118 (W.D.N.Y. 1990).

130.    The Supreme Court in *Moseley* held that the plaintiff must demonstrate actual dilution of its mark to prevail under the FTDA.  *Moseley*, 537 U.S. at 432-33.  Nevertheless, the Court also made clear that its holding does not mean that the plaintiff must introduce evidence of "the consequences of dilution, such as an actual loss of sales or profits…."  *Id.* at 433.  The Court held that "[i]t may well be … that direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can reliably be proved through circumstantial evidence – the obvious case is one where the junior and senior marks are identical.  *Id.* at 434.

131.    Federal courts that have addressed dilution issues since *Moseley* have held that actual dilution is established where the marks at issue are identical.  *See, e.g.*, *General Motors Corp. v. Autovation Techs., Inc.*, 317 F. Supp. 2d 756, 764 (E.D. Mich. 2004); *Nike Inc. v. Variety Wholesalers, Inc.*, 274 F. Supp. 2d 1352, 1372 (S.D. Ga. 2003), *aff'd*, No. 03-14293, 2004 WL 1121546 (11th Cir. May 3, 2004); *Pinehurst, Inc. v. Wick*, 256 F. Supp. 2d 424, 432 (M.D.N.C. 2003) (finding actual dilution where defendant used plaintiff's marks in its domain name because "[a] customer using the Internet will be unable to discern any appreciable difference' between the defendant's domain name and the plaintiff's mark).

132.    In this case, the second level domain of Houeix's scad.info domain name (the source identifying portion of the name) is identical to the SCAD mark and Houeix's domain name incorporates SCAD's exact Mark in whole.  *See, e.g.*, *Panavision International, L.P. v. Toeppen*, 141 F.3d 1316, 1327 n.8 (9th Cir. 1998) (noting that a domain name may "indicate to users some information as to the content of the site, and, in instances of well-known trade names or trademarks, may provide information as to the origin of the contents of the site.").  Such use of the SCAD Mark establishes the actual dilution of SCAD's mark by tarnishment and blurring.

-40-

133.    Based on the foregoing, the court finds that Houeix's use of the SCAD Mark in the

scad.info and scad-and-us.info domain names dilutes the distinctive quality of the SCAD Mark in

violation of 15 U.S.C. § 1125(c).

## III.    Houeix's First Amendment Defense

134.    Houeix contends that his speech at issue in this action is non-commercial in nature and

therefore protected from SCAD's claims by the First Amendment.  The court disagrees.

135.    SCAD does not seek to curtail Houeix's criticism or other speech regarding the

College.  Rather, SCAD requests only that the court enjoin Houeix from using domain names that

SCAD contends infringe and dilute its trademark rights.

136.    "The First Amendment is not a license to trammel on legally recognized rights in

intellectual property."  *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d

1184, 1188 (5th Cir. 1979).

137.    Trademark rights, as property rights, "need not 'yield to the exercise of First

Amendment rights under circumstances where adequate alternative avenues of communication exist.'"

*Dallas Cowboys Cheerleaders v. PussyCat Cinema, LTD.,* 604 F.2d 200, 206 (2d Cir. 1979)

(quoting *Lloyd Corp. v. Tanner*, 407 U.S. 551, 567 (1972)); *see also Coca-Cola Co. v. Purdy*, 382

F.3d 774, 787 (8th Cir. 2004) ("The use of trademarks has not been protected [by the First

Amendment] where it is likely to create confusion as to the source or sponsorship of the speech or

goods in question.").

138.    Even when the speech at issue is non-commercial in nature, the speech is not protected

by the First Amendment if the defendant uses the plaintiff's trademark in a source identifying manner that

ATL01/11779791v3

is likely to cause consumer confusion as to the source or origin of the speech in question.[5]  *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 541 (1987) (noncommercial use of mark "as opposed to a purely commercial [advertisement], does not give it a First Amendment right to 'appropriate to itself the harvest of those who have sown.'") (citing *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 239-40 (1918)); *United We Stand America, Inc. v. United We Stand America, N.Y., Inc.*, 128 F.3d 86 (2d Cir. 1997) ("Even assuming that [defendant] might communicate its political message more effectively by appropriating [plaintiff's] mark, such appropriation would cause significant consumer confusion.  It is not protected by the First Amendment."); *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769 (8th Cir. 1994) ("[Defendant] argues it has an absolute First Amendment right to use plaintiff's trademarks in its parody. No such absolute right exists."), *cert. denied*, 115 S.Ct. 903 (1995); *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 402 (8th Cir. 1987) (holding that defendant's use of MUTANT OF OMAHA mark was confusing and therefore not protected speech under the First Amendment); *Planned Parenthood*, 42 U.S.P.Q.2d at 1440 ("[B]ecause defendant's use of the term "planned parenthood" is not part of a communicative message, his infringement on plaintiff's mark is not protected by the First Amendment," despite the fact that the defendant was engaged in expressing noncommercial, political speech); *Jews for Jesus*, 993 F. Supp. at 287 (holding that defendant's use of the domain name "jewsforjesus.com" as the address for a site that was critical of the plaintiff did not implicate First Amendment concerns because the use of the plaintiff's mark in the domain name was not protected

