UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SAVANNAH COLLEGE OF ART AND  :
DESIGN, INC.,                :
                Plaintiff,   :   CASE No.   C-1-02-490
                             :
vs.                          :
                             :
PHILIPPE HOUEIX,             :
                             :   Magistrate Judge Hogan
                Defendant.

**DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW**

*Findings of Fact*:

1. Defendant is not a cybersquatter, he does not hold multiple domain names for the purpose of sale to trade mark registrants. Tr. I (Opening) 6:10

2. Defendant does not defame Plaintiff through the content of his web site, *scad.info* or *scad-&us-.com*. Defendant does not publish untrue statements of fact about Plaintiff that will harm the good will or reputation of Plaintiff.

3. The four marks registered to Plaintiff are SCAD BEES, SAVANNAH COLLEGE *of* ART *and* DESIGN, SCAD, and a graphic turret with SAVANNAH COLLEGE *of* ART *and* DESIGN. Tr.I (Murphy) 117-118, PX 1, DX 26

4. Plaintiff's rights in the SCAD mark and in the SAVANNAH COLLEGE *of* ART *and* DESIGN mark are for education services, namely providing instructions and training at the undergraduate, graduate and post graduate levels. Tr.I (Murphy)129:12, PX 1 p2, DX 25

5. Plaintiff's witness did not know the dollar amount spent on advertising for each mark. Tr.I (Murphy) 124:18

6. SCAD appears on products including hats and T-shirts sold at Plaintiff's Savannah bookstore. SCAD appears on team uniforms and on a theater marquee. PX3 PX9 PX21-27

7. Generally, the broadcasts and the newspaper articles using SCAD are in the Savannah Georgia area. PX29 PX33 The mark SCAD is not well known outside of Georgia. Tr.I (Houeix) 155:10-156:8

8. Advertisements and announcements in the N.Y. Times generally contain only the graphic turret with SAVANNAH COLLEGE *of* ART *and* DESIGN. PX30

9. The domain name *scad.edu* appears on several exhibits including the poster and NY Times ad. PX20 PX 30

10. The school catalogue and the poster mailed to high school art teachers prominently display the graphic turret with SAVANNAH COLLEGE *of* ART *and* DESIGN. Tr.I (Murphy) 47:23- 48:5 Tr.I (Murphy) 48:19-49:5 PX19 PX20

11. Generally when the SCAD mark appears on an exhibit, it is with the other marks: the turret with SAVANNAH COLLEGE *of* ART *and* DESIGN, or with SAVANNAH COLLEGE *of* ART *and* DESIGN mark. Tr.I (Murphy) 124:22 PX5 PX6 PX7 PX8 PX13 PX14 PX17 PX18 PX19 PX20

12. There is no advertising of the SCAD mark on national radio or Television or in USA Today. Tr.I (Murphy) 122:25

13. Plaintiff's witness testified that SCAD is generally understood to identify the school, to the students and prospective students, and to persons involved with art. Tr.I (Murphy) 63:3-13

14. SCAD is primarily a trade name of the plaintiff.

15. There is evidence that SCAD is used as a trademark on goods sold only at the bookstore in Savannah Georgia and perhaps at one location in France. Tr.I (Murphy) 121:21 Tr.I (Murphy) 122:12 PX21 thru PX 27.

16. There is little evidence that SCAD is used as the service mark for the college's education services.

17. Plaintiff's witness repeatedly used the *Back Button* to quickly return to a prior web page or web site, or to a web page, two pages remote. Tr.I (Murphy) 81:4 Tr.I (Murphy) 84:2 Tr.I (Murphy) 90:17 Tr.I (Murphy) 94:25

18. Plaintiff's witness testified that he usually accesses a web site by typing the name of the web site, in a search engine's window. Initially the witness did so. Tr.I (Murphy) 77:5-12

19. Defendant did not use deception in labeling the hyperlinks from his web site to third party web pages. JX1 PX40 PX41 PX42

20. Defendant did not use the SCAD mark in labeling the links from his web site to third party web pages. JX1 PX40 PX41 PX42 Tr.I (Murphy) 134:14

21. There is no deception by Defendant or use of the SCAD mark to cause Plaintiff's witness to go to the Partner's page of the WorldStudent web site. DX8 SCAD. Tr.I (Murphy) 137:21-138:-4 138:17-21

