## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **SAVANNAH COLLEGE OF ART AND** | : | |
| **DESIGN, INC.,** | : | |
| Plaintiff, | : | **CASE No.    C-1-02-490** |
| | : | |
| **vs.** | : | |
| | : | |
| **PHILIPPE HOUEIX,** | : | Magistrate Judge Hogan |
| | : | |
| Defendant. | : | |
| | : | **DEFENDANT'S CLOSING ARGUMENT** |

***Summary:***

Plaintiff-college seeks to censor Defendant's speech through its action to enforce the Lanham Act.   Defendant's web site *scad.info* comments on the fraudulent award, of grades, in Plaintiff's masters program, and on crime and security problems at the college.  It links to student forums and an accreditation web page for foreign students. Defendant's web site does not solicit donations, does not advertise, and does not sell products, services or ideologies. Its content shows that it is not sponsored or related to Plaintiff, or in competition with Plaintiff.

Plaintiff must prove one of four Lanham Act claims:

a)    trademark infringement under 15 U.S.C. 1114(a),
b)    false designation of origin under 15 U.S.C. 1125(a)(1)(A),
c)    false description under 15 U.S.C. 1125(a)(1)(B), or
d)    dilution of a famous mark 15 U.S.C. 1125(c).

An element of trademark infringement [§1114(a)] is: the use of the mark must be in connection with the sale or advertisement of a good or service. Both Trademark infringement and false designation [§1125(a)(1)], have as an element likelihood of confusion as to the origin or sponsorship of a good or service, or as to an  affiliation of the parties.

False designation of origin and false description [ §1125(a)(1)] require use in connection with

any good or service. False description requires a misrepresentation within an advertisement or commercial promotion. From the facts it is clear Defendant is not selling a service or product. Applying the *Bolger* test and *Gordon & Breach* tests, it will be clear that there are no advertisements or commercial promotions at *scad.info* and on linked web pages. Consequently there will be no trademark infringement [§1114(a)] or false description [§1125(a)(1)(B)].

In the Sixth Circuit the placement of a trade mark, within an internet domain name, *per se,* is not trademark infringement or false designation. Confusion is determined by the eight factor *Frisch's* analysis. In this matter confusion ought to be only analyzed for falsely designating the affiliation of the parties. There is no likelihood of confusion, under the *Frisch's* factors.

Defendant, Houeix, posted two e-mails that he received, concerning the unhealthy environment in Poetter Hall. Subsequent to the postings he saw one governmental report to the contrary. But he did not remove the posted e-mails. The posted e-mails are opinion, but may misrepresent a characteristic of one of the college's buildings. Conceivably, one element of a false description claim [§1125(a)(1)(B)] may be evidenced. But proof of the other element -- commercial advertisement or promotion, is lacking.

The Poetter Hall e-mails do not create a false impression of the origin of a good or service or the affiliation of the parties; nor do the posted e-mails concerning sexual harassment, rape and crime. There is no deception for the purposes of infringement [§1114(a)] or false designation [§1125(a)(1)(A)] claims.

**Issues:**

The first issue in this case is whether the use of *scad* in the domain name and on the home page of Defendant's web site is likely to cause confusion as to the origin of the service or the affiliation of the parties.

The second issue is whether there is dilution [§1125(c)].

***First Amendment***

The First Amendment always trumps the Lanham Act for circumstances similar to this matter -- a web site critical of the mark owner, with a the mark within the domain name, and with no selling or advertizing of competing products.

Freedom of speech protections are built into the Lanham Act. The scope of the Lanham Act remedies for infringement and dilution is limited by the First Amendment, to false and misleading commercial speech.[1]   For trademark infringement [§1114(a)] and false designation of origin [§1125(a)(1)(A)], the deception or likelihood of confusion must be in connection with a sale or advertisement of goods or services.  Further, the deception or confusion only concern the origin or sponsorship of the product or the affiliation of the parties. There is a defense of fair use[§1114(b)(4)]. For false description, the misrepresentation must be a part of commercial advertising or promotion [§ 1125(a)(1)(B)]. Defenses to dilution are comparative commercial advertising, non-commercial use and use in nature of news commentary  [§1125(c)].

The Lanham Act does not in any way limit political speech, consumer or editorial comment, or other constitutionally protected material.[2]   Speech on the Internet is to be accorded the highest level of protection.[3]   Speech that is only partly commercial is entitled to full First Amendment

---

[1]    *Taubman Co. V. Webfeats,* 319 F.3d 770, 774-775 (6th Cir. 2003)*;  Procter & Gamble v. Amway,* 242 F.3d 539, 547 (5th Cir. 2001) at ft. nt. 13 discusses the legislative history of the Lanham Act citing  *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1383 ft. nt. 6  (5th Cir. 1996)

[2]    *Procter & Gamble v. Amway,* 242 F.3d 539, 547. See *L.L. Bean, Inc.* v. *Drake Publishers, Inc.*, 811 F.2d 26, 29 (1st Cir. 1987): "[T]rademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." Also *Mattel v. MCA Records,*296 F.3d 894, 900 ( 2nd Cir, 2002)

[3]    *Reno v. ACLU*, 521 U.S. 844, 870 (1997)

protection.[4]   Although economic damage may be an intended effect of a web site operator who criticizes a mark owner and who has the mark in the domain name, the First Amendment  protects the critical commentary.[5]   The Supreme Court holds  commercial speech to be an "expression related solely to the economic interests of the speaker and the audience."[6]  Commercial speech, at its core, merely proposes a commercial transaction.[7]

Houeix's *scad.info* is linked to a yahoo student forum web pages that have separate-graphic-labeled windows, that when clicked,  may lead to advertisements.[8]  There is information at the bottom of a yahoo student forum page concerning attorneys, which is close to proposing a commercial transaction.[9]   These statements are not created or published by Defendant nor for Defendant's benefit.[10]  The test for commercial speech as noted in  *Procter & Gamble v. Amway,*[11] is found in the decision of *Bolger v. Youngs Drug Products.*[12]   In *Bolger* three factors are used to determine commercial speech (1) whether the communication is an advertisement, (2) whether the communication refers to a specific product or service, (3) whether the speaker has an economic

---

[4]   *Mattel v. MCA Records,*296 F.3d 894, 905 ( 2nd Cir, 2002), dilution of trademark case, citing *Hoffman v. Capital Cities/ABC,* 255 F.3d 1180, 1184 (9th Cir. 2001)

[5]   *Taubman Co. V. Webfeats,* 319 F.3d 770, 778 (6th Cir. 2003)

[6]   *Central Hudson Gas,* 447 U. S at 561 citing  *Va. State Bd.* 425 U. S. at 762.

[7]   *Procter & Gamble* at 547, citing *Va. State Bd. v. Va. Citz. Coun.* 425 U.S. 748,762 ;  96 S. Ct. 1817 (1976); *Semco v. Amcast,* 52 F.3d 108, 112 (6th Cir 1995)

[8]   PX53, PX54,  Tr.I (Murphy) 113:24-115:5  116:19.

