## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

SAVANNAH COLLEGE OF ART
AND DESIGN, INC.,
                Plaintiff,                    Civil Action No. 1:02-cv-490

       vs.

PHILIPPE HOUEIX,                **ORDER**
             Defendant.           (Hogan, M.J.)

## I. INTRODUCTION

This is an action for false designations of origin, false descriptions, and false

representations in violation of Section 43(a) of the Trademark Act of 1946, 15 U.S.C. § 1125(a),

and for federal service mark dilution arising under Section 43(c) of the Trademark Act of 1946,

15 U.S.C. § 1125(c).[1]  Plaintiff Savannah College of Art and Design, Inc. ("Savannah College")

seeks permanent injunctive relief, costs, and reasonable attorneys' fees.  The jurisdiction of the

Court is invoked under Title 15 United States Code, Section 1121 and Title 28 United States

Code, Sections 1331, 1337 and 1338, because this case arises under the Trademark Act of 1946,

15 United States Code Sections 1-51, et seq.  The jurisdiction of the Court is not disputed.  The

parties have consented to entry of final judgment by the undersigned United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c).

This case is before the Court following a two-day bench trial and on plaintiff Savannah

College's Proposed Findings of Fact and Conclusions of Law (Doc. 69), defendant Philippe

Houeix's ("Houeix") Proposed Findings of Fact and Conclusions of Law (Doc. 70), Savannah

---

[1]     On the first day of trial, the Court granted plaintiff's request to dismiss its cyberpiracy claim under
the Anticybersquatting Consumer Protection Act of 1999, 15 U.S.C. § 1125(d).

College's Closing Argument (Doc. 68), Houeix's Closing Argument (Doc. 71), and the record as a whole. The following decision contains findings of fact and conclusions of law as required under Fed. R. Civ. P. 52(a). The Court, having considered the pleadings filed by the parties, the evidence presented at trial, and the pre- and post-trial briefs of counsel, hereby enters the following Findings of Fact, Conclusions of Law, and Order. To the extent that the foregoing findings of fact should more properly be considered conclusions of law, and vice versa, they are hereby adopted as such. If a finding of fact or conclusion of law is pertinent to any determination other than that indicated by the heading under which it appears, it is deemed adopted as a finding of fact or conclusion of law applicable to such other determination or determinations as may be appropriate.

## II. FINDINGS OF FACT

The Court makes the following findings of fact:

1) Savannah College is located in Savannah, Georgia. Since 1978, Savannah College has offered high quality instruction at the college level in the fields of design, the visual and performing arts, the building arts, and the history of art and architecture.

2) Savannah College draws students from all over the United States and from more than eighty countries worldwide, many of whom seek information about Savannah College via the Internet.

3) Savannah College's current enrollment is approximately 6,700 students.

4) Since its inception, Savannah College has continuously used the term "SCAD" in interstate commerce as a service mark to identify its college-level education services.

5) The SCAD mark is distinctive and arbitrary in Savannah and Atlanta Georgia in as much as it is an acronym for the college's full name, "Savannah College of Art and Design."

6)  The acronym "SCAD" is generally understood to identify the school to the students and prospective students of Savannah College, and to persons involved with art.

7) Savannah College uses "SCAD" as a trademark to identify a wide variety of goods that Savannah College sells through its bookstore, including clothing, notebooks, journals, deskpads, mugs, pens, office paraphernalia and other imprinted materials. (Savannah College's service mark and trademark rights are referred to collectively hereinafter as the "SCAD mark").  These goods are sold only at the Savannah College bookstore in Savannah, Georgia and perhaps one location in France.

8) Advertisements for the Savannah College of Art and Design and its services have appeared regularly for years in such well known and widely distributed publications as *The New York Times, Business Week, Chicago Tribune, Los Angeles Weekly, The Atlanta Journal Constitution, The Village Voice, Art in America* and many others.

9) Since its inception, Savannah College has also printed and distributed numerous publications that make prominent use of the SCAD mark.  Many of these publications are distributed nationwide to prospective and current students, alumni, parents, and high schools. For example, Savannah College prints approximately one quarter million full color school catalogs each year that are sent to virtually every high school in the United States.  The SCAD mark is referenced throughout these catalogs to identify the College.  Other examples of such publications that make use of the SCAD mark include newsletters, admissions posters, post card mailers, brochures and schedules for Savannah College's athletic programs.

10) Savannah College's Admissions Department supplements these promotional materials by hosting numerous "SCAD Information Sessions" across the United States where prospective students and their parents can come and speak with Savannah College admissions representatives about the College and its programs.  If there is an information session being held in a large metropolitan area, Savannah College typically will place an advertisement in the metropolitan area's local paper regarding the event.

11) Savannah College has used the SCAD mark in many ways, including on the uniforms for its men's and women's athletic programs, on a college identification card that also functions as a debit card, on the marquee of a theater Savannah College owns in Savannah, Georgia named the "SCAD Trustees Theater," on brochures for events to be held at the SCAD Trustees Theater, and in the name of its parents association, the "SCAD Parents Association."

12)  Generally when the SCAD mark appears on an exhibit, it is with one of the other marks registered by Savannah College: the turret with SAVANNAH COLLEGE *of* ART *and* DESIGN, or with the SAVANNAH COLLEGE *of* ART *and* DESIGN mark. (Plaintiff's Trial Exhibits 5, 6, 7, 8, 13, 14, 17, 18, 19, 20).

13) Savannah College's annual advertising expenditures are nearly half-a-million dollars.

3

14)  Including the cost of printing and mailing Savannah College's catalogs, Savannah College spends between one and two million dollars a year on promotional materials.

15)  Articles about Savannah College have appeared in numerous newspapers and magazines, and Savannah College has been featured in various radio and television news broadcasts, primarily in the Savannah, Georgia area.  For years, Savannah College has engaged in substantial international advertising and promotional efforts, many of which prominently feature the SCAD mark and/or SCAD.EDU domain name.

16)  The marks registered to Savannah College are SCAD, SCAD BEES, SAVANNAH COLLEGE *of* ART *and* DESIGN, and a graphic turret with SAVANNAH COLLEGE *of* ART *and* DESIGN.

17)  On February 11, 2002, Savannah College was issued a Certificate of Registration, No. 2,686,644, for the "SCAD" mark by the United States Patent and Trademark Office for education services, namely providing instruction and training at the undergraduate, graduate and post-graduate levels.

18)  No one has challenged Savannah College's right to register or use the SCAD Mark to identify its goods and services.

19)  By virtue of Savannah College's longstanding promotion and use of its goods and services under the SCAD mark, the mark is well known in the field of higher education and among current and prospective students, faculty members, parents, and alumni as identifying the Savannah College of Art and Design.

20)  By virtue of Savannah College's long-term and substantial promotion and use of its SCAD mark throughout the state of Georgia, the SCAD mark is famous in Savannah and Atlanta, Georgia. (Doc. 53, Uncontroverted Fact #15)

21)  Savannah College is the only entity in the field of educational services in the United States that uses the term "SCAD" as a service mark or trademark to identify educational services or related goods or services.

22)  The Internet is an international network of interconnected computers used by more than 100 million individuals, companies, organizations, and educational institutions worldwide to exchange data, information, and ideas.

23)  Although the Internet permits a variety of communication, the best-known category of communication is the "World Wide Web" (the "web"). To post content on the web, a user must have an Internet domain name, which serves as an address through which a user's web site can be located.

24)  The web "address" for a site typically consists of the letters "www" and a domain name (e.g., scad.edu). Domain names consist of at least two parts: a top-level domain (e.g. ".edu") and

a second-level domain (e.g. "scad").

25) The ".info." top-level domain is one of several top-level domains that are unrestricted and open to registration by any Internet user.

26) The ".info" top-level domain is widely viewed by Internet users as a domain that can be used to find information regarding particular companies or institutions (e.g., information about Xerox Corporation can be found at XEROX.INFO).

27) The term "SCAD" is used by third parties in Internet domain names to identify other goods and services.  "scad.org" is the Internet address for the Smith County Appraisal District.  "scad.com" is the Internet address for a real estate organization.   "scad.dmon.co.uk" is the Internet address for the Skipton and Craven Action for Disability.  Houeix identified other third party websites that at one time used the SCAD acronym, including the site for a Japanese arts school, but was unable to verify that the sites are still active at the present time.  None of the websites relate to educational services promoted to the public in the United States.

28) Savannah College has used the e-mail address info@scad.edu as its general e-mail address for persons seeking information about the College since at least as early as 1998.

29) Since 1995, Savannah College has operated a heavily trafficked Internet web site under the domain name scad.edu that provides detailed information about Savannah College and its goods and services.

30) In 2002, the home page of Savannah College's *scad.edu* contained the graphic turret service mark and Savannah College *of* Art *and* Design mark. (Plaintiff's Trial Exhibit 35).  The current *scad.edu* homepage has the prominent mark Savannah College *of* Art *and* Design.  (Plaintiff's Trial Exhibits 87, 88).

31)  The scad.edu  domain name also serves as the address for Savannah College's internal Intranet, which in part serves to facilitate dialogue by and among the College's students and faculty regarding the College.

32) In addition to the quarter million catalogues printed and mailed to promote Savannah College, the scad.edu is an important marketing tool for the College.

33) In 2003, Savannah College received over 260 million hits on its scad.edu website.  In May 2002, the SCAD.EDU web site received more than 2.39 million hits, more than 1.35 million of which were from off-campus Internet users.

34)  The content on the scad.edu web site had grown so voluminous, having more than 50,000 pages, that Savannah College had to remove a large portion of the content (approximately 38,000 pages) to make the site easier for Internet users to navigate.

35) Savannah College has registered and uses other domain names, including scadradio.org,

scad.biz and scad.net to host additional content about the College and to capture additional
Internet traffic looking for information about the College.

36) In response to advertising in Europe by Savannah College, Houeix, a French citizen,
interviewed for an opening in Savannah College's interior design department.