---

[5]     For the reasons addressed above, Houeix's web site is a commercial use in commerce.  Accordingly, his speech is properly classified as commercial speech.  Nevertheless, even if his speech is classified as non-commercial, the result is the same.

speech); *MGM-Pathe Communication Co. v. Pink Panther Patrol*, 774 F. Supp. 869, 876

(S.D.N.Y. 1981) (holding that political speech is no less subject to the trademark laws and rejecting

First Amendment defense).[6]

139.    The same holds true with regard to Internet domain names.  A leading trademark

scholar has summarized the relevant First Amendment law as it relates to Internet domain names as

follows:

> Most cases have held that regardless of free speech principles, a web site containing
> criticism of a company or an organization cannot be identified by a domain name
> confusingly similar to the name or trademark of the target group.  The right to
> disseminate criticism on the Internet cannot trump the public's right not to be deceived
> by a confusingly similar domain name.  And the critic has no free speech "right" to
> confuse web users into thinking that they are entering a web site of the target.

5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 31:148:1 (4th ed.

2004).

140.    Houeix's argument that he is entitled to use a domain name that includes SCAD's mark

without alteration is tantamount to arguing that the First Amendment permits him to publish a newspaper

under the name *Wall Street Journal* as long as the newspaper he publishes is critical of the *Wall Street

Journal*.  Federal courts have consistently rejected any attempt to use the First Amendment to permit

such deceptive conduct.  *See, e.g.*, *OBH*, 86 F. Supp. 2d at 176 (enjoining use of plaintiff's trademark

"The Buffalo News" by defendant in a domain name "thebuffalonews.com" to host a web site to

parody and provide a public forum for criticism of The Buffalo News web site); *Planned Parenthood*,

---

[6]    In *Taubman*, 319 F.3d at 774-75, the Sixth Circuit stated that the Lanham Act applies only to commercial
speech.  However, this statement is dicta because the court found that it did not need to reach the constitutional
issue to decide the case.  *Taubman*, 319 F.3d at 775.  Additionally, the court did not engage in a fulsome analysis of
the issues because it did not need to.  It therefore did not consider the Supreme Court's decision in *San Francisco*

[Footnote Continued On Next Page]

42 U.S.P.Q.2d at 1440-41 (holding that defendant's use of plannedparenthood.com to host an anti-abortion site is not protected by the First Amendment); *Jews for Jesus*, 993 F. Supp. at 287 (holding that defendant's use of jewsforjesus.org to operate a site critical of plaintiff is not protected by the First Amendment).

141.    Moreover, as SCAD notes, numerous adequate alternatives of communcation are available to Houeix because there are innumerable domain names he could use as the address for his web site that would not cause consumer confusion.  Indeed, Houeix's web site was originally located at one such domain name:  phoueix-master-scad.com.

142.    Houeix's domain names are not central to the communication of his message and do not communicate his message.  For example, he has not registered "scadsucks.info."  An Internet user viewing either of Houeix's domain names could not discern that the sites located at those addresses are critical of SCAD.  To the contrary, Houeix's domain names serve as source identifiers and communicate that the sites are SCAD web sites, or web sites that are associated or affiliated with SCAD.  *See, e.g., Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc.*, 326 F.3d 687, 696 (6th Cir. 2003) ("Domain names can and do communicate information as to the source or sponsor of a web site.") (citing *PACCAR Inc. v. Telescan Tech., LLC*, 319 F.3d 243, 253 (6th Cir. 2003)).[7]

---

[Footnote Continued From Previous Page]

*Arts & Athletics* or the other case law addressed above in its comments regarding the scope of applicability of the Lanham Act.

[7]    Most of the cases Houeix cites in support oh his First Amendment defense are cases involving domain names of the nature "scadsucks.info."  *See, e.g., Taubman*, 319 F.3d at 778 ("taubmansucks.com [is permissible because it] removes any confusion as to source"); *Ford Motor Co. v. 2600 Enter., et. al.*, 177 F. Supp. 2d 661, 664 (E.D. Mich. 2001) (defendant registered domain name "fuckgeneralmotors.com"); *Lucent Technologies, Inc. v. Lucentsucks.com*, 95 F. Supp. 2d 528 (E.D.Va. 2000). (defendant registered domain name "lucentsucks.com").  The court in *Taubman* makes a distinction, as do other courts, between domain names such as shopsatwillowbend.com, that do not themselves communicate any message regarding the trademark holder, from domain names, such as

[Footnote Continued On Next Page]

Houeix thus has no reason to be using the scad.info domain name, other than to attract additional traffic to his website by mistake.