22. Nothing on the *scad.info* home page indicates that the foreign student link to the accreditation page, of the WorldStudent web page, is connected with SCAD. Tr.I (Murphy) 134:14

23. The top frame WorldStudent accreditation web page has a large spinning globe and very large name of WORLD STUDENT, below are several buttons including the Partner Button. There are no advertisements on the WorldStudent accreditation page. It has several pages of information and links to many international pages dealing with accreditation. Defendant links to this web page because it offers information to the foreign student on how the American system works and it has 150 links that will aid the understanding of accreditation. DX8 Tr.I (Houeix) 187:15-25

24. The WorldStudent accreditation web page has a right frame with blinking variable buttons, some of which had the logos and names of foreign schools or businesses. Clicking on a button may or may not lead to an advertisement. Tr.I (Murphy) 135:19-136:6.

25. Upon Plaintiff's witness clicking the Smurfit button, he went to a WorldStudent page with general comparative information about Smurfit Business School in Ireland. Tr.I (Murphy) 84:8-85:25

26. The defendant did nothing to lead Plaintiff from the WorldStudent accreditation page to the partners web page. No deception led plaintiff's witness to the partners page. Tr.I (Murphy) 138:1-21

27. The plaintiff's witness thinks that the WorldStudent partners page may be a listing of advertisers. No actual advertisements were visited or testified to. Tr.I (Murphy) 89:6-90:6

28. Plaintiff had no evidence that defendant owned the WorldStudent site. It did not contain advertisements directing the visitor to do business with the defendant. Tr.I (Murphy) 138:24-139:5

29. Defendant receives no compensation from the WorldStudent web site. He did not create it. He does not seek donations on his web site, or the WorldStudent web site. He does not own the WorldStudent web site. Tr.I (Houeix) 183:15-184:6

30. Defendant receives no compensation from the Yahoo or its forum or the LiveJournal web sites or the teachers.net forum . He did not create these. He does not seek donations on them. He does not own these sites. Tr.I (Houeix) 184:8-187:1 Tr.I (Murphy) 150:15

31. Defendant's web site has hyperlinks to the Yahoo, LiveJournal, and in the past to teachers.net forums; so that, a visitor to s*cad.info* may be exposed to information about the collage and may communicate about Plaintiff. Tr.I (Houeix) 187:5-10

32. There are no advertisements or promotions on the forum web page, of the LiveJournal web site to which defendant links his web site. JX 3 DX 10 Tr.I (Murphy) 147:2 - 148:1

33. For plaintiff's witness to go to the LiveJournal FAQ page that mentions that it has paid services, he had to hit the ABOUT Button then click on General Information in a drop down box. The top frame of these linked web pages conspicuously displays LiVEJOURNAL. PX79 Tr.I (Murphy) 91:23-92:16 Tr.I (Murphy) 148:2-10

34. Nothing on Defendant's web site *scad.info* caused plaintiff's witness to hit the ABOUT Button then to hit General Information. The use of the *scad* mark by defendant did not lead the plaintiff's witness to hit the ABOUT Button that eventually led to a second page with a promotion. Tr.I (Murphy) 148:22-149:17

35. While specific remote web pages, at WorldStudent and LiveJournal may be commercial, the web pages that were directly linked to Defendant's *scad.info* were commentary without any commercial aspects.

36. Defendant's web site links to a Yahoo forum for students of Plaintiff's college. It is non-deceptively labeled as *groups.yahoo/students/forum*. JX1 PX40 PX41 PX42 Tr.I (Murphy) 134:14

37. The yahoo web page has third party advertisements that link to attorneys. Tr.I (Murphy) 96:23 PX84

38. The actual yahoo forum page with discussion may have a button that leads to an advertisement. PX 54

39. The prior intermediate yahoo web page, PX 53, may have a box headed with "Advertisement" that when clicked leads to an advertisement. Tr.I (Murphy) 113:24-115:5 The "Netflix" box if clicked may lead to a page that has prices. Tr.I (Murphy) 116:19.