[9]   PX84

[10]   Tr.I (Houeix) 183:15-184:6, 184:8-187:1, 186:9, Tr.I (Murphy) 150:15

[11]   *Procter & Gamble v. Amway,* 242 F.3d 539, 547

[12]   *Bolger v. Youngs Drug Products,* 463 U. S. 60, 103 S. Ct. 2875 (1983)

motivation for the speech.[13]

     To determine whether the *scad.info* through its link, to the yahoo student forum, contains a commercial "advertisement.", it is necessary to apply the four factor *Gordon&Breach* test. "In order for representations to constitute "commercial advertising or promotion" under Section §1125(a)(1)(B), there must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. ... (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry."[14] An Eastern District of Tennessee decision, *Kansas Bankers Surety Co. v. Bahr Consultants*[15], having the facts that no competing products are sold, finds that the second and third prongs of the *Gordon&Breach* test are not met. Consequently, there is no commercial promotion and no violation of the Lanham Act. *Kansas Bankers* refers to legislative history in the House of Representatives.[16]  Similarly, in the case at hand, Houeix is not in

---

[13]    *Bolger,* 463 U. S. at 67.

[14]    *Gordon&Breach v. Am. Inst Physics* 859 F. Supp.1521,1535 (S.D. N.Y. 1994); *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996); *Kansas Bankers Surety Co. v. Bahr Consultants*, 69 F. Supp. 1004, 1013-1014 (E.D. Tenn. 1999).

[15]    *Kansas Bankers Surety Co. v. Bahr Consultants*, 69 F. Supp. 1004, 1013-1014 (E.D. Tenn. 1999)

[16]    " The "commercial" requirement was inserted to ensure that § 43(a) does not infringe on free speech protected by the First Amendment. *See* 135 Cong.Rec. H1216-17 (daily ed. April 13, 1989) (statement of Rep. Kastenmeier) ("The proposed change in section 43(a) should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material... The section is narrowly drafted to encompass only clearly false and misleading commercial speech."); 134 Cong.Rec 31,851 (Oct. 19, 1988) (statement of Rep. Kastenmeier) (commenting that the reach of Section 43(a) "specifically extends only to false and misleading speech that is encompassed within the "commercial speech' doctrine developed by the United States Supreme Court"). *See generally Gordon & Breach,* 859 F. Supp. at 1533-34 (discussing the legislative history of the Lanham Act)."

competition with the college and is not attempting to influence consumers to buy his services.[17] He

has no services to offer.[18]   The second and third prongs of the *Gordon&Breach* test are likewise not

met. Clearly there is no actionable false description [§1125(a)(1)(B)].  Since Houeix's use of the mark

is not  in connection with an advertisement, there is no trademark infringement [§1114(a)].

The Sixth Circuit in  *Semco v. Amcast*,  notes the Senate legislative history has a conflicting

broader definition of "commercial advertising or promotion", which does no more than "propose a

commercial transaction".[19]  It noted two of the three *Bolger* factors were met in finding a commercial

promotion.  Notably there was a finding of economic motivation.[20]   Houeix does not promote a

specific product, nor does he have any economic interest motivation. Two of the three *Bolger* factors

are not met.  There is no advertisement or  commercial promotion.  Houeix's use of the mark in a

domain is not use in connection with a sale or advertisement.   There are no violations of §1114(a)

or §1125(a)(1)(B).

The First Amendment is broadly applied and the Lanham narrowly where  the second prong

(commercial competition) and third prong (influence consumers to buy defendant's product) of the

*Gordon&Breach* test are not met, or where promotion of a specific product and economic interest

motivation factors of the *Bolger* test are not met. The First Amendment prohibits not only statutory

abridgement but also judicial action that restrains free speech.[21]

---

[17]    Tr.I (Houeix) 219:22, 222:19-223:3

[18]    Tr.I (Houeix) 184:5-17   186:10 219:5-8   219:21-220:15

[19]     *Semco v. Amcast*, 52 F.3d 108,112 (6th Cir 1995) Amcast's magazine article
misrepresented the quality of its plunger bits, that were competing with plaintiff's bits.

[20]    Id. at 113

[21]    *CPC International v. Skippy Inc.,* 214 F.3d 456,461 (4th Cir. 2000)

***Refuting Plaintiff's Oral Presentation – Initial Interest Confusion***

At the oral closing argument, Plaintiff projected bad law; namely, that the initia-interest-confusion presumption is the majority view. This is not true. In the Sixth Circuit, inclusion of a mark in a domain name is not confusion *per se*.[22] The rational for the initial confusion view is refuted by a simple observation -- the speed of the *Back Button*.[23] Contrary to Professor McCarthy's view ( McCarthy on Trademarks §31.148.1), the right to disseminate criticism of a trade mark owner trumps the public's *right* not to be confused by a domain name. The public's First Amendment right to free speech is preserved by the utility of the back button.

The rational of McCarthy's §31.148.1 and *P.E.T.A. v. Doughney* is: the mark within the domain name may cause frustration so that searching for the mark owner's web site ceases. To avoid frustration and the consequential infringement, the mark's initial viewing within the domain name, must be instantaneous with a title that suggests parody, or it must be with *sucks*. (*Sucks* supposedly indicates a critical commentary site.[24]) For frustration one must be confused for a significant time. The "confused" time spent in recognizing the meaning of "sucks" in a domain name, or in recognizing a parody meaning in verbiage added to a mark, within a domain name, may be four seconds. The back-button-response time is less than one second. If one visits *scad.info*, it is immediately (within three seconds) recognized that it is not the college's web site. The back button is hit and the visitor is immediately returns to his point of beginning, with no frustration. The First Amendment protections

---

[22]    See ft. nt. 27, infra

[23]    The *Back Button* on the video screen's tool bar or the computer keyboard was repeatedly used by Plaintiff's witness to quickly return to the point of beginning.Tr.I (Murphy) 81:4, 84:2 , 90:17, 94:25

[24]    McCarthy on Trademarks §31.148; *Taubman Co. V. Webfeats,* 319 F.3d 770, 777 (6th Cir. 2003)

do not depend upon recognition times that are less than five seconds. This is especially true, since a student interested college admissions will know that all college web pages are located in the top level domain name of *.edu*.[25]  The fact that Houeix's domain name does not end in *.edu* is an adequate simultaneous communication to dispel any confusion.  Not ending in *.edu* is the same as including *sucks* or parody verbiage in the domain name.