37) Savannah College requires each of its faculty members to have a graduate degree in their
field.  When Houeix interviewed with Savannah College, he represented that his educational
background was the equivalent of a graduate degree in the United States.

38) Savannah College offered Houeix employment as a professor in the Interior Design
Department, which Houeix accepted.  Savannah College also offered a teaching position to
Houeix's wife, Natalie Doucetle, in the College's school of fashion design.

39)  To permit Houeix to teach at the College, Savannah College secured a visa for Houeix that
would allow Houeix to teach in the United States for three years.

40)  During Houeix's first year of employment, as part of a routine audit of academic
credentials, an outside accreditation agency informed Savannah College that Houeix's
educational background was only the equivalent of an undergraduate degree in the United States.

41)  Although Savannah College could have chosen not to renew Houeix's contract as a result of
this information, Savannah College gave Houeix the option of continuing to teach at the College
provided that he enroll and make satisfactory progress in a graduate program in interior design.

42)  Houeix was angry at Savannah College for requiring him to enroll in the graduate program.
He had practiced in the field for many years and believed he knew everything there was to know
in the field. Nevertheless, Houeix needed to stay at Savannah College because of his visa status,
so he enrolled in Savannah College's graduate program in interior design and continued to teach
at the College.

43)  Brian Murphy, Savannah College's Executive Vice President of Business Affairs, testified
at trial that Houeix insisted he be allowed to enroll in an extra class per quarter than was
required by the College so that he could complete the degree on an accelerated basis.  Mr.
Murphy testified that to accommodate this demand and his teaching schedule, Dr. Crystal
Weaver, then head of Savannah College's Department of Interior Design, permitted Houeix to
take his classes in an individual, independent study format and allowed him to turn in work after
a quarter was done.

44) Houeix disputes that any individual arrangement or individual study program was made
for him so he could teach and earn his master's degree.  He testified he was scheduled to teach at
the same time his graduate degree classes were scheduled, and was told to concentrate on
teaching.  Houeix testified he did not engage in independent study projects and the College did
not require him to produce any projects as a master's degree student. Houeix testified he did not

receive instruction in master's degree classes.  He testified he was awarded grades for classes he did not attend and for classes that did not exist, and for student work he did not perform.  Houeix testified that this process was designed by Savannah College to keep its accreditation.  Houeix later posted documents to his website that, according to his testimony, corroborates his story.[2]

45)  Sometime after Houeix enrolled in Savannah College's graduate program, Savannah College fired Houeix's wife.  Houeix was upset by his wife's firing and believed it to be without cause.

46)  In August 2001, Houeix opened his first website, phoueix-master-scad.com.

47)  In September 2001, Houeix's wife obtained a job at the University of Cincinnati and secured an H1 Visa.

48)  With his wife's hiring at the University of Cincinnati, Houeix no longer needed to rely on the G1 Visa that he obtained through Savannah College to keep his family in the Unites States.  Houeix resigned from Savannah College's faculty on September 14, 2001, two days after the beginning of the first quarter of the College's 2001-02 school year, without advance notice to the College.

49)  Mr. Murphy testified that Houeix's departure was a complete surprise and caused considerable harm to Savannah College, its faculty members, and students.

50)  On October 29, 2001, Houeix registered the domain name scad.info.

51) Shortly after registering the scad.info domain name, Houeix began using the domain name to host a web site that is critical of Savannah College.

52) For a period of one month in early 2002, Houeix's scad.info website contained an advertisement for Register.com, his Internet service provider.  Register.com, Inc. is one of several registrars that are authorized to register domain names in the ".info" top-level domain.  Register.com registers domain names on a first-come, first-served basis, and makes no determination as to whether an applicant has rights in the desired domain name.  Houeix testified that he agreed to place this advertisement on his website in exchange for free web hosting services from Register.com.  During this period, scad.info was "under construction." (Plaintiff's Trial Exhibit 40).

53) The home page of the original scad.info website (Plaintiff's Trial Exhibit 40) contains a yellow and blue graphic of a well-known sculpture in Savannah, Georgia that is not connected to

---

[2]        While both parties offered evidence on the merits of Houeix's claim that he was awarded "fake" grades for work he never performed, the legitimacy of that claim is no longer at issue in this case (see Doc. 42)  and ultimately is not relevant to the trademark infringement and dilution claims still pending.  The Court provides this information merely as context for resolution of this case.

Savannah College.  Upon this graphic is superimposed the mirror image of ".edu" on one side of the image and ".info" on the other side, and the words, "Everything is different when you look at it from another point of view."  Above the image appears the term SCAD.INFO, with the words "Share, Communicate, Announce, Disclose" appearing below the term.

54) When Houeix actually opened the scad.info website, it was with an Internet provider other than Register.com.

55)  *Scad.info* does not contain the graphic turret service mark registered to Savannah College nor use the Savannah College *of* Art *and* Design mark. (Joint Trial Exhibit 1; Plaintiff's Trial Exhibits 40, 41, 42).

56) For many months, Houeix's web site has had announcements concerning this lawsuit between the parties highlighted in one or more large boxes.

57) Immediately below the box with announcements about the lawsuit is the following text:

> *For those who are new in that story.*
>
> I was a SCAD "professor" in Interior Design since June 99.
> In August 2001, I opened a first web site about fraudulent process at the
> Savannah College of Art and Design, I resigned for ethical reasons.
> I have been receiving many testimonies about the Savannah College of Art and
> Design that make me think that it would be interesting to share them with
> everybody involved with the  Savannah College of Art and Design.
> So I registered the domain name http://www.scad.info "Share, Communicate,
> Announce, Disclose".
> The testimonies are published on the web site by categories such as
> Faculties/Students/Alumni, Parents and Others in respect of your choice to
> identify yourself or not.  I understand perfectly that some of you need to protect
> your name.
> The email is freedomofspeech@scad.info.
> Thank you for helping me in this enterprise.

(Joint Trial Exhibit 1).

58)  At the top left of the home page of Houeix's scad.info web site is a link entitled "Savannah College of Art and Design Fake Master Fraudulent Process." (Plaintiff's Trial Exhibit P-43). When a user clicks on this link, he is taken to a web page on which Houeix alleges that he was given fraudulent grades by Savannah College for classes he never attended and work he never performed.

59)  Mr. Murphy testified that the College did not know anything about Houeix's allegations concerning fraudulent grades until they read them on Houeix's web site.

60)  Houeix admits that he did not bring his allegations to the attention of anyone at Savannah College before he resigned, despite that the fact that he was aware that the College had a formal student grievance process through which he could have addressed the claims and despite the fact that he accepted new contracts and raises in salary from Savannah College while the alleged fraud was occurring.  Houeix testified that he was dissuaded from utilizing the College's grievance process given his experience with his wife's firing from Savannah College.

61)  After reading Houeix's allegations on the Internet, the College investigated Houeix's claims and concluded that they were without merit.  Savannah College also provided information about Houeix's allegations to the accreditation agency responsible for the accreditation of colleges in the southern United States, the Southern Association of Schools and Colleges ("SACS").

62)  Houeix testified that the purpose of his web site is to provide news and information to prospective students, parents and faculty members about Savannah College that they will not get from the College.  Houeix's intent on creating *scad.info* was to not only provide a site for his "story" but to provide a site for others to report their experiences with the school.  Houeix's intent also was to provide information to foreign students on accreditation and other matters of concern, and to publicize little discussed problems such as crime on the campus.

63) Houeix's web site scad.info does not charge a fee and is free to any Internet user.

64)  Houeix's web site contains links to certain other web pages. One link is to "www.worldstudent.com/uk/mag/features/accreditation.shtml," which has pop-up links that are clearly labeled which change every few seconds. At times, Houeix's web site is linked to teacher and student forum pages at "www.savannahnow.com/ubb/Forum7/HTML/000182.html;" "http://teachers.net/mentors/higher_education/topic257/6.11.01.13.16.39.html;" and "http://pub97.ezboard.com/ffailure75800frm1.showMessage?topic ID=89.topic." Currently Houeix's web site is linked to SCAD student forum groups at "http://groups.yahoo.com/group/scad3/interrupt?st=2&m=1&done=%2Fgroup%2Fscad3%2Fmessage%2F44" and "www.livejournal.com/ community/scad-community/30659.html."

65)  The links to third party websites contain message boards or other content Houeix believes prospective students to Savannah College should consider. (*See* Joint Trial Exhibit 1; Plaintiff's Trial Exhibit 43). These links include one "For foreign students seeking information on US Colleges and Universities," a link to "groups.yahoo/students forum," and a link to "LiveJournal.com/Students forum." (*See* Plaintiff's Trial Exhibits P-46, P-79, P-84, P-53, P-54, and Joint Trial Exhibit 3).

66) Clicking on the link "For foreign students seeking information on US Colleges and Universities" on the scad.info homepage leads to the WorldStudent.com accreditation page.

67)  The top frame of the WorldStudent.com accreditation web page has a large spinning globe and conspicuously displays the term "WORLD STUDENT." (Plaintiff's Trial Exhibit 46).

68) Houeix testified that his intent for including this link on his website was to offer information to foreign students on how the American educational system works and to aid them in their understanding of how schools are accredited.

69)  The WorldStudent accreditation web page has a right frame with blinking variable buttons, some of which had the logos and names of foreign schools or businesses. Clicking on a button may or may not lead to an advertisement.

70)  Nothing on the *scad.info* home page indicates that the foreign student link to the accreditation page of the WorldStudent web page is connected with Savannah College.

71) Mr. Murphy testified he had to search around the website for "some amount of time" to find the advertising links "to prove a point" that "it's a commercial site." (Doc. 64 at 137).

72)  Houeix's web site contains a link to LiveJournal.com, a chat room site.  There are no advertisements or promotions on the forum web page of the LiveJournal web site. (Joint Trial Exhibit 3).

73)  Additional links on the LiveJournal.com website may lead users to features which charge a fee for services.  Access to one such feature was two links removed from the LiveJournal.com forum page.  The top frame of these linked web pages conspicuously displays the term "LiveJournal."