143.    Accordingly, the First Amendment offers Houeix no defense to SCAD's claims.

## IV.    <u>Relief</u>

144.    Final judgment is entered in SCAD's favor on its claims of trademark infringement and dilution under federal law and its claim of unfair competition under the law of Ohio.

145.    Houeix is hereby ORDERED to immediately cease and desist from all further use of the scad.info and scad-and-us.info domain names and to take all necessary action within ten (10) calendar days of the date of this Order to complete transfer of the domain names to SCAD.

146.    Houeix, and each of his agents, employees, representatives, and all those in active concern or participation with them, are hereby PERMANENTLY ENJOINED from:

(a)    registering, seeking to register or using any domain name that incorporates the term "SCAD," any of SCAD's marks, or any term, mark, or name confusingly similar thereto;

(b)    adopting, using, or registering as a trade name, corporate name, service mark, e-mail address, meta-tag, or keyword any name or mark that incorporates the SCAD Mark or any term, name, or mark confusingly similar thereto;

---

[Footnote Continued From Previous Page]

taubmansucks.com, wherein the domain name itself communicates the defendant's negative viewpoint of the plaintiff/trademark holder. *Taubman*, 319 F.3d at 777-78  While the court in *Taubman* found that domain names of the latter type, which themselves are a form of commentary and which clearly indicate they are not affiliated with the trademark holder, are protected by the First Amendment, the court indicated that use of domain names of the former type would not be shielded by the First Amendment if used in connection with the advertising of goods and services and in a manner that gives rise to consumer confusion. *Id.* at 775.  The *Taubman* court found no likelihood of confusion with regard to the shopsatwillowbend.com domain name, but it does not appear that the plaintiff in *Taubman* raised, nor did the court address, the doctrine of initial interest confusion, which, as discussed above, was adopted by the Sixth Circuit in *Paccar Inc. v. Telescan Technologies, Inc.*, 319 F.3d 243, 253 (6th Cir. 2003), only two days prior to the court's decision in *Taubman*.

ATL01/11779791v3

(c)     passing off or inducing or enabling others to sell or pass off any goods, services, Internet web sites, or e-mail addresses that are not authorized by SCAD as and for goods, services, web sites, or e-mail addresses that are sponsored or endorsed by, associated with, or affiliated with SCAD; and

(d)     otherwise infringing or diluting the distinctive quality of the SCAD Mark.

147.     Costs shall be assessed against Houeix.  SCAD shall file its Bill of Costs with this court within ten (10) business days of the date of this Order.

148.     In light of Houeix's knowing and willful attempt to trade on the fame of the SCAD Mark and to intercept Internet traffic looking for SCAD's web sites on the Internet, the court finds that this case is exceptional within the meaning of 15 U.S.C. § 1117(a).  Accordingly, the court awards SCAD recovery of the reasonable fees and costs it has incurred in connection with its claims.  *See, e.g., Johnson v. Jones*, 149 F.3d 494, 503-04 (6th Cir. 1998).  SCAD shall file its attorneys' fee petition with the court within ten (10) business days of the date of this Order for consideration by the court.

ATL01/11779791v3

SO ORDERED, this _____ day of _____ 2004.


_____
UNITED STATES MAGISTRATE JUDGE



Respectfully submitted, this 5th day of November 2004.


_/s/ Stephen J. Butler_____
Stephen J. Butler, Esq.
Bar. No. 0010401
Theodore D. Lienesch, Esq.
Bar. No. 0016542
Thompson Hine LLP
312 Walnut Street
Cincinnati, Ohio 45202-4089
Telephone:  (513) 352-6700
Facsimile:  (513) 241-4771

David J. Stewart, Esq.
J. Patrick Elsevier, Esq.
Alston & Bird, LLP
1201 West Peachtree St.
Atlanta, Georgia 30309-3424
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

Counsel for Plaintiff Savannah College of Art
and Design, Inc.

ATL01/11779791v3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SAVANNAH COLLEGE OF ART
AND DESIGN, INC.,

        Plaintiff,

    v.

PHILIPPE HOUEIX,

        Defendant.

CASE NO. C-1-02 490

Magistrate Judge Hogan

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing PLAINTIFF SAVANNAH COLLEGE OF ART AND DESIGN, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW was electronically served upon John A. Rebel, counsel for Defendant Philippe Houeix, on this 5th day of November 2004.

        _/s/ Stephen J. Butler _____
        Stephen J. Butler (Bar. No. 0010401)
        Attorney for Plaintiff Savannah College of Art and
        Design, Inc.