40. The content of the "advertisement" boxes on the yahoo student forum do not competed with plaintiff's education services. PX 53 PX54 PX84

41. Defendant does not own, did not create, and does not receive compensation from, Yahoo. Tr.I(Houeix) 186:9

42. Defendant posted about 95% of the e-mails he received. Tr.II (Houeix) 54:2-20 He did not post ones that commented upon sexual matters. Defendant stopped posting e-mails critical

4

of named instructors. Tr.II (Houeix) 52:4-53:25

43. About five percent of the posted e-mails were favorable to the college. Tr.II (Houeix) 48:5-49:25  PX 43 p19 12/7/02, Tr.II(Houeix) 57:4-14

44. Defendant posted e-mails that were favorable to the college. Tr.II(Houeix) 48:14-49:15 PX43 p19 12/7/02, p23 9/18/04, p28 7/24/04, p5 8/4/03, p25 9/18/02

45. Defendant did not post an e-mail from the Beth Conception, editor of the school newspaper. Tr.II(Houeix) 50:8-52:3   The majority of emails received and posted were critical of the school.

46. One e-mail that was posted concerned a supervisor having sex with a student employee. Defendant contacted the woman prior to posting it. Defendant concluded that she is truthful. Tr.II (Houeix) 46:20-47:14 PX 85 p6 4/28/02

47. Defendant posted an e-mail from a student who had sued the plaintiff and lost concerning her victimization and rape by a criminal who broke into her dorm room. TR.II (Houeix) 47:15-22 DX43 p18 1/17/03, p1 2/2/04

48. The Defendant post e-mails concerning Poetter Hall which stated that it was a sick building and that a few employees had died of cancer after working there. He consulted a journalist on this. Defendant saw a report from a government agency that tested the building and found nothing harmful to the health. Defendant did not remove the e-mails. Tr.II(Houeix) 46:1-19 DX43 p17 1/22/03

49. Defendant did not create any of the e-mails nor ask third parties to create the e-mails. Tr.II (Houeix) 47:24-48:4

50. The web pages that contained the posted e-mails and defendant's story on the fake grading scheme, were controlled and created by Defendant, and did not have any advertisements, offers for sale, or sale of products. Additionally these pages did not solicit donations or link to any third party web pages. DX3 DX13 DX14 PX43

51. There is no evidence in the form of consumer awareness surveys or expert witness testimony as to the extent of the fame of Plaintiff's mark, or as to the extent of any damage suffered to the SCAD mark by defendant's web site.

52. Defendant's web site *scad.info* does not charge a fee.  Potentially it has a very broad audience. It is freely open to any inter net user. Tr.I(Murphy) 78:6

53. Defendant did not direct his message to high school art teachers, high school art students or their parents. He did not mail any messages to these groups, nor did he print or broadcast his message in the Savannah area.

54. The Plaintiff's art presentations, theatrical performances and sporting events were open to the general public in Savannah and elsewhere.

55. Plaintiff's services under the mark are broad, including: sale of apparel, intercollegiate sports, theatrical performance, design competitions with sponsors, student and alumni art exhibitions, and admission days through out the country in almost every state. Plaintiff's education services include many areas of art from the traditional fine arts, to animation, interior design, fashion design, architecture, television and film production and computer art.
Tr.I (Murphy) 29:12-21

56. During the fall of 2000, the Chair of Plaintiff's Interior Design Department told Defendant not to attend class and to not sweat doing a project, but to concentrate on teaching. DX13, p2 para 5

56. Plaintiff did not refute defendant's allegations of the grades being awarded for no student work on his part. Defendant's statement at *scad.info* is corroborated by the documents on the web site and is credible. DX13 DX14 DX15 thru DX 20

57. The plaintiff's witness headed an internal investigation of Defendant's complaint which was subsequently reported to the college's accreditation agency. Tr.II(Murphy) 84:5

58. Plaintiff's explanation admits Defendant was given special treatment and that classes were not attended. Tr.II(Murphy) 84:23 88:25

59. Plaintiff's witness testified that special projects were completed after courses had ended. Tr.II(Murphy) 85:12

60. Plaintiff's witness testified that Defendant did underlying complex research for the Palmer Johnson interior yacht design which was a part of Defendant's program and participation towards that class. The witness testified that this was actual class work for which a grade was earned. Tr.II(Murphy) 87:7-87:15

61. The Plaintiff's witness testified that all of the Defendant's classes were studio classes Tr.II(Murphy) 105:9 so that the practice of out-of-class projects was permissible. Tr.II(Murphy) 84:17-20   He admitted that there is a requirement to attend class for a studio course Tr.II(Murphy) 105:19