Plaintiff argues that the "initial interest confusion" applies, to the domain name of *scad.info*, without  analysis of the content of its web page. This severe form of  "initial interest confusion" conflicts with the First Amendment or "fair use". The majority view is that the  "initial interest confusion" presumption may only apply after a content analysis of the offending web site to determine if it sells competing products.[26]

In the Sixth Circuit the placement of a service mark within an internet domain name is not,

---

[25]    Ninety-nine percent of all universities and colleges have there main web pages at the Top Level Domain Name of *.edu*. In recent months several universities and departments within universities and colleges have begun to use the  Top Level Domain Name of *.info*. There are 7,000 colleges or universities with there primary web site at *.edu* and 1 or 2 at *.info*. Tr.I (Murphy) 105:4  Tr.I (Houeix) 219:9 Tr.II (Houeix)9:18 10:5 10:16  PX68  PX69

[26]    See Sixth Circuit case, below. See *TeleTech Customer Care Mgmt. (Cal.), Inc. v. Tele-Tech Co.*, 977 F. Supp. 1407, 1414 (C.D. Cal. 1997); *N. Light Tech., Inc. v. N. Lights Club*, 97 F. Supp. 2d 96, 113 (D. Mass. 2000); *Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108, 1119-21 (D. Minn. 2000); *Hasbro, Inc. v. Clue Computing, Inc., 66 F. Supp. 2d 117, 125 (D. Mass. 1999)*; *The Network Network v. CBS, Inc.*, 2000 WL 362016, at *5 (C.D. Cal. 2000); *Bihari v. Gross*, 119 F. Supp. 2d 309, 311 (S.D.N.Y. 2000); *Playboy Enters. v. Welles*, 78 F. Supp. 2d 1066, 1094 (S.D. Cal. 1999); *Strick Corp. v. Strickland*, 162 F.Supp. 2d 372, 379 (Ed Pa. 2001); *HQM, Ltd. v. Hatfield*, 71 F. Supp. 2d 500, 508-09 (D. Md. 1999);  *Chatam Int'l v. Bodum*, 157 F. Supp. 2d 549, 2001  (E.D. Pa 2001); *BigStar Entm't, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 211 (S.D.N.Y. 2000); *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 104 F. Supp. 2d 427, 462 (D.N.J. 2000); Maynard, *The Initial Interest Confusiion Doctrine and Trademark Infringement on the Internet*, 57 Wash & Lee L. Rev. 1303, 1306 (Fall 2000).
*Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108, 1119-21 (D. Minn. 2000) the mark is in the domain name. *Northland* rejects likelihood of confusion simply because both parties' Internet sites were on the Internet and both were vying for the attention of Internet

*per se*, mark infringement [§1114(a)] or false designation of origin [§1125(a)(1)(A)].[27]

The Sixth Circuit Court of Appeals in *Taubman* stated:

"Moreover, the only important question is whether there is a likelihood of confusion *between the parties' goods or services*. Under Lanham Act jurisprudence, it is irrelevant whether customers would be confused as to the origin of the websites, unless there is confusion as to the origin of the respective products."[28]

Plaintiff argues that there is initial interest confusion between *scad.edu* and *scad.info*. The Sixth Circuit decision of *Taubman v. Webfeats* held that *"Likelihood of confusion between the origin or affiliation of the web sites is irrelevant in absence of confusion between the parties' products."*[29] Here Defendant has no products.

Most, if not all, of the cases cited in support of the initial confusion view, have findings that the content of the web site seeks donations, sells books, or competing ideologies, or that the web site is part of a broader system that competes with the mark owner, or that the web site is held for profit by a cybersquatter [§1125(d)]. Legal concepts dealing with domain names are developing. The four

---

[27] *Data Concepts, Inc. v. Digital Consulting, Inc.,* 150 F.3d 620,624,627 (6th Cir. 1998), Digital owned the DCI trademark, Data used the web address *dci.com* no likelihood of confusion as a matter of law; *Taubman Co. v. Webfeats,* 319 F.3d 770, 774-775 (6th Cir. 2003);*Paccar v. Telescan Technologies*, 319 F.3d 243,250 (6th Cir., 2003) recognizes that confusion may arise with mark in domain name, if competition and commercial use present, but applied the eight factor *Frisch's* analysis. See *Wells Fargo v. WhenU.com* 293 F. Supp. 2d 734, 764 where it is noted that the 6th Circuit applies the eight factor Frish's analysis. *Big Time v. Marriott International, Inc.*, 2003 U.S. Dist. LEXIS 35, at *33, (ED Mich. 2003) and *Ford v. 2600 Enterprises*, 177 F. Supp. 2d 661, 665 (ED Mich 2001) hold that misdirection to a web site because the domain contains a trademark is a mere inconvenience and not a basis for a trademark claim.

[28] *Taubman v. Webfeats*, 319 F.3d 770, 776 (6th Cir, 2003) citing *Bird v. Parsons*, 289 F.3d 865, 877 (6th Cir. 2002) and *Daddy's Junky Music Stores*, 109 F.3d at 280.

[29] See *Taubman v. Webfeats*, 319 F.3d 770, 776 (6th Cir, 2003)

cases cited by McCarthy are distinguished. In *P.E.T.A. v. Doughney*[30] the defendant was a cybersquatting, offering to sell the multiple sites he owned. Further the web site linked to many sites that sold products competing with P.E.T.A.'s ideology. In *OBH v. Spotlight Magazine*[31] there is clear commercial competition between the parties. The plaintiff's mark buffalo news was incorporated in domain name. There was a content analysis for confusion. The New York court determined that the use was in connection with goods and services and the sale of goods and services, since there were links to Defendant's other web sites that competed with plaintiff in the apartment rental ads. Initial interest confusion was mentioned because the consumer might go through the links to the competing commercial sites of Defendant.[32]  Defendant's website link boxes, and those of linked sites, do not deceive, as found in *Jews for Jesus v. Brodsky.*[33] Plaintiff cites *Planned Parenthood*[34], which is distinguished on the facts: that competitive  social issues on abortion, sale of books and deceptive links  were present on the infringer's website and its linked web pages. The web site was intertwined with Defendant's Catholic Radio. *Brookfield Communications, Inc. v. W. Coast Entm't,*[35] and *N.Y.Soc.Pub. Acct. v. E. Louis Assoss.,*[36] had the mark in the domain name and with

---

[30]    113 F Supp. 2d 915 (E.D. Va. 2000)

[31]    86 F. Supp. 2d 176 (W.D. N.Y. 2000)

[32]    *OBH* 86 F. Supp. 2d at 186

[33]    993 F. Supp. 282 (Dc N.J. 1998

[34]    1997 U.S. Dist. LEXIS 3338, 1997 WL 133313, See *Ford v. 2600 Enterprises*, 177 F. Supp. 2d 661, 663, 665 (ED Mich 2001) which analyzes *Planned Parenthood V. Bucci*, and *Jews for Jesus v. Brodsky*, and notes "in both cases the marks were used in connection withy informational services that competed with those offered" by the mark owner. Also see *Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108, 1119,1120 (D. Minn. 2000) where *Planned Parenthood* is distinguished.

[35]    174 F.3d 1036, 1062 (9th Cir. 1999)

[36]    79 F. Supp 2d. 331, 340

metatags luring customers of the mark to the site. Both cases involved commercial competition. Houeix does not use metatags or other means to divert plaintiff's customers to his site.[37] Neither the college or Houeix have an informational services web sites that compete such as found in *Jews for Jesus, Planned Parenthood* and *P.E.T.A.* In *Jews for Jesus,* there was bait and switch, but at a commentary web sites, such as the subject case, there may be incidental baiting, but there is no switching[38].