74)  Houeix's web site links to a Yahoo forum for students of Savannah College.  It is labeled "groups.yahoo/students forum." (Joint Trial Exhibit 1).  Clicking on the groups.yahoo/students forum link leads to a Yahoo!Groups page.  This page contains links for advertisements for third party products and services. (*See* Plaintiff's Trial Exhibits 53, 54 and 84).

75)  The content of the "advertisement" boxes on the yahoo student forum pages do not compete with plaintiff's education services. (*See* Plaintiff's Trial Exhibits 53, 54 and 84).

76)  Houeix receives no compensation from the WorldStudent web site, Yahoo web site or its forum, or the LiveJournal web site.  None of these sites contain advertisements directing visitors to do business with Houeix.  Houeix  neither created nor owns these websites.

77)  Nothing on Houeix's web site *scad.info* caused Mr. Murphy to select the WorldStudent web site, Yahoo web site or its forum, or the LiveJournal web site links or subsequent links from those pages.

78)  Another link on the home page of Houeix's web site is entitled "Savannah College of Art and Design's Testimonies." (Plaintiff's Trial Exhibit P-43). When clicked, this link redirects users to a web site located at the domain name scad-and-us.info. (*See* Plaintiff's Trial Exhibit P-43).

79)  Scad-and-us.info is another domain name that Houeix registered after he resigned from

Savannah College. (*See* Plaintiff's Trial Exhibit P-38). Houeix created the scad-and-us.info website because his Internet service provider shut down scad.info due to a complaint. The site Houeix operates at the domain name consists of e-mails Houeix has received from third parties about the College and its faculty, staff, and administration from prospective students, parents, faculty members and staff. (*See* Plaintiff's Trial Exhibit P-43).

80)  Houeix's scad.info web site also contains a link at the top of the site entitled "Emails of the Week." (*See* Plaintiff's Trial Exhibit P-44). When a user selects this link, the user is directed to a web page within the scad.info web site that contains a selection of the various e-mails that Houeix has received from third parties about the College and its faculty, staff, and administration. (*See* Plaintiff's Trial Exhibit P-44).

81)  The scad.info and scad-and-us.info websites are not bulletin boards[3].  Rather, Houeix selects the e-mails he wishes to post to these sites from among the emails he receives.

82)  The majority of the e-mails that Houeix has received and posted on his sites are critical of Savannah College.  Of the approximately 200 e-mails posted on his websites, Houeix testified that he would characterize five of the e-mails as being favorable to Savannah College.  Houeix estimated that he posted over 95% of the emails he received.  Houeix does not post emails which comment on sexual matters and stopped posting emails critical of named instructors. Houeix admits that he does not post e-mails to his site that disagree with his point of view.

83)  Houeix testified that the e-mails he posts to his sites are truthful and non-scandalous in his opinion, even when he may not have a factual basis for the veracity of the statements made therein.  For example, Houeix's sites contain allegations of rape allegedly occurring in a Savannah College dormitory room and another allegedly perpetrated by a staff member of the College; allegations of the death of three faculty members caused by contamination in Poetter Hall, a building on the College's campus; and allegations that a College  professor, whom Houeix identified by name, told sexist and crude jokes in class. (Plaintiff's Trial Exhibits P-43, P-85). Houeix posted these allegations to his web site even though: Houeix testified that he has no factual basis for knowing whether the rape allegations are true or not; Houeix has a report from the Centers for Disease Control that the contamination claim is false; and Houeix admitted that he never contacted the named faculty member regarding classroom conduct allegation.

84) The web pages that contain the posted e-mails and Houeix's story concerning the "fake grading scheme" were controlled and created by Houeix, and did not have any advertisements, offers for sale, or sale of products.  Additionally these pages did not solicit donations or link to any third party web pages. (Defendant's Trial Exhibits 3, 13, and 14; Plaintiff's Trial Exhibit 43 at page 1 of 50 through page 50 of 50).

85) Another link on the home page of Houeix's web site is entitled "Securitycampus.org." (Plaintiff's Trial Exhibit P-43). When clicked, this link redirects users to a web site about

---

[3]        A type of electronic message center.

security and crime reporting requirements on college campuses.

86) Houeix did not use the SCAD mark in labeling the links from his web site to his "Savannah College of Art and Design Fake Master Fraudulent Process" link, Savannah College of Art and Design's Testimonies link, Securitycampus.org link, or to third party web pages. (Joint Trial Exhibit 1; Plaintiff's Trial Exhibits 41, 42, 43).

87)  There are no products, goods or services sold or offered for sale on Houeix's web site *scad.info*.

88) Houeix does not provide educational services and is not in competition with Savannah College.

89) Houeix had no economic interest in creating the hyperlinks to other web pages from scad.info.

90)  Prospective students and faculty members have written to Houeix and informed him that they have decided not to attend Savannah College or accept a faculty position at Savannah College on the basis of the materials contained on his websites.

91) Houeix chose the "scad" portion of his scad.info and scad-and-us.info domains to refer to the College and to convey the purpose of the website, to "share, communicate and disclose" information about Savannah College.  Houeix admits that the websites he operates under these domain names are designed to targets persons who are affiliated with the College or who may one day be affiliated with the College.

92)  Houeix testified that persons who are familiar with Savannah College may think the domain name scad.info has some affiliation with the College.

93)  An alumnus of Savannah College has expressed that she was briefly confused after accessing Houeix's web site when she was looking for Savannah College's web site.

94)  At least two dozen other individuals have telephoned Savannah College and expressed that they inadvertently went to Houeix's scad.info web site, and at least three individuals have written to Houeix and stated that they "stumbled" onto his site.

95)  Once a user gets to Houeix's site and examines it, he or she will discover that the site is not in fact a Savannah College site.

96)  An Internet user who intends to access a party's products or services, but who has not done so before, may go to a search engine to locate the party's web site.  Internet users interested in reaching Savannah College's web site may use a search engine such as Yahoo! to locate the site.

97)  Searches for Savannah College's web page on popular Internet search engines list Savannah

12

College's web site as their first or second "hit."

98)  When a user conducts a search in Yahoo! on the term "scad," Savannah College's web site appeared as the first search result.  Houeix's scad.info web site was not within the first ten search results of the 141,000 results. (Plaintiff's Trial Exhibit 74).

99)  When a user conducts a search in Yahoo! on the term "scad," a prompt appears to suggest that a search on "scad college" may lead to more focused results.

100)  A search of "scad college" on September 22, 2004 returned Houeix's scad.info and scad-and-us.info sites as the third and sixth search results, respectively. (*See* Plaintiff's Trial Exhibit P-75).

101)  The search listing results for Houeix's sites in Yahoo! do not clearly identify that the sites are unaffiliated with Savannah College. (*See* Plaintiff's Trial Exhibit P-75).  From all appearances, the search engine listing for the scad-and-us.info site is for a Savannah College site. (*See* Plaintiff's Trial Exhibit P-75).

102)  Houeix's web site does not use metatags[4] to misdirect Internet users of search engines using the keyword "scad" to his web site.

103)  Houeix registered his .info domain names just after the .info top-level domain became available for registration.  Because there can be only one registrant for any given domain name, Houeix's registration prevents Savannah College from being able to register or use scad.info to host its own web site.

104)  Mr. Murphy testified that Savannah College would like to own the scad.info domain name to capture the Internet traffic that is looking for information about Savannah College at a web site located in the .info domain.  Mr. Murphy further testified that the College could use the scad.info domain name to host some of the content that Savannah College has removed from the scad.edu web site due to size considerations.

105)  Mr. Murphy further testified that although the .info domain name is a relatively new top-level domain, it is being used with increasing frequency by colleges and universities in the United States to serve as the address for primary or secondary websites. (*See* Plaintiff's Trial Exhibits P-56 through P-69, P-73). In support of this testimony, Savannah College introduced print-outs of websites of more than fourteen colleges and universities in the United States that operate websites at domain names in the .info top-level domain, including Brigham Young, Ohio University, Rutgers, San Diego State, the University of Colorado, Arizona State, Michigan State, and others. (*See* Plaintiff's Trial Exhibits 56-58, 60-69, 73).

---

[4]    "A metatag is a hypertext markup language ('HTML') code, invisible to the Internet user, that permits web designers to describe their web page." *Bihari v. Gross*, 119 F. Supp.2d 309, 312 n.3 (S.D.N.Y. 2000).

## III.  CONCLUSIONS OF LAW

### A.  TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION CLAIMS

"The Lanham Act prohibits the unauthorized use of a registered trademark when selling
or advertising a good or service using the trademark is likely to confuse or deceive consumers."
*U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1188 (6th Cir. 1997).  The Lanham
Act provides, in relevant part:

> Any person who shall, without the consent of the registrant--
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of
> a registered mark in connection with the sale, offering for sale, distribution, or
> advertising of any goods or services on or in connection with which such use is
> likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,
> connection, or association of such person with another person, or as to the origin,
> sponsorship, or approval of his or her goods, services, or commercial activities by
> another person . . . shall be liable in a civil action by the registrant[.]

15 U.S.C. § 1114(1)(a).  To establish its trademark infringement claim under the Lanham Act,
Savannah College must prove that it has a valid trademark[5]; that Houeix uses such mark in
interstate commerce in connection with the sale, offering for sale, distribution, or advertising of
any goods or services; and that Houeix's use of such mark is likely to cause confusion.   To
establish its unfair competition claim, Savannah College must show that Houeix "on or in
connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or
device, or any combination thereof, or any false designation of origin, false or misleading
description of fact, or false or misleading representation of fact" in a manner that is "likely to
cause confusion. . . ." 15 U.S.C. § 1125(a)(1)(A).  *See Bird v. Parsons*, 289 F.3d 865, 877 (6th

---

[5]        A service mark in a service industry parallels a trademark in an industry that sells a product. *See*
15 U.S.C. § 1127.  The Court shall use these terms interchangeably.