62. On reviewing Defendant's student class schedule, DX17  Plaintiff's witness admitted that he did not know that all of the classes were studio and that many appeared not to be studio classes. Tr.II(Murphy) 105:21 - 108:15

63. The plaintiff's witness was a part of the investigation of Defendant's complaint to the accreditation agency. Not all of the Defendant's instructors were interviewed. Tr.II(Murphy) 111:16-113:12

6

64. Plaintiff at first testified that the Palmer Johnson competition was one of the Defendant's masters projects. Tr.II(Murphy) 87:7-87:15 109:20 110:19 The Palmer Johnson competition was completed by May 11, 2000, with public presentations of the final student designs. Tr.II(Houeix) 126:2-12 The May 11th exhibition of the yacht interior design was announced by Defendant's poster dated April 2000. DX31.

65. Defendant enrolled in the masters program during August 2000. His class schedule begins during September 2000. It was impossible for the Defendant's faculty assistance on the Palmer Johnson competition to be a part of any master class student work. DX16

66. The links from *scad.info* to Defendant's story are not labeled with the service mark SCAD. There is nothing deceptive in the label for this link that could trick the unwary into going to the web page with the fake grade story. DX13 JX1 PX40 PX41 PX42

67. The links from *scad.info* to Testimonies are not labeled with the service mark SCAD. The e-mails are clearly e-mails and opinions of third parties. JX1 PX40 PX41 PX42 PX43

68. The *security campus.org* is not a deceptive link or labeled with SCAD. It deals with Clery Act reporting. DX7 JX1 PX40 PX41 PX42

69. A few months ago a link was to *Connect Savannah*, a newspaper article on the deficiencies in security, crime and crime reporting at the college. It interviewed ex-guards and students who told stories of shootings, robberies, rapes, sodomization by criminals and car jackings. It noted that Plaintiff misrepresented crime statistics. DX5 Tr.I (Houeix) 182:12-21 Posters of e-mails were victims of crime. DX43 p38 5/3/02, p43 4/13/02

70. Defendant offered no goods or services for sale, and defendant did not advertise, at his web site or on any linked pages. Tr.I (Houeix) 219:22

71. Defendant is not in competition with the plaintiff. Defendant does not, nor is he likely to, provide education services at any level. Tr.I (Houeix) 222:19-223:3

72. Defendant had no economic interest motivation in creating the hyperlinks to other web pages from *scad.info*. Tr.I (Houeix) 184:5-17   186:10 219:5-8   219:21-220:15

73. A reasonable inter net user, who does not know the domain name of the desired web site, will use a search engine. Tr.I (Murphy) 77:5-12 A reasonable inter net user searching for Plaintiff will type in *scad* in the search engine's window and not *scad college*.

74. The Yahoo search engine results using *scad*, had the plaintiff college as Number 1 with numerous other users of *scad*. Defendant's site, *scad.info* was not in the first ten hits and was not on the same page as the college at No. 1. There are 141,000 hits under *scad*. PX74 Tr.I (Murphy)69:12-22

75. Yahoo search engine results for *scad college* had plaintiff college *scad.edu* as Number 1 with Defendant's sites: *scad.info* at Number 3 and *scad-&-us.info* at Number 6. Tr.I (Murphy)70:18-22 PX75

76. A reasonable inter net user will click on the Number 1 site on the hit list for *scad*, especially when it is clearly labeled as Plaintiff college and not refine the search by adding *college*.

77. A reasonable user intending on clicking on Plaintiff's Number 1 listed site, may inadvertently click an unintended web site on the search engine's hit list.

78. The Defendant did not manipulate search engines to control the fine print in the search's hit list. Tr.I (Houeix) 219:11

79. The defendant as part of his web site *scad.info* did not insert metatags to manipulate search engines. Tr.I (Houeix) 219:9

80. Defendant opened *scad-&-us.info* because his inter net service provider shut down *scad.info* due to a complaint. Tr.I (Houeix) 179:5-180:23

81. Plaintiff is the owner of *scad-sucks.com.* PX75

82. Ninety-nine percent of all universities and colleges have there main web pages at the Top Level Domain Name of *.edu*. In recent months several universities and departments within universities and colleges have begun to use the Top Level Domain Name of *.info*. There are 7,000 colleges or universities with there primary web site at *.edu* and 1 or 2 at *.info*. Tr.I (Murphy) 105:4  Tr.I (Houeix) 219:9 Tr.II (Houeix)9:18 10:5 10:16  PX68  PX69