Since June 2002 it has been impossible for Houeix to have a domain name with *scadsucks*, since Plaintiff has registered *scadsucks* in all top level domain names.[39]

The *P.E.T.A.* decision besides presuming initial confusion, presumes "in connection with goods or services or the sale of goods or services" when a user arrives at a web page with a domain name incorporating a mark. It is speculated that out of frustration or anger, the inter net consumer quits searching for the mark owner's web site. Thus hindering access to the mark owner's product. Perhaps four of five years ago, at a time when computer operation knowledge was not so univeral, there was a basis for this presumption. Today the presumption fails because of the BACK BUTTON. Brian Murphy was ask to go to *scad.info*. Out of habit he typed *scad.info* in the search engine search box, then stated this is what I usually do.[40] He had visited the *scad.info* site many times. No one browsing the internet becomes frustrated let alone angry, because they know of, and use the back

---

[37]    Tr.I (Houeix) 219:9

[38]    *Northland Insurance v. Blaylock,*115 F. Supp. 2d  at page 1120

[39]    Plaintiff is the owner of *scad-sucks.com,* PX75. A search in *Network Solutions* reveals that Plaintiff is the owner of *scadsucks.com, scadsucks.net, scadsucks.biz, scadsucks.info, scadsucks.org*

[40]    Tr.I (Murphy) 81:4,  84:2, 90:17,  94:25

button repeatedly.[41]  Via a search engine, the inter net consumer arrives at the wrong web site,

realizes that in a brief moment, hits the back button, then bingo back to the hit list of the search

engine. Reads the list more carefully, picks the correct web site and clicks on the mark owner's site.

In *Ford Motor* the Michigan District Court noted:

> "Trademark law requires reasonableness on the part of consumers. Although the need
> to search for a mark holder's site may rise to the level of inconvenience, this
> inconvenience is not cognizable. An Internet user who intends to access either party's
> products or services, but who has not done so before, may go to a search engine, or
> on America Online, to Keyword. Any inconvenience to an Internet user searching for
> Plaintiff's web site is trivial. Searches for Plaintiff's web page on popular internet
> search engines, including google.com, goto.com, and lycos.com, list Plaintiff's web
> site as their first or second "hits.""[42]

The Yahoo search engine results using *scad*, had the college as Number 1 with numerous other users

of *scad*. Defendant's site, *scad.info* was not in the first ten hits and was not on the same page as the

college at No. 1.[43]  Yahoo search engine results for *scad college* had plaintiff college *scad.edu*  as

Number 1 with Defendant's sites: *scad.info* at Number 3 and *scad-&-us.info* at Number 6.[44]

Literary or song titles have hybrid purposes to attract readers or listeners and to relate the

subject of the song or novel.[45] The same is true of domain name of *scad.info.*  The expressive title rule

is that as long as the title is related to the subject of the expressive work, it is speech protected by the

---

[41]    Id.

[42]    *Ford v. 2600 Enterprises*, 177 F. Supp. 2d at 666 citing *Strick Corp., v. Strickland*
162 F. Supp. 2d 372, 379, see also *Hasbro Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117,
124-25.

[43]    PX74  Tr.I (Murphy)69:12-22

[44]    PX75   Tr.I (Murphy)70:18-22

[45]    *Rosa Parks v. LaFace Records*, 76 F. Supp. 2d 775, 780 (ED Mich 1999) citing
*Rogers v. Grimaldi*, 875 F.2d 994, 998 (2nd Cir. 1989)

First Amendment.[46] The rule logically needs to extend to a mark with a domain name.

**_Remoteness of Hyperlinked pages:_**

The fact that a linked web site may carry advertisement is too remote to be treated as Defendant's advertisement for the purposes of establishing "use in connection with good or service".[47]

In *Bally,* a site critical of a mark owner was analyzed. A linked pornography website was found not to improperly create an association between Bally's mark and pornography. The *Bally* court noted:

> "It is true that both sites are under the same domain name, "Compupix.com." Furthermore, it is also true that at a variety of times there were links between Faber's various sites. However, at no time was any pornographic material contained on Faber's "Bally sucks" site. From its inception, this site was devoted to consumer commentary. Looking beyond the "Bally sucks" site to other sites within the domain or to other linked sites would, to an extent, include the Internet in its entirety. The essence of the Internet is that sites are connected to facilitate access to information. Including linked sites **as grounds for finding commercial use** or dilution would extend the statute far beyond its intended purpose of protecting trademark owners from uses that have the effect of "lessening . . . the capacity of a famous mark to identify and distinguish goods or services." 15 U.S.C. § 1127. Further, it is not logical that a reasonably prudent Internet user would believe **that sites which contains no reference to a trademark** and **which are linked to**, or within the same domain as, a site that is clearly not sponsored by the trademark owner are in some way sponsored

---

[46]    *Rosa Parks v. LaFace Records*, 76 F. Supp. 2d 775, 780 "Lanham Act ordinarily applies to commercial transactions involving ordinary goods and services, not expressive rights in which First Amendment concerns are paramount."

[47]    *Ford v. 2600 Enterprises*, 177 F. Supp. 2d 661 (ED Mich 2001). For the facts similar to this case—no products or services sold at a commentary website—the mark's use is not "in connection with commerce" *Ford v. 2600 Enterprises*, 177 F. Supp. 2d 661 (ED Mich 2001); *Bally Total Fitness Holding Corp. v. Faber* 29 F. Supp. 2d 1161, 1167 (CD Cal. 1998); *Lucent Technologies, Inc. v. Lucentsucks.com*,   95 F. Supp. 2d 528, 535 (ED Va. 2000). See concurring opinion,  Merritt J.,  *Data Concepts, Inc. v. Digital Consulting, Inc.,* 150 F.3d 620, 627 (6th Cir. 1998), a domain name of a website used wholly for communicative purposes and not used to identify the source of a product or service, is not trademark use in connection with commerce.

by the trademark owner."[48]

Linked web pages have only been held to be "in connection with goods or services or sales of goods or services", where the alleged infringer created the linked web page, and where the linked page solicits donations or sells a product for the the benefit of the infringer, or promotes the sale of a book allied with the alleged infringer, or promotes informational services that compete with the informational services of the mark owner.[49]   Defendant's web site has a hyperlinks to several third party web pages: WorldStudent accreditation page, LiveJournal forum page, Yahoo student forum page with clearly labeled links.    None of the Defendant's links contain deception, as found in the link boxes discussed at *Jews for Jesus v. Brodsky*,[50]  and *Victoria's Secrets v. Artco*,[51]   There are no competing products or services advertised on the Yahoo forum page, on the LiveJournal page or on the WorldStudent page.

Nothing on the *scad.info* home page indicates that the foreign student link to the accreditation page, of the WorldStudent web page, is connected with SCAD.[52] The top frame WorldStudent accreditation web page has a large spinning globe and very large name of WORLD STUDENT, below are several buttons including the Partner Button. There are no advertisements on the WorldStudent accreditation page. It has several pages of information and links to many international

---

[48]    *Bally Total Fitness Holding Corp. v. Faber* 29 F. Supp. 2d 1161, 1168 (CD Cal. 1998); cited with approval in *Ford v. 2600 Enterprises*, 177 F. Supp. 2d at 664

[49]    See *Taubman Co. V. Webfeats,* 319 F.3d 770, 775 (6th Cir. 2003) the alleged infringer created the linked web pages where his and his girlfriend's products were sold was "in connection with advertising". *Ford v. 2600 Enterprises*, 177 F. Supp. 2d 661, 663 (ED Mich 2001) which analyzes *Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 309 (D.N.J. 1998) and *Planned Parenthood V. Bucci*, 1997 U.S. Dist. LEXIS 3338, 1997 WL 133313; In

[50]    993 F. Supp. 282, 309 (D.N.J. 1998)

[51]    194 F. Supp 2d 704, 729 (SD Ohio 2002).