14

Cir. 2002).  While a claim of unfair competition, unlike a claim of trademark infringement, does

not require that a defendant use the plaintiff's trademark, *id.*, Houeix's use of Savannah

College's trademark is implicated in the unfair competition claim.  Thus, to prevail on its

trademark infringement and unfair competition claims, Savannah College must establish: (1) that

it possesses a mark; (2) that Houeix uses the mark; (3) that Houeix's use of the mark occurs "in

commerce;" (4) that Houeix's uses the mark "in connection with the sale, offering for sale,

distribution, or advertising" of goods or services; and (5) that Houeix uses the mark in a manner

likely to confuse consumers. 15 U.S.C. § § 1114(1)(a), 1125(a)(1)(A).


**Possession and use of mark**

It is undisputed that Savannah College owns trademark and service mark rights in the

SCAD mark, as evidenced by the issuance of Certificate of Registration, No. 2,686,644, for the

mark by the United States Patent and Trademark Office.  *See* 15 U.S.C. § 1057(b).  It is also

undisputed that Houeix uses the mark in his domain names scad.info and scad-and-us.info and

that, in part, the "scad" portion of his domain names refers to the Savannah College of Art and

Design.  The Court notes, however, that the mere use of the mark in a domain name does not,

without more, violate the Lanham Act.  *See Bird v. Parsons*, 289 F.3d 865 (6th Cir. 2002)

(domain name www.efinancia.com did not infringe registered tradename "Financia" because not

used in commerce).


**Use in commerce**

15

Houeix's use of the scad.info and scad-and-us.info domain names on the Internet constitutes a use "in commerce" for purposes of the Lanham Act. The Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. A mark is used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services." 15 U.S.C. § 1127. Courts have construed the "use in commerce" requirement under the Lanham Act broadly to "denote[] Congress's authority under the Commerce Clause rather than an intent to limit the [Lanham] Act's application to profit making activity." *United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 92-93 (2d Cir. 1997). *See also Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1194 (11th Cir. 2001) ("Because Congress' authority under the Commerce Clause extends to activity that substantially affects interstate commerce, the Lanham Acts's definition of commerce is concomitantly broad in scope: all commerce which may lawfully be regulated by Congress.") (internal citations and quotation marks omitted). "In the computer and Internet context, courts have consistently held that providing information over the Internet satisfies the commerce requirement of the Lanham Act." *Cable News Network L.P., L.L.L.P. v. CNNews.com,* 177 F. Supp.2d 506, 517-518, n.25 (E.D. Va. 2001), *aff'd in part and rev'd in part on other grounds*, 56 Fed. Appx. 599, 2003 W.L. 152846 (4th Cir. 2003), citing *Planetary Motion*, 261 F.3d at 1194-95 (holding that the distribution of software for end-users over the Internet satisfies the "use in commerce" jurisdictional predicate); *Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313, * 3

16

(S.D.N.Y.1997) (holding that "[t]he nature of the Internet indicates that establishing a typical home page on the Internet, for access to all users would satisfy the Lanham Act's 'in commerce' requirement"), *aff'd*, 152 F.3d 920 (2d Cir.), *cert. denied*, 525 U.S. 834 (1998).  Thus, Houeix's dissemination of information over the Internet satisfies the "use in commerce" requirement.

**In connection with the sale, offering for sale, distribution, or advertising of any goods or services**

A central issue in this case is whether Houeix's use of the SCAD mark in the domain names scad.info and scad-and-us.info is "in connection with the sale, offering for sale, distribution, or advertising of any goods or services" for purposes of the Lanham Act.  Savannah College contends that Houeix uses the SCAD mark in connection with the advertising or sale of goods and services in at least three ways: (1) he advertises the goods and services of third parties on his web site in the form of banner ads and links to third party commercial websites; (2) he has prevented others from reaching Savannah College's web site; and (3) Houeix's sites are designed to harm Savannah College commercially.  Houeix argues that he does not sell or promote services or products on his websites, nor do his sites contain advertisements or commercial promotions.  According to Houeix, the speech contained on his Internet sites does not constitute commercial speech and as non-commercial speech is protected by the First Amendment and not within the jurisdiction of the Lanham Act.

The Court's analysis of whether Houeix's use of the SCAD mark in the domain names scad.info and scad-and-us.info is "in connection with the sale, offering for sale, distribution, or advertising of any goods or services" is governed by the Sixth Circuit's decision in *Taubman Co. v. Webfeats*, 319 F.3d 770 (6th Cir. 2003).  In *Taubman*, the plaintiff "The Shops at Willow

17

Bend" was a shopping mall owner who maintained its own official website at "theshopsatwillowbend.com." The defendant, a web designer by trade, registered the domain name "shopsatwillowbend.com" and created an Internet website at that address. The defendant's website included a disclaimer that the site was unofficial and contained a link to the plaintiff's official website. The defendant described his site as a "fan site" that had no commercial purpose. The site contained links to a custom-made shirt company, "shirtbiz.com," and to his own design business, "Webfeats." The plaintiff sued the defendant under the Lanham Act for trademark infringement, seeking an injunction and demanding surrender of the defendant's domain name. The defendant responded by adding other websites using "complaint names," including "taubmansucks.com," "shopsatwillowbendsucks.com," and other web names with the moniker "sucks.com."[6] These web names linked to the same site which detailed the defendant's legal battle with the plaintiff and his lawyers.

In analyzing the plaintiff's Lanham Act claims, the Sixth Circuit noted that the Act regulates only commercial speech which is entitled to less protection under the First Amendment. When a First Amendment challenge is raised in conjunction with a Lanham Act claim, the first issue the Court must address is whether the use of the trademark in question is "commercial." *Taubman*, 319 F.3d at 774. "If [the defendant's] use is commercial, then, and only then, do we analyze his use for a likelihood of confusion." *Id*. If the Court determines the use is commercial, then the Court must ask whether the use produces a likelihood of confusion. *Id*. If the Court determines the use is "misleading commercial speech," such use falls outside the protection of the First Amendment. *Id*. In other words:

---

[6]    The process of registering and using "complaint names" is now commonly known as "cybergriping." *Taubman*, 319 F.3d at 772.

> [A]ny expression embodying the use of a mark not 'in connection with the sale ... or advertising of any goods or services,' and not likely to cause confusion, is outside the jurisdiction of the Lanham Act and necessarily protected by the First Amendment.

*Id*. at 775.  Thus, the Court of Appeals determined it need not analyze the defendant's First Amendment defense independent of the Lanham Act analysis. *Id*.

In examining whether the website "shopsatwillowbend.com" is non-commercial, the Sixth Circuit found irrelevant the defendant's motivation for creating the website.  Whether the defendant intended his website to be non-commercial is not the proper inquiry.  Rather, the Sixth Circuit determined that the inclusion of advertising links on the website, even though extremely minimal, rendered the use of the plaintiff's mark "in connection with the advertising" of the goods sold by the advertisers. *Taubman*, 319 F.3d at 775.  "This is precisely what the Lanham Act prohibits." *Id*.  After the defendant removed the links to a custom-made shirt business and his own web design business from his website, the Court determined the Lanham Act could not be invoked since there was no longer any use "in connection with the advertising" of goods and services:

> As long as [the defendant] has no commercial links on either of his websites, including links to shirtbiz.com, Webfeats, or any other business, we find no use "in connection with the advertising" of goods and services to enjoin, and the Lanham Act cannot be properly invoked.

*Id*. at 775.

In this case, Savannah College argues that the banner advertisements for Register.com and links to other "third party commercial websites," including WorldStudent.com, Yahoo.com, and LiveJournal.com, make Houeix's scad.info website "commercial" within the meaning of the Lanham Act.

19

It is clear that when Houeix's scad.info website contained an advertisement for Register.com Houeix's use of the SCAD mark was "in connection with the advertising" of the goods sold by the advertiser. *Taubman*, 319 F.3d at 775.  Nevertheless, it is undisputed that Houeix's website no longer contains an advertisement for Register.com.  Because the only relief Savannah College seeks in this case is injunctive relief, there is no ongoing "violation" by virtue of the removal of the Register.com advertisement and any request for injunctive relief on this basis is rendered moot. *Taubman*, 319 F.3d at 775.  Therefore, the Court must examine Houeix's website for other indicia of commerciality.

It is undisputed that Houeix's scad.info and scad-and-us.info websites currently contain no advertising, no sales of goods or services, and no solicitations of donations or other payments. Houeix's scad.info website includes a link "For foreign students seeking information on US Colleges and Universities," a link to "groups.yahoo/students forum," and a link to "LiveJournal.com/Students forum."  Clicking on the "foreign students" link connects the user to WorldStudent.com accreditation page.   Clicking on the groups.yahoo/students forum link leads to a Yahoo!Groups page Internet message board.  Clicking on the link to "LiveJournal.com/ Students forum" leads to LiveJournal.com, a chat room site.  It is undisputed that Houeix receives no compensation from the WorldStudent web site, Yahoo web site, or LiveJournal web site, nor did he create or own these websites.  Visually, the links contained on the scad.info homepage do not appear to offer any goods or services for sale.

Nevertheless, Savannah College argues that the WorldStudent.com, Yahoo.com, and LiveJournal.com websites are "commercial" websites and Houeix's inclusion of links to these websites on scad.info renders his site "commercial."  Savannah College contends that these links

connect Internet users to sites which in turn either contain advertisements for third party products and services or, in the case of the LiveJournal.com site, have features which may charge users to access such features. For example, clicking on the link "For foreign students seeking information on US Colleges and Universities" on Houeix's website leads to the WorldStudent.com website "Features" page entitled "The Importance of Accreditation." (Plaintiff's Trial Exhibit 46). The WorldStudent accreditation web page has a right frame with blinking variable buttons, some of which have the logos and names of foreign schools or businesses. Savannah College argues that these blinking buttons are advertisements for different schools or businesses and, as such, make Houeix's use of the SCAD mark "in connection with the advertising" of the services or goods sold by the advertisers. Houeix concedes that clicking on one of these blinking buttons may lead to an advertisement. (Doc. 70, Proposed Finding of Fact #24). Likewise, clicking on the groups.yahoo/students forum link leads to a Yahoo!Groups forum page where Internet users can post messages for other Internet users to view. These pages in turn contain links for advertisements for third party products and services. (*See* Plaintiff's Trial Exhibits P-53, P-54 and P-84). Plaintiff's Trial Exhibit 54 is a copy of a yahoo student forum page which contains a box conspicuously labeled "advertisement" for "LifeScript" vitamins. Unlike the defendant's website in *Taubman* which contained direct advertising links on the homepage, Houeix's website contains links which when clicked lead to new websites which in turn contain advertising links thereon. The issue then becomes whether the two step process to reach the commercial content or advertisements on these web pages is sufficient to make Houeix's use of the SCAD mark one "in connection with the sale . . . or advertising of any goods or services." We think not.