83. Plaintiff has advertised its web address as *scad.edu*, especially on its posters to high school art teachers and on a few N Y Times ads. PX20 PX29

84. *Scad.info* does not contain the graphic turret service mark registered to Plaintiff and does not use the Savannah College *of* Art *and* Design mark of Plaintiff that contains italicized *of* and *and*. JX1 PX40 PX41 PX42 Tr.I (Houeix) 213:1-12

85. The home page of Plaintiff's *scad.edu* contains its graphic turret and Savannah College *of* Art *and* Design mark. Tr.I (Houeix) 213:15-25 PX35 The current *scad.edu* homepage has the prominent mark Savannah College *of* Art *and* Design. PX87 PX88

86. Defendant's web site's home page does not contain *scad.edu*. It does not contain *.edu*, rather it has the mirror image. Tr.I (Houeix) 167:21 JX1 PX40 PX41 PX42

87. Defendant's web page has a large prominent yellow logo that represents a famous Savannah Georgia statue, that is not connected to the college. Tr.I (Houeix) 167:9-18 It also represents two views. Tr.I (Houeix) 168:7-13 Superimposed upon the logo is: "Everything is different

8

when you look at it from a different point of view". Any viewer who has previously visited *scad.edu* will quickly recognize that *scad.info* is not Plaintiff's web site.Tr.I (Houeix) 168:19 JX1 PX40  PX41  PX42

88. Defendant's web site has for many months had announcements concerning this lawsuit between the parties highlighted in one or more large boxes. These prominent boxes will cause a reasonable visitor to quickly realize that this is not Plaintiff's web site. JX1 PX40  PX41  PX42

89. Defendant's web site has boldly printed Fake Masters Fraudulent Process which will lead a reasonable person to believe that this is not Plaintiff's web site. JX1 PX40  PX41  PX42

90. A visitor who is searching for plaintiff's web site and inadvertently lands on *scad.info* will not be frustrated or angry, since the back button will immediately return the visitor to his point of origin. Upon existing *scad.info* with the back button, pop-up adds or automatic links to other web sites do not occur.  Tr.I (Murphy) 81:4 Tr.I (Murphy) 84:2  Tr.I (Murphy) 90:17  Tr.I (Murphy) 94:25

91. Defendant's intent on creating *scad.info* was to not only provide a site for his story but to provide a site for others to report their difficulties with the school. Defendant's intent also was to provide information to foreign students on accreditation and other matters of concern, and to publicize little discussed problems such as crime about the campus. Tr.I (Houeix) 161:10-164:1 168:8 221:21-222:18

92. During one month in early 2002 Defendant's inter net service provider, register.com, had its "advertisement" on *scad.info*. During this period *scad.info* was under construction. Tr.I (Houeix) 169:9-172:6 PX40

93. Defendant did not criticize the quality of plaintiff's education services. Tr.I (Houeix) 214:22-215:210 175:9-16

94. There are no words to reasonably describe Plaintiff's college, other than "Savannah College of Art and Design," or "SCAD". Tr.I (Houeix) 219:1-4

95. It can not be assumed that *scad.info* refers to Plaintiff school because there are other domain names: *scad.org* and *scad.com*  which refer to entities other than the college. Tr.I (Houeix) 165:13

96. Someone who knows the college may think that *scad.info* has something to do with the college. Tr.I (Houeix) 165:13

97. There is no evidence that the Plaintiff suffered damages from Defendant's use of *scad*. Tr.II 68:18. Professors and students who decided not to enter the college had multiple reasons for doing so. PX43 p7 5/21/03

98. There are numerous third-party users of *scad* within domain names, on the inter net. DX22, Tr.I (Houeix) 198:10-207:11 Tr.I (Murphy) 152:15-153:14 DX74,

99. There are no products, goods or services sold or offered for sale on Defendant's web site *scad.info*.

100. Defendant is not competing with Plaintiff in its protected area of education, at *scad.info*.

101. There was brief confusion about the content of *scad.info.* PX51

102. Defendant's intent in using *scad.info* is not to cause confusion or to profit or derive a benefit. Tr.I (Houeix) 161:10-164:1 168:8 221:21-222:18

*Conclusions of Law:*

**1.** The placement of a service mark within an internet domain name is not, *per se*, mark infringement [15 U.S.C. 1114(a)] or false designation of origin [15 U.S.C. 1125(a)(1)(A)] in the Sixth Circuit.[1]

**2.** For mark infringement [15 U.S.C. 1114(a)] the use of the mark must be in connection with the sale, offering for sale, distribution, or advertising of any goods or services, and the use must be in the class of uses reserved to the mark owner in its registration of the mark.