[52]    Tr.I (Murphy) 134:14

pages dealing with accreditation. Defendant links to this web page because it offers information to the foreign student on how the American system works and it has 150 links that will aid the understanding of accreditation.[53] The WorldStudent accreditation web page has a right frame with blinking variable buttons, some of which had the logos and names of foreign schools or businesses. Clicking on a button may or may not lead to an advertisement.[54] Upon Plaintiff's witness clicking the Smurfit button, he went to a WorldStudent page with general comparative information about Smurfit Business School in Ireland.[55] The defendant did nothing to lead Plaintiff from the WorldStudent accreditation page to the partners web page. No deception led plaintiff's witness to the partners page. [56] The clearly labeled and non-deceptive link boxes and the *WorldStudent* page heading mitigate against confusion.[57]

The plaintiff's witness thinks that the *WorldStudent* partners page may be a listing of advertisers. No actual advertisements were visited or testified to.[58] Plaintiff had no evidence that defendant owned the *WorldStudent* site. It did not contain advertisements directing the visitor to do business with the defendant.[59] Plaintiff's witness admitted that he was searching for a commercial page at the WorldStudent web site.[60]

---

[53]    DX8 Tr.I (Houeix) 187:15-25

[54]    Tr.I (Murphy) 135:19-136:6.

[55]    Tr.I (Murphy) 84:8-85:25

[56]    Tr.I (Murphy) 138:1-21

[57]    See *Therma-Scan*, 295 F.3d at 634.

[58]    Tr.I (Murphy) 89:6-90:6

[59]    Tr.I (Murphy) 138:24 139:5

[60]    Tr.I (Murphy) 137:6-20 139:11-140:6

There are no advertisements or promotions on the LiveJournal forum web page, to which defendant links his web site.[61] For plaintiff's witness to go to the LiveJournal FAQ page that mentions that it has paid services, he had to hit the ABOUT Button then click on General Information in a drop down box. The top frame of these linked web pages conspicuously displays LiVEJOURNAL.[62] Nothing on Defendant's web site *scad.info* caused plaintiff's witness to hit the ABOUT Button then to hit General Information. The use of the *scad* mark by defendant did not lead the plaintiff's witness to hit the ABOUT Button that eventually led to a second page with a promotion.[63] While specific remote web pages, at WorldStudent and LiveJournal may be commercial, the web pages that were directly linked to Defendant's *scad.info* were commentary without any commercial aspects.

The yahoo web page has third party "advertisements" that link to attorneys.[64] As previously discussed at the First Amendment section, above, these are not commercial advertisements by defendant. The actual yahoo student forum page may have a separate graphic box button that leads to an advertisement.[65] The prior intermediate yahoo web page, may have a separate graphic box headed with "Advertisement" that when clicked leads to an advertisement[66] The "Netflix" box if clicked may lead to a page that has prices.[67] The content of the "advertisement" boxes on the yahoo

---

[61]    JX 3 DX 10 Tr.I (Murphy) 147:2 - 148:1

[62]    PX79 Tr.I (Murphy) 91:23-92:16 Tr.I (Murphy) 148:2-10

[63]    Tr.I (Murphy) 148:22-149:17

[64]    Tr.I (Murphy) 96:23 PX84

[65]    PX 54

[66]    PX53 Tr.I (Murphy) 113:24-115:5

[67]    Tr.I (Murphy) 116:19.

student forum do not competed with plaintiff's education services.[68]  Defendant does not own, did

not create, and does  not receive compensation from, Yahoo.[69]

Non-deceptive and non-misleading commercial use is not trademark infringement. Examples

arise under the fair use exemption of 15 U.S.C.1115(b)(4) for comparative advertising, or for

nominative use of the mark where there is reasonably no other descriptive word to use.[70]  The alleged

infringer must use the mark as a trademark.[71]  There are no facts to support a finding of use "in

connection with commerce" and a likelihood of consumer confusion as to the origin of a good or

service[72] or the affiliation of the mark owner with the alleged infringer.[73]

During one month in early 2002 Defendant's inter net service provider, register.com, had its

"advertisement" on *scad.info*. During this period *scad.info* was under construction.[74]  Plaintiff is only

seeking injunctive relief in this matter. Injunctive relief is proper only to prevent an on-going violation

of the Lanham Act. A brief "advertisement" by the inter net service provider, on the defendant's web

site, that ceased many months ago, is not a basis for injunctive relief.[75]

*No Probability of Confusion:*

---

[68]    PX 53 PX54 PX84

[69]    Tr.I(Houeix) 186:9

[70]    *New Kids On Block  v.  News America Publish.* 971 F.2d 302, 308   (9th Cir. 1992)

[71]    *Interactive v. A2Z Mobile,* 326 F.3d 687, 695

[72]    *Champions Golf Club v. The Champions Golf Club,* 78 F.3d 1111, 1116, 1123 (6th Cir. 1996); *Bird v. Parsons,* 289 F.3d 865, 877 (6th Cir, 2002)

[73]    *Gray v. Meijer*, 295 F.3d 641, 646 (6th Cir. 2002)

[74]    . Tr.I (Houeix) 169:9-172:6 PX40

[75]    *Taubman Co. V. Webfeats,* 319 F.3d 770, 775 (6th Cir. 2003) Citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329-330, 64 S. Ct. 587 (1944)

Houeix's use of *scad* in the domain name and on the web site does not cause confusion as to the origin or sponsorship of services, since he has no services or goods to sell or advertise on the site. Houeix's use of *scad* in the domain name and on the web site does not cause confusion as to the affiliation of the parties. Likelihood of confusion is synonymous with a probability of confusion, which is more than a possibility.[76]

The Sixth Circuit has adopted eight factors for the likelihood of confusion analysis:

> (1) strength of plaintiff's mark,
> (2) relatedness of the goods/services,
> (3) similarity of the marks,
> (4) evidence of actual confusion,
> (5) marketing channels used,
> (6) likely degree of purchaser care,
> (7) defendant's intent in selecting the mark; and
> (8) likelihood of expansion of the product lines.[77]

These factors are a guide.[78] In a trademark infringement case, the central issue "is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.[79]    The eight factors focus on the ultimate inquiry: "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.[80]

**Factor 1) Strength of Plaintiff's Mark**

---

[76]    *Pebble Beach v. Tour 18*, 155 F.3d 526, 543 (5th Cir. 1998); *Northland Ins. v. Blaylock*, 115 F. Supp. 2d 1108, 1122 (D. Minn. 2000)

[77]    *Gray*, 295 F.3d 641, 646; *Daddy's Junky Music v. Big Daddy's Family Music*, 109 F.3d 275, 280 (6th Cir. 1997).