21

In a case similar to the instant case, the district court in *Bosley Medical Institute, Inc. v. Kremer*, 2004 W.L. 964163, *8 (S.D. Cal. 2004), held that links to commercial sites one step removed from the defendant's complaint website were "insufficient to infuse [the defendant's] sites with a commercial purpose." *Id*. In *Bosley*, a dissatisfied former patient of the plaintiff Bosley Medical Institute, Inc., an organization which specialized in hair transplantation and restoration, purchased and registered the Internet domain names "bosleymedical.com" and "bosleymedicalviolations.com." The websites contained content critical of the plaintiff, descriptions of various governmental investigations into the plaintiff's services and business practices, and descriptions of medical board disciplinary actions against the plaintiff. The plaintiff argued that the defendant's websites made commercial use of the plaintiff's marks because the websites contained links to other hair industry websites. The *Bosley* Court held the fact that the critical websites contained links to other sites which in turn contained links to advertising about the plaintiff's competitors was too tenuous of a connection to constitute commercial use:

> Bosley does not dispute that Kremer's sites contain no paid advertising; rather, it points out that the links on Kremer's sites lead to other sites which contain links to advertising about Bosley's competitors. Kremer admits that those sites include links to commercial websites. However, the commercial content on those sites is one step removed from Kremer's own websites. Further, Kremer is not engaged in his own business enterprise through his websites. In *Taubman*, the Sixth Circuit found that the defendant had engaged in commercial use because his cybergriping site also contained a link to his Webfeats business. *See Taubman*, 319 F.3d at 775. Here, a review of Kremer's websites shows that their sole purpose is to provide critical content of Bosley and its services, and to inform the public about the various government inquiries into Bosley's business practices. The fact that Kremer's sites link to another site which in turn includes commercial links is insufficient to infuse Kremer's sites with a commercial purpose.

*Bosley Medical Institute*, 2004 W.L. 964163, *8.

This Court agrees with the rationale of *Bosley* and further finds that such rationale comports with the underlying purpose of the Lanham Act: to prevent the defendant from unfairly profiting or capitalizing on the plaintiff's goodwill and established reputation through the unauthorized use of a trademark. *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 964 (6th Cir. 1987). In the instant case, the links appearing on Houeix's website for WorldStudent.com, groups.yahoo/students forum, and Livejournal.com are not in themselves advertisements or offers to sell or distribute goods and services. There is nothing inherently commercial in the link "For foreign students seeking information on US Colleges and Universities" which leads to the WorldStudent.com accreditation web page. Likewise, the links to groups.yahoo/students forum and Livejournal.com are not in themselves advertisements or suggest any offer for the sale of goods or services. The undisputed evidence in this case shows that Houeix took no action to cause Mr. Murphy, plaintiff's witness, to select the links which eventually led to the web pages which in turn contained advertising. In fact, Mr. Murphy testified that he spent some time searching around the WorldStudent.com website to find the advertising links to "prove" his point that such sites were "commercial." To arrive at the sites containing commercial content requires a process which is two steps removed from the initial decision to select the scad.info site offering. The connection between clicking on scad.info and the subsequent sites which contain advertisements is too tenuous to make Houeix's sites "commercial" within the meaning of the Lanham Act. *Bosley*, 2004 W.L. 964163, *8. It is a stretch to say that Houeix is capitalizing on the SCAD mark to promote some business that is two steps removed from his web site. Therefore, the Court finds the links to WorldStudent.com, groups.yahoo/students forum, and LiveJournal.com on Houeix's website do not constitute a use

of the SCAD mark in connection with the advertising or sale of goods and services.

Next, Savannah College argues that Houeix has used the SCAD mark in connection with the sale or advertising of goods and services by interfering with the ability of Internet users to reach Savannah College's website. Houeix conceded that he chose to use the term "scad," in part, because he knew it would capture more web traffic at his site. Houeix also conceded that Internet users familiar with Savannah College may think the domain name scad.info is affiliated with Savannah College. Savannah College argues that once at Houeix's site, Internet users may become frustrated or confused and not continue to look for Savannah College's web site. The unstated conclusion of Savannah College's argument is that by diverting users from Savannah College's website Houeix has caused Savannah College economic harm. In a similar vein, Savannah College argues that Houeix's sites are designed to harm Savannah College commercially by posting information on his sites intended to dissuade potential students from attending or potential faculty from accepting positions at Savannah College. Savannah College argues that Houeix selects which emails to post on his sites, the majority of which are critical of Savannah College, and has posted allegations of fraudulent grading, rape, and death without evidence to confirm such allegations. In support of this argument, Savannah College cites *Planned Parenthood Federation of America, Inc. v. Bucci*, 1997 WL 133313 (S.D.N.Y. March 24, 1997), and *Jews for Jesus v. Brodsky*, 993 F. Supp. 282 (D.N.J.), *aff'd*, 159 F.3d 1351 (3d Cir. 1998), two cases construing whether the use of a mark is "commercial" for purposes of trademark dilution under 15 U.S.C. § 1125(c).

In *Planned Parenthood*, the defendant was an anti-abortion activist who registered the domain name "plannedparenthood.com" and set up a website advertising an anti-abortion book

24

entitled The Cost of Abortion.  The plaintiff Planned Parenthood Federation of America, Inc.

sought to enjoin the defendant from using the "plannedparenthood.com" domain.  The *Planned*

*Parenthood* court found the disputed domain name to be "commercial" for three reasons:  (1)

although the defendant did not profit personally from Internet sales, his "self-styled effort to

'plug' The Cost of Abortion [fell] within the purview of the commercial use requirement"; (2)

the defendant's use of the "plannedparenthood.com" domain was deemed "part and parcel" of

his broader efforts to solicit contributions for the anti-abortion movement; and (3) the

defendant's actions were "designed to, and do, harm plaintiff commercially." *Id*. at *5.

　　　In *Jews for Jesus v. Brodsky*, 993 F. Supp. 282 (D.N.J.), *aff'd,* 159 F.3d 1351 (3d Cir.

1998), the court held that the defendant's use of the plaintiff's mark in the domain name

"jewsforjesus.com" constituted a "commercial use" because the site was "a conduit" to another

of the defendant's webpages which conducted fund raising through the sale of merchandise.  In

addition, the court found the defendant's use of the mark and name of the plaintiff's organization

to be a commercial use because it was designed to harm the plaintiff by disparaging it and

inhibiting Internet users in locating the plaintiff's website. *Id*. at 308.  Relying on these cases,

Savannah College argues that Houeix's use of the scad.info domain to disparage Savannah

College and cause it economic harm constitutes a "commercial" use of the SCAD mark.

　　　The cases cited by Savannah College are distinguishable from the instant case.  While

Houeix uses the SCAD mark in his domain name like the defendants in *Planned Parenthood* and

*Jews for Jesus*, the Court determines that Houeix's use of the SCAD mark does not deter

Savannah College's commercial success in an unlawful manner.  Unlike the defendant in

*Planned Parenthood*, Houeix does not provide any goods or services for sale on his scad.info

25

site, nor does he endorse any particular product or service or solicit donations for any particular

cause.  Nor does his website link to any other website he owns for purposes of fundraising

through the sale of merchandise like the website in *Jews for Jesus*.  Rather, his site is a gripe site

containing information critical of Savannah College, including the "story" of his experiences at

Savannah College and the posting of similar critical views of the College from others.[7]   The

crux of the *Planned Parenthood* and *Jews for Jesus* cases is that  a "commercial" use is

established any time an unauthorized use of a protected mark hinders or impacts the commercial

success of the mark's owner or otherwise disparages the mark owner.  However, the Sixth

Circuit rejected this argument in *Taubman*, stating that "although economic damage might be an

intended effect of [the defendant's] expression, the First Amendment protects critical

commentary when there is no confusion as to source, even when it involves the criticism of a

business.  Such use is not subject to scrutiny under the Lanham Act." *Taubman*, 319 F.3d at 778.

*See also Bosley Medical Institute*, 2004 W.L. 964163, *8 (the defendant's "desire to undermine

Bosley's business, and his use of Bosley's marks to further that agenda, do not constitute a

commercial use of the marks."); *Ford Motor Co. v. 2600 Enterprises*, 177 F. Supp. 2d 661 (E.D.

Mich. 2001) (use of word "ford" in programming code found to be "noncommercial" despite

argument that use might disparage or otherwise commercially harm the mark owner); *Northland

Ins. Cos. v. Blaylock*, 115 F. Supp.2d 1108, 1122-23 (D. Minn. 2000) (upholding the defendant's

use of "northlandinsurance.com" to criticize plaintiff Northland Insurance Companies as

noncommercial speech).  Therefore, Houeix's use of the SCAD mark to provide critical

---

[7]         Houeix testified he tries to post only truthful information on his website.  Savannah College
disputes this.  This Court's job is not to determine the truth or falsity of the information posted on Houeix's website.
Houeix's state law claims have been dismissed and Savannah College has not brought an action for defamation, the
cause of action available in the event it believes Houeix's actions constitute defamation.

commentary on Savannah College does not constitute a commercial use of the mark.