---

[1] *Data Concepts, Inc. v. Digital Consulting, Inc.,* 150 F.3d 620,624,627 (6th Cir. 1998), Digital owned the DCI trademark, Data used the web address *dci.com* no likelihood of confusion as a matter of law; *Taubman Co. v. Webfeats,* 319 F.3d 770, 774-775 (6th Cir. 2003);*Paccar v. Telescan Technologies*, 319 F.3d 243,250 (6th Cir., 2003) recognizes that confusion may arise with mark in domain name, if competition and commercial use present, but applied the eight factor *Frisch's* analysis. See *Wells Fargo v. WhenU.com* 293 F. Supp. 2d 734, 764 where it is noted that the 6th Circuit applies the eight factor Frish's analysis, as opposed to the 9th Circuit that has adopted the "initial interest confusion" test.

**3.**     For false designation of origin and false description [15 U.S.C. 1125(a)(1)] the forbidden conduct must be in connection with goods or services, or containers for

**4.**     In the Sixth Circuit, for trademark infringement or false designation of origin, there must be a likelihood of confusion as to the origin or sponsorship of a good or service[2], or likelihood of confusion as to an affiliation of the mark owner with the alleged infringer.[3]

**5.**     Likelihood of confusion is identical for infringement [15 U.S.C. 1114(a)] and false designation of origin [15 U.S.C. 1125(a)(1)(A)].

**6.**     Likelihood of confusion is synonymous with a probability of confusion, which is more than a possibility.[4]

**7.**     The Sixth Circuit has adopted eight factors for the likelihood of confusion analysis:
   (1) strength of plaintiff's mark,
   (2) relatedness of the goods/services,
   (3) similarity of the marks,
   (4) evidence of actual confusion,
   (5) marketing channels used,
   (6) likely degree of purchaser care,
   (7) defendant's intent in selecting the mark; and
   (8) likelihood of expansion of the product lines.[5]

**8.**     These factors are a guide.[6] The ultimate inquiry is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin or affiliation of the goods offered by the parties.[7]

**9.**     With regard to the relatedness factor, it is unlikely that confusion will occur where the alleged

---

[2]     *Champions Golf Club v. The Champions Golf Club,* 78 F.3d 1111, 1116, 1123 (6th Cir. 1996);

[3]     *Gray v. Meijer*, 295 F.3d 641, 646 (6th Cir. 2002)

[4]     *Pebble Beach v. Tour 18*, 155 F.3d 526, 543 (5th Cir. 1998); *Northland Ins. v. Blaylock*, 115 F. Supp. 2d 1108, 1122 (D. Minn. 2000)

[5]     *Frisch's Rest. v. Elby's Big* Boy, 670 F.2d 641, (6th Cir 1982); *Gray*, 295 F.3d 641, 646; *Daddy's Junky Music v. Big Daddy's Family Music*, 109 F.3d 275, 280 (6th Cir. 1997).

[6]     *Gray*, 295 F.3d 641. at page 646.

[7]     *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 568 (6th Cir. 2000).

infringer is not selling or advertising any good or service.[8]

**10.** Use of a mark other than a trademark to describe the mark owner's services is fair use under 15 U.S.C. 1115(b)(4); and consequently, exempt from mark infringement.[9]

**11.** The Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade."[10] A service mark is deemed to be used in commerce only when it is used or displayed in the sale or advertising of services.[11]

**12.** There can be no liability under the Lanham Act absent the use of a trademark in a way that identifies the products and services being advertised by the defendant.[12] goods. I f defendant is using plaintiff's trademark in a 'nontrademark' way- that is, in a way that does not identify the source of a product- then trademark infringement and false designation of origin laws do not apply."[13]

**13.** For a false description violation [15 U.S.C. 1125(a)(1)(B)] commercial advertisement or promotion is determined by the *Bolger*[14] factors:
        (1) whether the communication is an advertisement,
        (2) whether the communication refers to a specific product or service,
        (3) whether the speaker has an economic motivation for the speech,.[15]

as modified by other Supreme Court decisions on commercial speech.[16]