[78]    Id. at page 646.

[79]    *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 568 (6th Cir. 2000).

[80]    "*Daddy's Junky Music*, 109 F.3d at 280; *Homeowners Group v. Home Marketing Specialists*, 931 F.2d 1100, 1107, (6th Cir.1991).

The *scad* mark is not strong outside of Georgia.[81] There are many unrelated third party users of *scad.* The greater the number of identical or more or less similar trade-marks already in use on different kinds of goods, the less is the likelihood of confusion.[82]   Four marks are registered to Plaintiff are SCAD BEES, SAVANNAH COLLEGE *of* ART *and* DESIGN, SCAD, and a graphic turret with SAVANNAH COLLEGE *of* ART  *and* DESIGN.[83]   The dollar amount spent on advertising for each mark is unknown..[84]  The domain name *scad.edu* appears on several exhibits including the high poster and NY Times announcements.[85] The costly and numerous school catalogue and the poster mailed to high school art teachers prominently display the graphic turret with SAVANNAH COLLEGE *of* ART  *and* DESIGN, but not the mark SCAD.[86]  Generally when the SCAD mark appears on an exhibit, it is with the other marks: the turret with SAVANNAH COLLEGE *of* ART  *and* DESIGN, or with SAVANNAH COLLEGE *of* ART  *and* DESIGN mark. Out side of Georgia SCAD is not a strong mark, especially when the school is identified by multiple marks.

The mark SCAD does not have the incontestable status, after five years of registration

---

[81]    Tr.I (Houeix) 155:10-156:8,  Generally, the broadcasts and the newspaper articles using SCAD are in the Savannah Georgia area. PX29 PX33   There is no advertising of the SCAD mark on national radio or Television or in USA Today. Tr.I (Murphy) 122:25

[82]    *Homeowners*, 931 F.2d at 1108 (quoting Restatement of Torts § 729 cmt. g (1938). *SCAD*'s, lack of strength is indicated by "numerous third-party registrations of the mark ...," *Homeowners* 931 F.2d at 1108. "In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." 2 McCarthy, *Trademarks* § 11:85. See *Data Concepts, Inc. v. Digital Consulting, Inc.,* 150 F.3d 620, 625 (6th Cir. 1998)

[83]    Tr.I (Murphy) 117-118,  PX 1, DX 26

[84]    Tr.I (Murphy) 124:18

[85]    PX20 PX 30

[86]    Tr.I (Murphy) 47:23- 48:5,  48:19-49:5 PX19 PX20

[§1115(b)], so that strength can not be presumed. There has been no consumer survey evidence or expert testimony as the mark's strength.  The requisite evidence of "broad public recognition across product lines" is lacking.[87]  This factor weighs heavily for Defendant.

### Factor 2) Relatedness of the Goods/ Services

The three *Therma-Scan* categories  regarding the relatedness of the goods or services are:

1)  the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar;
2)  the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors;
3)  the goods or services are totally unrelated, confusion is unlikely.[88]

Minor similarities were insufficient to establish that the products were related for the purpose of this factor.[89] Houeix has no goods or services for sale. There is nothing to compare the college's services to. Plaintiff's services and Defendant's commentary are not competitive and are unrelated, so that the third *Therma-Scan* factor applies. As noted above, in the discussion of the First Amendment and Linked Web Pages,  any information on linked pages can not be treated as Houex's offers for sale. Consequently, confusion is unlikely.

### Factor 3)  Similarity of the Marks

Evaluating the similarity of the marks "entails more than a simple side-by-side comparison of the trademarks in question."[90]   "[A] detailed analysis of specific features of a trademark is not appropriate; rather, [the Court] must view marks in their entirety and focus on their overall

---

[87]    *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 632-633 (6th Cir. 2002), citing *Homeowners*, 931 F.2d at 1107 and *Daddy's Junky Music*, 109 F.3d at 281 (6th Cir. 1997)

[88]    *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 632-633 (6th Cir. 2002); *Daddy's Junky Music,* 109 F.3d at 282 (6th Cir. 1997).

[89]    *Therma-Scan*, 295 F.3d at 633

[90]    *Therma-Scan*, 295 F.3d at 633. See *Homeowners,* 931 F.2d at 1109

impressions, not individual features.'"[91]

Defendant's domain name *scad.info* is not identical to *SCAD*. As noted previously, use of *scad.info* is a strong indicator of use outside of Plaintiff's protected area of college education denoted by *.edu.*

The home page of Plaintiff's *scad.edu* contains its graphic turret and Savannah College *of Art and* Design mark.[92] The current *scad.edu* homepage has the prominent mark Savannah College *of Art and* Design.[93] Defendant's web site's home page does not contain *scad.edu*. It does not contain *.edu*, rather it has the mirror image.[94] Defendant's web page has a large prominent yellow logo that represents a famous Savannah Georgia statue, that is not connected to the college.[95] It also represents two views.[96] Superimposed upon the logo is: *Everything is different when you look at it from a different point of view.*. Any viewer who has previously visited *scad.edu* will quickly recognize that *scad.info* is not Plaintiff's web site.[97] Defendant's web site has for many months had announcements concerning this lawsuit between the parties highlighted in one or more large boxes. These prominent boxes will cause a reasonable visitor to quickly realize that this is not Plaintiff's web site.[98] Defendant's web site has boldly printed Fake Masters Fraudulent Process which will lead a

---

[91]   *Therma-Scan*, 295 F.3d at 633, *Daddy's*, 109 F.3d at 283.

[92]   Tr.I (Houeix) 213:15-25  PX35

[93]   PX87 PX88

[94]   Tr.I (Houeix) 167:21  JX1 PX40  PX41  PX42

[95]   Tr.I (Houeix) 167:9-18

[96]   Tr.I (Houeix) 168:7-13

[97]   Tr.I (Houeix) 168:19 JX1 PX40  PX41  PX42

[98]   JX1 PX40  PX41  PX42

reasonable person to believe that this is not Plaintiff's web site.[99]   It can not be assumed that *scad.info*

refers to Plaintiff school because there are other domain names: *scad.org* and *scad.com*  which refer

to entities other than the college.[100]   The linked web pages are prominently labeled with the names

of the two web services, any link boxes are clearly labeled without reference to *SCAD*. This

diminishes the likelihood of confusion created by use of *SCAD* and reduces the importance of

similarity of mark factor.[101] Ultimately, the similarity of the marks here will not be decisive if other

factors indicate a lack of confusion.[102]

### Factor 4) Evidence of Actual Confusion

Plaintiff provides an e-mail of an alumna who arrived at *scad.info* accidentally.[103] It clearly

shows that the visitor realized that she was not at a website associated with Plaintiff. She is dismayed

about the content of the *scad.info*. But she was not confused about the sponsorship of the "weird"

page at *scad.info*. The fact that an Internet user types in *tnn.com* and does not land at the Nashville

Network site does not alone demonstrate confusion.[104]  Thus there is no evidence of actual confusion.