Finally, Savannah College contends that Houeix's mere registration of the domain names scad.info and scad-and-us.info interferes with Savannah College's ability to engage in commerce. Mr. Murphy testified that colleges are increasingly using the .info domain to support their programs and Houeix's use of scad.info prevents Savannah College from being able to register and use the .info top level domain. Savannah College has cited to no legal authority, nor has the Court found any, which holds that the mere registration of a domain name which prevents the mark's owner from registering the same domain name constitutes a commercial use of the mark. While the Sixth Circuit has recognized that registering a domain name that includes a valid trademark with the intent to profit through reselling the domain name to the trademark's owner may constitute a commercial use under the Lanham Act, such instances are limited to where the defendant made a habit and business practice of such practices. *Taubman*, 319 F.3d at 776, citing *E & J Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 270 (5th Cir. 2002) (noting that defendant had made a business practice of selling domain names on eBay for no less than $10,000); *Panavision International, L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998). There is no evidence here that Houeix has attempted to sell the scad.info domain name to Savannah College. Therefore, the Court concludes that Houeix's use of the SCAD mark in his domain names is not in connection with the sale or advertisement of goods and services within the meaning of the Lanham Act. Since Houeix's use of the SCAD mark is not in connection with the sale or advertisement of goods or services, Savannah College's trademark infringement and unfair competition claims must be dismissed. *Taubman*, 319 F.3d at 774.

Assuming, arguendo, that Houeix's use of the SCAD mark is considered commercial

27

speech, i.e., "in connection with the sale . . . or advertising of any goods or services," the Court

finds such use is not likely to cause confusion in the minds of consumers about the origin of the

information contained in Houeix's websites as explained below.

**Likelihood of confusion**

Proof of infringement requires a showing that the "defendant's actual practice is likely to

produce confusion in the minds of consumers about the origin of the goods or services in

question." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, __ U.S. __, 2004 W.L.

2804921, *4 (Dec. 8, 2004). Whether there is a likelihood of confusion is the key question in

trademark infringement cases. *Bird*, 289 F.3d at 877, citing *Daddy's Junky Music Stores, Inc. v.

Big Daddy's Family Music Ctr.,* 109 F.3d 275, 280 (6th Cir. 1997) ("The touchstone of liability

under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion

among consumers regarding the origin of the goods offered by the parties."); *Champions Golf

Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116, 1123 (6th Cir. 1996)

(explaining that the central inquiry in claims of trademark infringement and unfair competition is

whether the defendant's use of the plaintiff's mark is likely to cause confusion). The Sixth

Circuit has developed an eight factor test for determining likelihood of confusion: (1) strength of

the plaintiff's mark, (2) relatedness of the goods or services, (3) similarity of the marks, (4)

evidence of actual confusion, (5) marketing channels used, (6) likely degree of purchaser care,

(7) defendant's intent in selecting its mark, and (8) likelihood of expansion of the product lines.

*Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir.

1982). The eight *Frisch's* factors "imply no mathematical precision, and a plaintiff need not

show that all, or even most, of the factors listed are present in any particular case to be successful." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988). "The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,* 931 F.2d 1100, 1107 (6th Cir. 1991). The "burden of proving likelihood of confusion (that is, infringement) [is] on the party charging infringement," in this case Savannah College. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, __ U.S. __, 2004 W.L. 2804921, *4 (Dec. 8, 2004). Analyzing the relevant factors, and for the reasons that follow, the Court concludes there is not a likelihood that consumers will be confused about the source of information conveyed on Houeix's websites.

   (1) strength of the plaintiff's mark

     "The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due." *Daddy's Junky Music Store*, 109 F.3d at 280. In determining the strength of the mark, the Court examines the distinctiveness of a mark and the public's ability to recognize it. *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003). Marks can be described as generic ("cereal"), descriptive ("Super Glue"), suggestive ("Citibank"), or fanciful/arbitrary (being completely fabricated by the trademark holder, such as "Kodak" and "Xerox"), with generic marks on the weak end of the spectrum and fanciful/arbitrary marks on the strong end. *See Toucan Golf, Inc.*, 337 F.3d at 624; *Daddy's Junky Music Stores*, 109 F.3d at 280-281. "A mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is

unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both." *Frisch's*, 759 F.2d at 1264.

The SCAD mark, being derived from the first letters of Savannah College of Art and Design, is a considered a fanciful mark. *See, e.g., YKK Corp. v. Jungwoo Zipper Co., Ltd.*, 213 F. Supp. 2d 1195, 1201 (C.D. Cal. 2002). The evidence also shows that Savannah College has spent considerable resources marketing the SCAD mark in promoting the school to prospective students and others. The mark is used in magazine and newspaper advertisements, brochures, and other publications which are distributed nationwide to prospective and current students, alumni, parents, and high schools. The SCAD mark is also displayed on numerous items that Savannah College sells through its bookstores, including clothing, notebooks, office paraphernalia, and others. While Houeix contends that the SCAD mark is almost always used in conjunction with one of the other marks registered by the Savannah College, i.e., the graphic of the turret or the Savannah College *of* Art *and* Design mark, the evidence shows that the SCAD mark is readily recognizable and likely to be associated with the Savannah College of Art and Design among prospective students of art and design colleges, parents of such students, and alumni of the Savannah College. The evidence does not show the SCAD mark has worldwide name recognition like "Kodak." However, among the relevant group of consumers in the field of higher education and in the State of Georgia, the SCAD mark is strong.

Houeix presents evidence that the SCAD mark is used by third parties in Internet domain names to identify other goods and services and argues that such use by third parties weakens the strength of the mark. *See Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 625 (6th Cir. 1998). For example, "scad.com" is the Internet address for a real estate organization in

South Carolina. "Scad.org" is the Internet address for the Smith County Appraisal District. While Houeix identified numerous other Internet domain names which use the term "scad," he was unable to verify that any of these websites are currently active with the exception of scad.com and scad.org. Because Houeix was unable to show that these other uses of the term "scad" are actively used in commerce, they cannot be considered as weakening the strength of the SCAD mark. *See Autozone, Inc. v. Tandy Corp.*, 373 F.3d 786, 794-95 (6th Cir. 2004). Thus, this factor weighs in favor of Savannah College.

(2) relatedness of goods and services

The Court considers the following three categories in determining the second factor of the relatedness of goods and services:

> First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely.

*Daddy's Junky Music Stores*, 109 F.3d at 282. In the instant case, the parties agree that they do not directly compete. Houeix offers no goods or services on his website or elsewhere. He does, however, offer information and critical commentary about Savannah College which is intended to reach prospective students, faculty, and others. Therefore, this case falls under the second category, and the likelihood of confusion will depend on other factors.

(3) similarity of the marks

In considering the similarity of the marks, a factor of considerable weight, the Court must

perform more than a side-by-side comparison of the competing marks. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002). Instead, "the marks must be viewed in their entirety and in context [and a] court must determine, in light of what occurs in the marketplace, whether the mark will be confusing to the public when singly presented." *Data Concepts*, 150 F.3d at 626. The Court "should examine the pronunciation, appearance, and verbal translation of conflicting marks." *Daddy's Junky Music*, 109 F.3d at 283. "[C]ourts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks 'may confuse consumers who do not have both marks before them but who may have a "general, vague, or even hazy, impression or recollection" of the other party's mark.'" *Id.*, quoting *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1188 (6th Cir. 1988)(quoting *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976). In other words, "the relevant inquiry is whether a particular trademark, when viewed alone, would lead to uncertainty about the goods or services that it identifies." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002).

In the instant case, the SCAD mark and scad.info differ in the latter's lack of capitalization and the addition of the .info in the domain name designation. The pronunciation of "scad" is the same in both the mark and domain name. In terms of Savannah College's website, scad.edu, the domain names scad.edu and scad.info are visually similar, with the exception of the first level domain of .edu and .info. *See PACCAR Inc. v. TeleScan Technologies, L.L.C.,* 319 F.3d 243, 252 (6th Cir. 2003)(defendant's domain names, "peterbiltnewtrucks.com" and "kenworthnewtrucks.com" appeared in same font and all lower case letters and have same appearance as plaintiff's domain names "peterbilt.com" and

"kenworth.com" and, excluding common descriptive words ("new trucks") following mark, each domain name contained exact character match to either "Peterbilt" or "Kenworth" mark supporting a finding of similarity of the marks).  While the "scad" portion of the domain names are similar, the Court must avoid a mere side-by-side comparison of the marks in determining whether Houeix's use of the SCAD mark is likely to confuse consumers or Internet users. *Therma-Scan*, 295 F.3d at 633.  The Court finds the Sixth Circuit's decision in *Taubman* to be helpful in answering this inquiry.

In *Taubman*, the Sixth Circuit compared the plaintiff's official website "theshopsatwillowbend.com" with the "fan" site created by the defendant, "shopsatwillowbend.com."  In examining the likelihood of confusion among customers, the Court of Appeals stated, "the only important question is whether there is a likelihood of confusion *between the parties' goods or services*." 319 F.3d at 776 (emphasis in the original), citing *Bird v. Parsons*, 289 F.3d 865, 877 (6th Cir. 2002).   The *Taubman* Court wrote, "[u]nder Lanham Act jurisprudence, it is irrelevant whether customers would be confused as to the origin of the web sites, unless there is confusion as to the origin of the respective products." *Taubman*, 319 F.3d at 776.  The *Taubman* Court went on to examine the content of the defendant's website and found that a conspicuous disclaimer informing customers they had not reached the plaintiff's official mall site and a hyperlink to the official site within the disclaimer dispelled any likelihood of confusion as to the source of the plaintiff and defendant's respective goods. *Id*. at 777.  "Here, a misplaced customer simply has to click his mouse to be redirected to Taubman's site." *Id*.