---

[8] *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 632-633 (6th Cir. 2002); *Daddy's Junky Music,* 109 F.3d at 282 (6th Cir. 1997)

[9] *New Kids On Block v. News America Publish.* 971 F.2d 302, 308 (9th Cir. 1992)

[10] 15 U.S.C. § 1127 at "use in commerce"

[11] Id. at 2)

[12] 15 U.S.C. § 1127 *See, e.g., DaimlerChrysler AG v. Bloom,* 315 F.3d 932, 936 (8th Cir. 2003); [**66] *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 623-25 (6th Cir. 1996).

[13] *Interactive Prods. Corp.*, 326 F.3d 687at 695 (6th Cir. 20030

[14] *Bolger v. Youngs Drug Products,* 463 U. S. 60,67, 103 S. Ct. 2875 (1983)

[15] *Semco v. Amcast*, 52 F.3d 108,112 (6th Cir. 1995)

[16] See *City of Cinti. v. Discovery Network,* 113 S. Ct. 1505, 1551-1513 (1993) discussing combinations of commercial and non-commercial speech. See *Seven-Up Co. v. Coca-*

**14.**  The application of the Lanham Act [15 U.S.C. 1114(a), 15 U.S.C. 1125(a)(1)(A), 15 U.S.C. 1125(a)(1)(B) and 15 U.S.C. 1125(c)] is limited by the First Amendment, to commercial speech.[17]

**15.**  For dilution remedy [15 U.S.C. §1125(c)] the service mark must be of the select class of truly famous or renown marks. The mark must be on the level of AUTOZONE, FORD, KODAK, DUPONT, or XEROX. It must attain the level of a household word for the dilution remedy.[18]

**16.**  The dilution remedy exemption at 15 U.S.C. 1125(c)(4)(B), of "noncommercial use" refers to fully constitutionally protected speech.[19]

**17.**  The dilution remedy does not apply to niche fame.[20]

---

*Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996) cited by *Kansas Bankers Surety Co. v. Bahr Consultants*, 69 F. Supp. 1004, 1013-1014 (E.D. Tenn. 1999) for other factors to determine commercial advertisement..

[17]  *Taubman Co. V. Webfeats,* 319 F.3d 770, 774-775 (6th Cir. 2003)*; Procter & Gamble v. Amway,* 242 F.3d 539, 547 (5th Cir. 2001) at ft. nt. 13 discusses the legislative history of the Lanham Act citing *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1383 ft. nt. 6 (5th Cir. 1996

[18]  See *Thane International, v. Trek Bicycle,* 305 F.3d 894, (9th Cir. 2002) discusses the legislative history of 15U.S.C. 1125(c) noting that the mark must have a special *aura;* examples of dilution would be DUPONT shoes, BUICK aspirin and KODAK pianos. A mark will achieve broad-based fame only if a large portion of the general consuming public recognizes that mark. ....the mark must be a household name. *Avery Dennison v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999) noted Dilution is a cause of action invented and reserved for a select class of marks - those marks with such powerful consumer associations that even non-competing uses can impinge on their value. *Avery Dennison* at page 876 noted to be capable of being diluted, a mark must have a degree of distinctiveness and 'strength' beyond that needed to serve as a trademark. Citing 3 McCarthy, *at* § 24:109. *TCPIP Holding Co. v. Haar Communs., Inc.*, 244 F.3d 88, 98, 99 (2nd Cir. 2001**).**

[19]  *Mattel v. MCA Records,*296 F.3d 894, 905 ( 2nd Cir, 2002) discusses the legislative history; at page 906 it cites *Bolger* supra at ft. nt. 5 & 9;

[20]  *TCPIP Holding Co. v. Haar Communs., Inc.*, 244 F.3d 88, 99 (2nd Cir. 2001**);** *Heidi Ott v. Target Corp,* 153 F. Supp. 2d 1055, 1075 (DC Minn. 2001)**;** Dissent in     *Time Mirror v. Los Vegas Sporting News*, 212 F.3d 157, 174 (3rd Cir. 2000); *Michael Caruso & Co. v. Estefan Enters., Inc.*, 994 F. Supp. 1454, 1463 (S.D. Fla.), *aff'd*, 166 F.3d 353 (11th Cir. 1998); *Golden Bear Int'l, Inc. v. Bear U.S.A., Inc.*, 969 F. Supp. 742, 749 (N.D. Ga. 1996); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 968 F. Supp. 568, 578 (D. Colo. 1997), *aff'd*, 185 F.3d