"Four instances of actual confusion is not significant."[105]  Similarly, confusion that is brief or that

occurs among individuals who are not familiar with the products in question is entitled to considerably

---

[99]    JX1 PX40  PX41  PX42

[100]    Tr.I (Houeix) 165:13

[101]    See *Therma-Scan*, 295 F.3d at 634, and *Big Time Worldwide Concert & Sport Club v. Marriott International, Inc.*, 2003 U.S. Dist. LEXIS 35 (ED Mich.) at *25.

[102]    *Hasbro, Inc. v. Clue Computing, Inc., 66 F. Supp. 2d 117, 123 (D. Mass. 1999)*.

[103]    PX51

[104]    *The Network Network v. CBS* 54 U.S.P.Q. 2d 1150 (CD Cal 2000)

[105]    *Daddy's Junky Music Stores*, 109 F.3d at 284.

less weight than are "chronic mistakes and serious confusion of actual customers."[106]

Plaintiff has argued that --a likelihood of confusion is presumed when a defendant intentionally copies a trademark design "with the intent to derive a benefit from the reputation of another."[107] Plaintiff's authority dealt with cases in which confusion is caused to derive a profit. Here, Defendant did not intend to profit or derive any benefit, from the commentary use of the mark. There is no link-box deception as discussed above. A reasonable person looking at the home page of *scad.info* will not associate it with Plaintiff. There is no likelihood of actual confusion.

### Factor 5) Marketing Channels Used

Defendant is not selling or marketing a product or service. This factor requires the Court to analyze "the parties' predominant customers and their marketing approaches."[108] Defendant's commentary site may be, in part, directed to Plaintiff's customers, but it is directed without marketing. At most Defendant warns about Plaintiff, but not about its product or services.

Plaintiff argues that use the Internet by both parties, evidences this factor. However, a general "reference to Internet use is no more proof of a company's marketing channels than the fact that it is listed in the Yellow Pages of the telephone directory."[109]  *Therma-Scan* identified three questions relevant to this factor. One question is:  'whether the parties' marks are utilized in conjunction with [Internet]-based products.'[110] Defendant has no products. Clearly there is no evidence to support the marketing channel factor.

---

[106]  *Therma-Scan*, 295 F.3d at 634.

[107]  *Ford Motor Co  V. Lloyd Design Corporation* 22 Fed. Appx. 464; 2001 U.S. App. LEXIS 23668 (6th Cir. 2001);  *Ferrari v. Roberts* 944 F.2d 1235, 1243 (6th Cir. 1991).

[108]  *Therma-Scan*, 295 F.3d at 636;  *Homeowners*, 931 F.2d at 1110.

[109]  *Therma-Scan*, 295 F.3d at 637.

[110]  *Therma-Scan*, 295 F.3d at 637.

**Factor 6) Likely Degree of Purchaser Care**

Customers searching for the *SCAD* mark are not being directed to Defendant's Internet site by deceptive links or hidden metatags. Visitors who arrive accidently at *scad.info* are not potential customers of Plaintiff. As noted above, potential students know, or should know that all colleges and universities are located at *.edu* and not at *.info*.

A higher degree of care, "is appropriate where the buyer in question has a particular expertise or sophistication, or is making an expensive or unusual purchase. This expectation of greater care, diminishes the likelihood of confusion."[111] College students are likely to exercise a greater degree of care. The cost of a college education and the sophistication of the purchaser must be weighed. It requires an inquiry on both: will buyers accidentally purchase the other company's product, and will sophisticated purchasers be confused as to affiliation.[112]

"Trademark law requires reasonableness on the part of consumers."[113] Although the need to search for a mark holder's web site "may rise to the level of inconvenience, this inconvenience [is] not cognizable."[114] Any inconvenience to an Internet user searching for Plaintiff's web site is trivial.[115] Consumer care is high because of the expense of education and the sophistication of the student consumer. Accordingly, the likely-degree-of-purchaser-care factor does not favor Plaintiff.

---

[111]    *Homeowners,* 931 F.2d at 1111; *Therma-Scan*, 295 F.3d at 638.

[112]    *Data Concepts,* 150 F.3d at 626,

[113]    *HQM, Ltd. v. Hatfield*, 71 F. Supp. 2d 500, 508-09 (D. Md. 1999); *Hasbro Inc.,* 66 F. Supp. 2d at 124-25.

[114]    *HQM Ltd., 71 F. Supp. 2d at 508* (citing *Hasbro*, 66 F. Supp. 2d at 124-25) ; *Chatam Int'l v. Bodum*, 157 F. Supp. 2d 549, 2001 WL 894085, at *6-*7 (E.D. Pa 2001).

[115]    *Strick Corp. v. Strickland*, 162 F.Supp. 2d 372,379 (Ed Pa. 2001). See *Ford v. 2600 Enterprises*, 177 F. Supp. 2d 661, 665 (ED Mich 2001) See ft. nt. 42 supra

## Factor 7) Defendant's Intent in Selecting the Mark

Houeix's intent in using *scad.info* is not to cause confusion or to derive a benefit.[116] Houeix's intent on creating *scad.info* was to not only provide a site for his story but to provide a site for others to report their difficulties with the school. Defendant also intended to provide information to foreign students on accreditation, and to publicize little discussed problems such as crime about the campus.[117]   His intent is not to compete with Plaintiff. Plaintiff's service is not subject to comparison with Defendant's commentary. If the comparison of works, products or designs does not raise an issue as to likelihood of confusion, then presumption of intent to deceive does not arise.[118] There is no evidence that he is attempting to steer would be students away from Plaintiff's college. The web site is critical of the administration of the school and not of the education that is provided. The testimonies posted by staff, instructors and students is both favorable and unfavorable to the school.[119]

Defendant's intent was not to pass off his product for that of the Plaintiff, *Northland* citing *Squirt v Seven Up* 628 F.2d 1089, so that this factor is in Defendant's favor. A copied design, or use of deceit by way of hidden metatags that direct a consumer to the infringer's competing product  is evidence of an intent to confuse. The *SCAD* mark is used in a communicative- fair-use manner without any solicitation of donations, or  requests to purchase services. In *Victoria's Secrets* and in

---

[116]    Tr.I (Houeix) 161:10-164:1 168:8 221:21-222:18

[117]    Tr.I (Houeix) 161:10-164:1 168:8 221:21-222:18

[118]    *Gray*, 295 F.3d at 651.

[119]    About five percent of the posted e-mails were favorable to the college. Tr.II (Houeix) 48:5-49:25 PX 43 p19 12/7/02, Tr.II(Houeix) 57:4-14  Defendant posted e-mails that were favorable to the college. Tr.II(Houeix) 48:14-49:15 PX43 p19 12/7/02, p23 9/18/04, p28 7/24/04, p5 8/4/03, p25 9/18/02

*Jews for Jesus,* there was bait and switch, but at commentary websites as the subject case and in

*Northland,*115 F. Supp. 2d  at page 1119, there may be incidental baiting, but there is no switching

Houeix's intent in using the mark is to describe the school in his narrative and to title his expressive

communication. This factor is in Defendant's favor since there is no intent to derive a benefit.

      **Factor8) Likelihood of Expansion of the Product Lines.**

      There is no likelihood of expansion, since Defendant does not sell any goods or services.