While there is no explicit  "disclaimer" or link to the official scad.edu website on Houeix's website, the website's homepage has a number of prominent features which

33

immediately alert the user to the fact that Savannah College is not the origin of the information and material contained therein.  A yellow and blue graphic that represents a famous Savannah, Georgia statue (not connected to Savannah College) is prominently displayed in the center of the web page.  A mirror image of ".edu" is overlaid on the graphic and superimposed on the graphic are the words, "Everything is different when you look at it from another point of view." (Joint Trial Exhibit 1).  The reversed version of the .edu serves to clarify Houeix's intention of criticizing Savannah College and reduces the likelihood of confusion to some extent.  The website also includes a prominent statement to the left of this graphic set out in bold-faced type: "Savannah College of Art and Design Fake Master Fraudulent Process."  In the middle of the page is a box containing announcements about the instant federal lawsuit displayed in red bold-face print. (Joint Trial Exhibit 1).   Directly below this box are the words "_For those who are new in that story_" with an italicized paragraph of  Houeix's own "story" explaining the origin and reasons for his website. (Joint Trial Exhibit 1).  A reasonable internet user would know by perusing the content of scad.info that Savannah College is not the source of the information contained therein.

Moreover, it is unlikely that a prospective student or faculty member searching the Internet for information about the Savannah College of Art and Design would be confused by Houeix's website because a search using one of the Internet search engines would display the scad.edu result, which ranks as the number one search result, before scad.info or scad-and-us.info.  The evidence at trial, as well as common experience, indicates that Internet search engines such as "Yahoo!" or "Google" are commonly used to assist users intending to access a party's products or services on the Internet.  Searches for Savannah College's official web page

on popular Internet search engines list Savannah College's website as their first or second "hit." As demonstrated at trial, a search using the term "scad" in the search engine "Yahoo!" yielded 141,000 results with Savannah College's website appearing as the first search result. Houeix's scad.info or scad-and-us.info websites were not within the first ten search results. It follows that any reasonable Internet user desiring information on the Savannah College of Art and Design would simply click on the first search result, i.e., the result for scad.edu, to obtain the information sought.

At trial, Savannah College demonstrated a search yielding results which placed Houeix's websites within the top ten search results. After performing a search using the term "scad" which yielded scad.edu as the number one search result, Mr. Murphy demonstrated a search using the term "scad college" following a prompt from the Yahoo! search engine. The search using "scad college" returned Houeix's scad.info and scad-and-us.info as the third and sixth search results respectively. Savannah College points out that the search results for Houeix's websites in Yahoo! do not clearly identify that the sites are unaffiliated with Savannah College and from all appearances the particular listing for scad-and-us.info is for a Savannah College site. (Plaintiff's Trial Exhibit 75). Based on this evidence, Savannah College argues that the relevant Internet user group would likely be confused as to the source of the websites.

The fallacy of this argument rests with the assumption that a user looking for the "official" Savannah College website and finding the scad.edu website as the number one search result would nevertheless ignore this result and perform yet a second search using the term "scad college." This is an illogical assumption that considerably weakens Savannah College's argument in this matter. In any event, similar to a user who mistakenly landed on the

35

defendant's website in *Taubman*, a visitor who is searching for Savannah College's official website and inadvertently lands on scad.info can simply hit the "back" button to immediately return the visitor to his or her point of origin.

Is it conceivable that an Internet user searching for information on Savannah College may initially type the URL[8] scad.info in the address box? Of course. Is it likely? No. The .edu domain is universally used by schools of higher education while the .info domain is relatively new. Thus, a user who is inclined to start his or her search with a URL is more likely to input scad.edu rather than scad.info.

The issue for the Court is the "likelihood" of confusion, not the mere "possibility" of confusion, among relevant consumers. *See, e.g., A & Houeix Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 205-206 (3d Cir. 1999) (en banc); *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998); *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 618 (7th Cir. 1995). This factor coupled with the sophistication of the user, as discussed below, indicates the likelihood of confusion in this case is minimal. Although a user may initially be confused over the origin of the domain name scad.info by viewing the domain name in isolation, when viewed in the context of Houeix's website there is little likelihood of confusion between the source of the educational services offered by Savannah College and the critical commentary offered by Houeix on his website. *Taubman*, 319 F.3d at 776.

In this regard, Savannah College argues that the "initial interest confusion" doctrine supports a finding that consumers or users who see the scad.info domain name and are familiar

---

[8]      URL is the acronym for Uniform Resource Locator, i.e., a world wide web address.

36

with Savannah College may believe, at least initially, that a site operated at that domain name

originates from Savannah College.  The initial interest confusion doctrine has been explained as

follows:

> Initial interest confusion, as coined by the Ninth Circuit, is a brand of confusion particularly applicable to the Internet. Generally speaking, initial interest confusion may result when a user conducts a search using a trademark term and the results of the search include web sites not sponsored by the holder of the trademark search term, but rather of competitors. The Ninth Circuit reasoned that the user may be diverted to an unsponsored site, and only realize that she has been diverted upon arriving at the competitor's site. Once there, however, even though the user knows she is not in the site initially sought, she may stay. In that way, the competitor has captured the trademark holder's potential visitors or customers.

*Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 55 F. Supp.2d 1070, 1074 (C.D.

Cal.), *aff'd*, 202 F.3d 278 (9th Cir. 1999).  The initial interest confusion doctrine has also been

portrayed as a form of "bait" and "switch" by permitting a competitor to effectively get its foot

in the door by confusing customers and thereby impacting the buying decisions of such

consumers.  *See Dorr-Oliver Inc. v. Fluid-Quip Inc.*, 94 F.3d 376, 382 (7th Cir. 1996).

The cases which support the "initial interest confusion" doctrine are of a far different

order than the situation faced by this Court.  The courts applying the initial interest confusion

doctrine as an element of the likelihood of confusion analysis faced situations where the

defendant had a commercial or financial incentive or motive for using the plaintiff's mark to

attract initial interest.  *See, e.g., Jews for Jesus v. Brodsky*, 993 F. Supp. 282 (D.N.J.), *aff'd*, 159

F.3d 1351 (3d Cir. 1998); *Planned Parenthood Federation of America, Inc. v. Bucci*, 1997 W.L.

133313 (S.D.N.Y. March 24, 1997).[9] *Cf. Northland Ins. Companies v. Blaylock*, 115 F. Supp.2d

1108, 1120 (D. Minn. 2000)(rejecting initial interest confusion doctrine in case involving

---

[9]     In this regard, see the Court's discussion of *Planned Parenthood* and *Jew for Jesus* at pages 25-26, *supra*.

defendant's use of plaintiff's mark in domain name of website that was critical of plaintiff's insurance services). The concern is that a trademark holder's competitor will gain a commercial or financial advantage by capturing the initial attention of consumers who were originally looking for the plaintiff's products and who "will simply decide the utilize [the defendant's] offerings instead." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999). In the instant case, unlike those cases applying the initial interest confusion doctrine, Houeix is not offering competing products or services for sale. Houeix is not attempting to gain financially or commercially by using the SCAD mark to lure users to his website. Rather, the objective of his website is to share his critical commentary on Savannah College and to provide a forum for others to do the same. "[W]hile defendant may arguably be trying to 'bait' Internet users, there is no discernable 'switch.'" *Northland Ins.*, 115 F. Supp.2d at 1120.

Savannah College cites the Sixth Circuit's decision in *PACCAR* in support of its argument that initial interest confusion applies in this case. While the Sixth Circuit recognized the initial interest confusion doctrine in *PACCAR*, 319 F.3d at 253, its decision two days later in *Taubman*, 319 F.3d at 776, failed to acknowledge the doctrine in a similar trademark infringement case. Both *PACCAR* and *Taubman* involved the use of the plaintiff's mark in the defendant's Internet domain address. *PACCAR* involved competing goods for sale over the Internet. In rejecting the argument that a disclaimer on the defendant's websites "peterbiltnewtrucks.com" and "kenworthnewtrucks.com" remedied any potential confusion with the plaintiff's websites "peterbilt.com" and "kenworth.com", the *PACCAR* Court stated that "[a] disclaimer disavowing affiliation with the trademark owner read by a consumer after reaching

38

the web site comes too late. This 'initial interest confusion' is recognized as an infringement under the Lanham Act." *PACCAR*, 319 F.3d at 253.

The Sixth Circuit in *Taubman*, however, found it irrelevant whether customers would be confused about the origin of the websites "theshopsatwillowbend.com" (the plaintiff's website) and "shopsatwillowbend.com" (the defendant's website) unless there was confusion as to the origin of the respective products. *Taubman*, 319 F.3d at 776. By finding that the disclaimer and hyperlink on the defendant's website in *Taubman* dispelled any likely confusion on the part of consumers, the Sixth Circuit necessarily rejected any initial interest confusion that consumers may experience by viewing the domain names only. Unlike *PACCAR*, the defendant in *Taubman* did not offer or advertise any goods or services for sale on his website, but used his website to post information critical of the plaintiff trademark holder.

In this Court's view, the *PACCAR* and *Taubman* decisions can be reconciled with reference to the purpose underlying the initial interest confusion doctrine: preventing competitors of a trademark holder from gaining an unfair financial or commercial advantage by luring unsuspecting users to their websites through use of the trademark. This Court has found no Sixth Circuit cases applying the initial interest confusion doctrine subsequent to *PACCAR*. Because this case is similar to *Taubman* and does not involve competition for goods or services like *PACCAR*, this Court will follow the decision in *Taubman* and declines to apply the initial interest confusion doctrine in this matter.

(4) evidence of actual confusion

While evidence of actual confusion is the best evidence of likelihood of confusion, the absence of actual confusion evidence is inconsequential. *PACCAR*, 319 F.3d at 252, citing *Data Concepts*, 150 F.3d at 626. "Where evidence of actual confusion exists, the weight to which such evidence is entitled varies depending upon both the type and amount of confusion that occurs." *Therma-Scan, Inc.*, 295 F.3d at 634, citing *Homeowners Group*, 931 F.2d at 1110.

In support of its contention that consumers are likely to be confused by Houeix's website, Savannah College submitted evidence of an email from a Savannah College alumna to an employee of Savannah College which states in pertinent part:

> I am so crushed right now, I went to the scad home page and I got this totally odd webpage which is heartbreaking if it is true. I am so confused since I have loved my 4 years there. . . . If you can please tell me what is going on if not I'll understand. . . .