**18.** To dilute a mark's high degree of niche fame, the mark owner and alleged diluter must be operating in the same narrow market,[21] and defendant's website must be narrowly directed at influencing the niche market.[22]

**19.** A niche market requires highly specialized market segments with an identifiable customer base. As the market segment in which the parties products operate becomes less specialized and less unitary the likelihood of a high degree of fame fades.[23]

**20.** Criticism of a mark owner at a web site, that incorporates the mark in the domain name, is noncommercial use [15 U.S.C. 1125(c)(4)(B)] and exempt from the dilution remedy.[24]

**21.** Injunctive relief is proper only to prevent an on-going violation of the Lanham Act. An Advertisement by the inter net service provider, on the defendant's web site, that ceased many months ago, is not a basis for injunctive relief.[25]

**22.** A non-deceptive hyper link that is not labeled with Plaintiff's mark, from Defendant's web site, to a third party web page with an advertisement, is not: commercial use, or use in connection with the sale, offering for sale, distribution, or advertising of any goods or services, or use in connection with goods or services, unless motivated by the economic interest of Defendant.

**23.** Information contained on a web page is irrelevant to a determination of Lanham Act

---

1084, 1999 U.S. App. LEXIS 15225, 1999 WL 527486 (10th Cir. 1999); The 6th Circuit has no reported decisions. The circuits are split.

[21] *Time Mirror v. Los Vegas Sporting News,* 212 F.3d 157,    (3rd Cir. 2000) sports newspaper is niche market; *Syndicated Sales v. Hampshire Paper*, 192 F.3d 633, 640 (7th Cir. 1999) wholesalers of floral arrangement buckets, or baskets, at ft. nt. 7 a geographic can not define a niche market. *Thane International, v. Trek Bicycle,* 305 F.3d 894, 908 (9th Cir. 2002) *Avery Dennison v. Sumpton*, 189 F.3d 868, 877 (9th Cir. 1999)

[22] *Hartog & Co. v. swix.com*, 136 F. Supp. 2d 531, 538 (ED VA 2001);

[23] *Thane International, v. Trek Bicycle,* 305 F.3d 894, 909 (9th Cir. 2002)

[24] *Ford v. 2600 Enterprises*, 177 F. Supp. 2d 661, 665 (ED Mich 2001); *Northland Ins. v. Blaylock*, 115 F. Supp. 2d 1108, 1122-1123 (D. Minn. 2000), *Strick Corp. v. Strickland*, 162 F.Supp. 2d 372, 379 (Ed Pa. 2001); *Chatam Int'l v. Bodum*, 157 F. Supp. 2d 549 (E.D. Pa 2001);

[25] *Taubman Co. V. Webfeats,* 319 F.3d 770, 775 (6th Cir. 2003) Citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329-330, 64 S. Ct. 587 (1944)

violations, where the web page is not linked directly to Defendant's web site, or is more than one operation or link remote from the defendant's web site, unless the defendant or an affiliate of the defendant, has control over the linked web pages.

**24.**   Information contained on a web page is irrelevant to a determination of Lanham Act violations, when that web page is not linked directly to Defendant's web site, even though that web page is a part of a web site that contains a second web page to which Defendant's web site has a hyper link.

**25.**   Including a service mark in a domain name, alone, is not commercial speech in absence of the web site's content being commercial speech, and in absence of the defendant being a cybersquatter who has a business practice of registering multiple domain names for the purpose of selling them to mark owners.[26]

     /s/ John A. Rebel
John A. Rebel (0031771)
Attorney for Defendant
McKinney & Namei
15 E. 8th St.
Cincinnati, Ohio 45202
(513) 721-0200, Fax: 513- 632-5898

**Certification of Service**

The foregoing was electronically served on the attorneys for plaintiff, on this 5th day of November, 2004.

     /s/ John A. Rebel
John A. Rebel (0031771)
Attorney for Defendant

---

[26]   *Taubman Co. V. Webfeats,* 319 F.3d 770, 776 (6th Cir. 2003)