There is no likelihood of confusion as to the origin of services or affiliation of the parties. Therefore

there are no infringement or false origin violations of the Lanham Act.

***Dilution of a Mark:***

      The dilution remedy [§1125(c)] is not limited by consumer confusion, or by noncompetitive

use. But dilution is limited by noncommercial use, fair use, and news commentary. The litmus test for

dilution is  the  mark must be of the select class of truly famous or renown  marks and must have a

very high degree of distinctiveness. The mark must be on the level of AUTOZONE, FORD, KODAK,

DUPONT, or XEROX. It must attain the level of a household word for the dilution remedy.[120]

Distinctiveness for dilution is much greater that distinctiveness for trademark registration.[121] There

---

    [120]    See *Thane International, v. Trek Bicycle,* 305 F.3d 894, (9th Cir. 2002) discusses the legislative history of 15U.S.C. 1125(c) noting that the mark must have a special *aura;* examples of dilution would be *DUPONT shoes, BUICK aspirin and KODAK pianos.* A mark will achieve broad-based fame only if a large portion of the general consuming public recognizes that mark. ....the mark must be a household name. In *Avery Dennison v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999) it was noted Dilution is a cause of action invented and reserved  for a select class of marks - those marks with such powerful consumer associations that even non-competing uses can impinge on their value. At *Avery Dennison*  page 876 it noted to be capable of being diluted, a mark must have a degree of distinctiveness and 'strength' beyond that needed to serve as a trademark. Citing 3 McCarthy, *at* § 24:109. *Moseley v. V. Secret Catalogue*, 537 U.S. 418, 4314, 123 S. Ct. 1115,11225 (2003) recognizes that the mark must be truly famous.

    [121]  Id., *Avery Dennison*  page 876

must be actual dilution.[122]  The dilution remedy exemption at §1125(c)(4)(B), of "noncommercial use" refers to fully constitutionally protected speech.[123]

There is no evidence, such as consumer surveys, that *SCAD* is within the select class of truly renowned or famous service marks. It is not a household word. Thus, the litmus test for the dilution remedy [§ 1125(c)] is not met. Refer to the above discussion on strength of the mark.

The Second Circuit has held that the dilution remedy does not apply to niche fame.[124]  The Ninth and other Circuits[125]  have held there may be dilution of niche fame, but the defendant's use must be  narrowly directed at influencing any niche market.  A niche market requires highly specialized market segments with an identifiable customer base. As the market segment in which the parties products operate becomes less specialized and less unitary the likelihood of a high degree of fame fades.[126]  There is no evidence of niche fame.  There is no evidence that *scad.info* is narrowly directed at influencing any niche market. There are no Sixth Circuit decisions approving niche fame

---

[122]  *Autozone v. Tandy,* 373 F. Supp. 786, 804 (6th Cir. 2004); *Moseley v. V Secret Catalogue,* 537 U.S. 418, 123 S. Ct.1115 (2003)

[123]   *Mattel v. MCA Records,*296 F.3d 894, 905 ( 2nd Cir, 2002) discusses the legislative history; at page 906 it cites *Bolger* supra at ft. nt. 5 & 9;

[124]   *TCPIP Holding Co. v. Haar Communs., Inc.*, 244 F.3d 88, 99 (2nd Cir. 2001**); *Heidi Ott v. Target Corp**, 153 F. Supp. 2d 1055, 1075 (DC Minn. 2001)**; Dissent in     *Time Mirror v. Los Vegas Sporting News*, 212 F.3d 157, 174  (3rd Cir. 2000);  *Michael Caruso & Co. v. Estefan Enters., Inc.*, 994 F. Supp. 1454, 1463 (S.D. Fla.), *aff'd*, 166 F.3d 353 (11th Cir. 1998); *Golden Bear Int'l, Inc. v. Bear U.S.A., Inc.*, 969 F. Supp. 742, 749 (N.D. Ga. 1996); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 968 F. Supp. 568, 578 (D. Colo. 1997), *aff'd*, 185 F.3d 1084, 1999 U.S. App. LEXIS 15225, 1999 WL 527486 (10th Cir. 1999); The 6th Circuit has no reported decisions. The circuits are split.

[125]   *Time Mirror v. Los Vegas Sporting News,* 212 F.3d 157,     (3rd Cir. 2000) sports newspaper is niche market; *Syndicated Sales v. Hampshire Paper*, 192 F.3d 633, 640 (7th Cir. 1999) wholesalers of floral arrangement buckets, or baskets, at ft. nt. 7 a geographic boundary can not define a niche market. *Thane International, v. Trek Bicycle,* 305 F.3d 894, 908 (9th Cir. 2002) *Avery Dennison v. Sumpton*, 189 F.3d 868, 877 (9th Cir. 1999)

[126]   *Thane International, v. Trek Bicycle,* 305 F.3d 894, 909 (9th Cir. 2002)

dilution.

Defendant did not direct his message to high school art teachers, high school art students or their parents. He did not mail any messages to these groups, nor did he print or broadcast his message in the Savannah area. These groups presumably would be the niche market.

The Plaintiff's art presentations, theatrical performances and sporting events were open to the general public in Savannah and elsewhere. Plaintiff's services under the mark are broad, including: sale of apparel, intercollegiate sports, theatrical performance, design competitions with sponsors, student and alumni art exhibitions, and admission days through out the country in almost every state. Its advertisments were not directed to a unitary group. Plaintiff's education services include many areas of art from the traditional fine arts, to animation, interior design, fashion design, architecture, television and film production and computer art.[127]  This goes against the notion of a specialized market segments.  There is no evidence of a unitary group of customers or a specialized product.

Actual damages are required for the dilution remedy.[128]  There is no evidence that the Plaintiff suffered damages from Defendant's use of *scad*.[129] Professors and students who decided not to enter the college had multiple reasons for doing so.[130]

Criticism of a mark owner at a web site, that incorporates the mark in the domain name, is noncommercial use and exempt from the dilution remedy.[131]  There are absolutely no  facts to support dilution remedy.

---

[127]    Tr.I (Murphy) 29:12-21

[128]    *Moseley v. V. Secret Catalogue*, 537 U.S. 418, 434, 123 S. Ct. 1115,1125 (2003)

[129]    Tr.II  68:18.

[130]    PX43 p7 5/21/03

[131]    *Ford v. 2600 Enterprises*, 177 F. Supp. 2d 661, 665 (ED Mich 2001); *Northland Ins. v. Blaylock*, 115 F. Supp. 2d 1108, 1122-1123 (D. Minn. 2000)

*Conclusion*:

For the foregoing reasons Plaintiff's Complaint must be dismissed.


Respectfully submitted,

_    /s/  John  A.  Rebel        _

John A. Rebel (0031771)
Attorney for Defendant
McKinney & Namei
15 E. 8th St.
Cincinnati, Ohio 45202
(513) 721-0200, Fax: 513- 632-5898

### Certification of Service

The foregoing was electronically  served on the attorneys for  plaintiff, on this 5th  day of November, 2004.

_    /s/ John A. Rebel            _
John A. Rebel (0031771)
Attorney for Defendant