(Plaintiff's Trial Exhibit 51). By order of October 14, 2004, the Court admitted such evidence over Houeix's objection but determined such evidence is entitled to little weight. (Doc. 63). Read in the context in which this statement was made, it appears that the source of the declarant's confusion was not Houeix's use of the SCAD mark in his website, but rather the content of the message posted on Houeix's website which apparently was contrary to the alumna's experience at Savannah College and her beliefs about the school's integrity. Even if the source of the declarant's confusion was Houeix's use of the mark in his website, this evidence of actual confusion is entitled to little weight because a single, brief instance of actual confusion is much less probative when measured in the context of the number of "hits" or page requests for the official scad.edu website. *See Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1110 (6th Cir. 1991)(noting that "the existence of only a

handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks may even lead to an inference than no likelihood of confusion exists"). Mr. Murphy testified there have been over 260 million "hits" or page requests for the scad.edu webpage seeking information on Savannah College. Evidence of a single, confused alumna provides only weak support for a finding of a likelihood of confusion. *Id. See also Therma-Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 635-36 (6th Cir. 2002). Likewise, the circumstantial evidence presented by Savannah College (two dozen phone calls to Savannah College and three emails to Houeix which indicated the scad.info website was discovered inadvertently) is inconsequential in view of the millions of requests for the scad.edu homepage. *Id*. Savannah College submits that the proper measure of confusion must be made by comparing the instances of confusion with the number of hits on Houeix's website, the site where the confusion will occur. Even if the number of hits on Houeix's website is relatively small, as Savannah College suggests, the number of hits on Savannah College's website indicates millions of Internet users have successfully located the College's official website and were not dissuaded by Houeix's site from continuing their search for the official College website. The scant evidence of actual confusion when measured against the number of actual visitors to Savannah College's official website provides weak support for a finding of likelihood of confusion.


(5) marketing channels used

In analyzing the factor of marketing channels used, the Court must examine the parties' predominant customers and their marketing approaches. *Therma-Scan, Inc.,* 295 F.3d at 636,

citing *Homeowners,* 931 F.2d at 1110.  In this case, both parties use the Internet in an attempt to

reach the same audience,  i.e., potential students and their parents and potential faculty of

Savannah College.  However, there is no evidence that Houeix is "marketing" anything on his

site.  Accordingly, Savannah College's claim of likelihood of confusion on this basis is

weakened.


(6) likely degree of purchaser care

        The criterion for determining whether an ordinary purchaser would differentiate between

products or services with similar marks is the exercise of ordinary caution. *Therma-Scan, Inc.*,

295 F.3d at 638.  Where the purchaser has a particular expertise or sophistication, or is making

an expensive or unusual purchase, it is appropriate to apply a higher degree of care. *Id.*;

*Homeowners Group*, 931 F.2d at 1111.  "This expectation of greater attention, where

appropriate, diminishes the likelihood of confusion." *Therma-Scan, Inc.*, 295 F.3d at 638.

        In this case, it is hard to imagine a more important or expensive purchase than a college

education.  The degree of care and thought involved in choosing a college is undoubtedly higher

than that required for most purchases.  While Savannah College argues that they typical high

school student cannot be classified as "highly sophisticated," this argument ignores the most

likely purchaser of a college education–the student's parents.  A college education is the type of

service that implicitly reflects a high degree of consumer care.  Moreover, it is common

knowledge that college-bound high school students are likely some of the most sophisticated

Internet users.  These students are included in a generation of children who have had Internet

training beginning in elementary school and who are more adept at navigating the Internet than

their parents or the majority of the judges on this Court. The likelihood that such a consumer would consider Houeix's site to be legitimately associated with Savannah College is minimal. *See Champions Golf Club Inc. v. The Champions Golf Club Inc.,* 78 F.3d 1111, 1120 (6th Cir. 1996) (court must inquire into whether buyers would accidentally purchase other company's product and whether sophisticated purchaser might be confused as to affiliation).


(7) <u>intent in selecting its mark</u>

"If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners Group*, 931 F.2d at 1111. "Intent is relevant because purposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user." *Daddy's Junky Music Stores*, 109 F.3d at 286. While proof of intent to infringe on a mark is not necessary to show likelihood of confusion, "the presence of that factor strengthens the likelihood of confusion." *Wynn Oil Co. v. American Way Svc. Corp.*, 943 F.2d 595, 602 (6th Cir. 1991). "Circumstantial evidence of copying, particularly the use of a contested mark with knowledge of the protected mark at issue, is sufficient to support an inference of intentional infringement where direct evidence is not available." *Therma-Scan*, 295 F.3d at 638-39. Lack of intent, however, neither reduces nor increases the probability of confusion. *Daddy's Junky Music Stores, Inc.,* 109 F.3d at 286.

In this case, the Court finds credible Houeix's testimony that his purpose in creating *scad.info* was to provide a site for communicating his negative experiences with Savannah College and to provide a forum for others to report their experiences. Houeix's intent also was

43

to provide information to foreign students on accreditation and other information he believed was important. At the time Houeix registered the domain name scad.info, Savannah College had not yet registered the SCAD mark with the United States Patent and Trademark Office. On the other hand, Houeix admitted he chose the "scad" portion of his scad.info and scad-and-us.info domains to convey not only to the purpose of the website, i.e., to "share, communicate and disclose" information about Savannah College, but to specifically refer to the College. Houeix also admitted that the websites are designed to target persons who are affiliated with the College or who may one day be affiliated with the College. On balance, this factors weighs in favor of Savannah College on the issue of likelihood of confusion.

(8) likelihood of expansion of the product lines

Savannah College has presented no evidence that suggests that Houeix is likely to begin competing with it in the provision of art and design education. This factor is neutral on a finding of likelihood of confusion.

In summary, Savannah College has demonstrated a likelihood of confusion based upon two factors only: the strength of the SCAD mark and, to a lesser extent, Houeix's intent in selecting the mark. The other factors are either neutral or do not support a finding likelihood of confusion. At bottom, the question for the Court is whether, considering all the *Frisch's* factors, there is a likelihood that consumers will be confused about the source of the information conveyed on Houeix's scad.info or scad-and-us.info sites. *Taubman*, 319 F.3d at 776. Given the prominent features of Houeix's website which alert Internet users of the critical nature of his commentary concerning Savannah College, any reasonable Internet user would readily ascertain

44

that Houeix's sites are not affiliated with or sponsored by Savannah College.  There is little

evidence of actual confusion.  The sophistication of the likely Internet user group coupled with

the expense of a college education indicate that users will use a greater degree of caution in

examining Houeix's sites and are not likely to believe Savannah College is the sponsor or creator

thereof.  Given these factors, any likelihood of confusion is relatively minimal.  Savannah

College has failed to show that Houeix's actions create a likelihood of confusion and has

therefore failed to establish its trademark infringement and unfair competition claims.


B.  TRADEMARK DILUTION CLAIM

       The Federal Trademark Dilution Act of 1995 (FTDA) amended section 43 of the Lanham

Act to include a remedy for "dilution of famous marks." 15 U.S.C. § 1125.  Section 43 of the

Lanham Act provides in relevant part that "[t]he owner of a famous mark shall be entitled . . .  to

an injunction against another person's commercial use in commerce of a mark or trade name, if

such use begins after the mark has become famous and causes dilution of the distinctive quality

of the mark." 15 U.S.C. § 1125(c)(1). Dilution is defined as "the lessening of the capacity of a

famous mark to identify and distinguish goods or services, regardless of the presence or absence

of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of

confusion, mistake, or deception." 15 U.S.C. § 1127. To establish its trademark dilution claim

under 15 U.S.C. § 1125(c), Savannah College must show that its mark (SCAD) is (1) famous;

and (2) distinctive, and that Houeix's use of the mark is (3) a commercial use in commerce; (4)

subsequent to plaintiff's mark becoming famous; and (5) causing actual dilution of the

distinctive quality of the SCAD mark.  *See AutoZone*, 373 F.3d at 802; *Kellogg Co. v. Toucan*

*Golf, Inc.*, 337 F.3d 616, 628 (6th Cir. 2003).   Federal law also explicitly exempts from coverage three uses of trademarks that, though potentially dilutive, are nevertheless permitted: comparative advertising; news reporting and commentary; and noncommercial use. 15 U.S.C. § 1125(c)(4)(B).

In this case, Savannah College's dilution claim fails because Savannah College has not established that Houeix's use of the SCAD mark was a "commercial use." 15 U.S.C. § 1125(c). As discussed above in connection with the trade infringement and unfair competition claims, Houeix's use of the SCAD mark is not a commercial use.  Houeix's websites contain his critical commentary of the College and postings from others who, for the most part, share similar views. Houeix's use of the SCAD mark is for noncommercial commentary, and as noncommercial speech is exempt from the Act.  Thus, Houeix's noncommercial use of the SCAD mark is not actionable under the Lanham Act. *See* 15 U.S.C. § 1125(c)(4)(B).   *See, e.g., Bosley Medical Institute, Inc. v. Kremer*, 2004 W.L. 964163 (S.D. Cal. 2004); *Northland Ins. Companies v. Blaylock*, 115 F. Supp.2d 1108, 1123 (D. Minn. 2000); *Bally Total Fitness Holding Corp. v. Faber*, 29 F. Supp. 2d 1161 (C.D. Cal. 1998). *Cf. Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809- 10 (6th Cir. 2004)(defendant's registration of domain name "lucasnursery.com" and creation of website for purposes of complaining about allegedly bad landscaping services was not a commercial use under Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)).  Because Savannah College has failed to establish an essential element of its trademark dilution claim, the Court need not review the remaining elements. Accordingly, Savannah College's trademark dilution claim must be dismissed.

Based upon the foregoing findings of fact and conclusions of law, this Court concludes

that Savannah College has failed to establish its trademark infringement, unfair competition, and

trademark dilution claims.  The Court therefore enters judgment in favor of Houeix.  In

accordance with this opinion, the Clerk of the Court is directed to enter JUDGMENT in favor of

defendant Houeix.

**IT IS SO ORDERED.**

Date:   12/20/2004               s/Timothy S. Hogan
                                          Timothy S. Hogan
                                          United States Magistrate Judge